# In The Matter Of:

*Jon Batts v. Remington Arms Company, LLC*
*USDC WDT, Waco Div.; Case No. WA:17-CV-00346-RP*

---

*Charles Wayne Powell*
*June 19, 2019*

---



We
speak
your
language.

228 Robert S. Kerr Avenue, Suite 840
Oklahoma City, OK 73102
405-236-8426 * Fax 405-236-8429
LegaleseReporting@gmail.com

EXHIBIT 3

```
         IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF TEXAS
                     WACO DIVISION

JON BATTS,                    )
                              )
        Plaintiff,            )
                              )
vs.                           ) Case No. WA:17-CV-00346-RP
                              )
REMINGTON ARMS COMPANY,       )
LLC,                          )
                              )
        Defendant.            )




                    *  *  *  *  *

   VIDEOTAPED DEPOSITION OF CHARLES WAYNE POWELL

      TAKEN ON BEHALF OF THE DEFENDANT

         IN OKLAHOMA CITY, OKLAHOMA

            ON JUNE 19, 2019

               *  *  *  *  *




  Reported By:  Theresa A. White, CSR, RPR, RMR, CRR

                  *  *  *  *  *

          LEGALESE REPORTING SERVICES
               Court Plaza Building
       228 Robert S. Kerr Avenue, Suite 840
          Oklahoma City, Oklahoma  73102
       Phone 405-236-8426 * Fax 405-236-8429
              www.LegaleseReporting.com
```

EXHIBIT 3

```
 1              A P P E A R A N C E S
 2   For the Plaintiff:
         Robert M. Meador, Esq.
 3       RAD LAW FIRM
         8001 LBJ Freeway, Suite 300
 4       Dallas, TX  75251-1321
         972-661-1111
 5       rmeador@radlawfirm.com

 6   For the Defendant:
         Steven E. Danekas, Esq.
 7       SWANSON MARTIN & BELL, LLP
         2525 Cabot Drive, Suite 204
 8       Lisle, IL  60532
         312-923-8273
 9       sdanekas@smbtrials.com
            and
10       Mitchell C. Chaney, Esq.
         McGINNIS LOCHRIDGE
11       600 Congress Avenue, Suite 2100
         Austin, TX  78701
12       512-495-6198
         mchaney@mcginnislaw.com
13
14   Also Present:
         Derek Watkins
15
     Videographer:
16       Ken L. Young, CLVS
17
18
19
20
21
22
23
24
25
```

EXHIBIT 3

```
1                     TABLE OF CONTENTS

2                         EXAMINATION
   Description                              Page  Line
3
   CHARLES WAYNE POWELL,.....................   5    20
4  Direct Examination By Mr. Danekas..........   5    23
   Cross Examination By Mr. Meador........... 204    17
5  Redirect Examination By Mr. Danekas........ 247   23

6                      *  *  *  *  *

7                     PLAINTIFF EXHIBITS
   Description                              Page  Line
8
       1 -  Curriculum vitae.................. 205    8
9                      *  *  *  *  *
10
                     DEFENDANT EXHIBITS
11 Description                              Page  Line

12     1 -  Defendant's Second Amended
            Notice of Deposition of Charles
13          Powell...........................  69    18

14     2 -  1/14/19 Report................... 165    25

15     4 -  6/3/19 Report.................... 166     2

16     8 -  Mr. Powell's paper file..........  87    21

17    10 -  Document showing amounts paid to
            SSEC in the Harris lawsuit for
18          2012-2018....................... 253     3

19    11 -  Document showing amounts paid to
            SSEC in the Harris lawsuit for
20          2019............................ 254     8

21    21 -  Photo of the subject barrel lug... 177   14

22    23 -  Owner's Manual Break-Action
            Firearms H&R..................... 150     7
23
      38 -  Nine pages of Mr. Powell's
24          handwritten notes on graph paper..  71    8

25
```

EXHIBIT 3

```
 1              DEFENDANT EXHIBITS CONTINUED

 2     Description                           Page  Line

 3     39 -  Folder labeled "Technical
             Literature" with documents
 4           inside...........................   74      4

 5     40 -  Folder labeled "Radiography"
             with documents inside............   74     19
 6
       41 -  Folder labeled "Thrust Load of
 7           Breech/Lugs" with documents
             inside...........................   75     13
 8
       42 -  Folder labeled "Strain Gage"
 9           with documents inside............   75     22

10     43 -  Folder labeled "Fuji Prescale
             Film" with documents inside.......   76      2
11

12                     * * * * *

13          EXHIBITS MARKED IN A PREVIOUS DEPOSITION

14     Description                           Page  Line
             Plastic box containing ammo
15     24 -  (Marked in Jon Batts' deposition)..   30      2

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 3

```
1              S T I P U L A T I O N
2          It is stipulated that the deposition of
3  CHARLES WAYNE POWELL may be taken pursuant to the
4  Federal Rules of Civil Procedure and pursuant to
5  Notice on June 19, 2019, beginning at 10:06 a.m.
6  before Theresa A. White, CSR, RPR, RMR, CRR.
7                    * * * * *
8          VIDEOGRAPHER:  We're on the record at 10:06
9  on Wednesday, June 19th, 2019.  This is the
10 videotaped deposition of Charles Powell in the matter
11 of Jon Batts versus Remington Arms Company, LLC,
12 filed in U.S. District Court for the Western District
13 of Texas, Waco Division.  If the attorneys will state
14 their appearances, and the witness may be sworn.
15         MR. MEADOR:  Robert Meador for the plaintiff
16 Jon Batts.
17         MR. DANEKAS:  Steven Danekas on behalf of
18 Defendant Remington Arms.
19         MR. CHANEY:  Mitchell Chaney for Remington.
20              CHARLES WAYNE POWELL,
21 having been duly sworn or affirmed, was examined and
22 testified as follows:
23              DIRECT EXAMINATION
24 BY MR. DANEKAS:
25    Q    You are Charles Powell?
```

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 5

1         S T I P U L A T I O N
2      It is stipulated that the deposition of
3  CHARLES WAYNE POWELL may be taken pursuant to the
4  Federal Rules of Civil Procedure and pursuant to
5  Notice on June 19, 2019, beginning at 10:06 a.m.
6  before Theresa A. White, CSR, RPR, RMR, CRR.
7                 * * * * *
8      **VIDEOGRAPHER:** We're on the record at 10:06
9  on Wednesday, June 19th, 2019.  This is the
10 videotaped deposition of Charles Powell in the matter
11 of Jon Batts versus Remington Arms Company, LLC,
12 filed in U.S. District Court for the Western District
13 of Texas, Waco Division.  If the attorneys will state
14 their appearances, and the witness may be sworn.
15     **MR. MEADOR:** Robert Meador for the plaintiff
16 Jon Batts.
17     **MR. DANEKAS:** Steven Danekas on behalf of
18 Defendant Remington Arms.
19     **MR. CHANEY:** Mitchell Chaney for Remington.
20         CHARLES WAYNE POWELL,
21 having been duly sworn or affirmed, was examined and
22 testified as follows:
23         **DIRECT EXAMINATION**
24 BY MR. DANEKAS:
25    Q  You are Charles Powell?

Page 6

1     A  Yes, sir.
2     Q  Mr. Powell, in this case is it your opinion
3  that Mr. Batts was using proper, factory-compliant
4  ammunition at the time of the incident?
5     A  Yes.
6     Q  Is it your opinion that when Mr. Batts pulled
7  the trigger on the incident round, that there was
8  some engagement between the barrel catch and the
9  barrel lug?
10    A  Yes.
11    Q  Is it your opinion that the force of the shot
12 that Mr. Batts fired caused the barrel lug to
13 disengage from the barrel catch?
14    A  Yes.
15    Q  Is it your opinion that the disengagement
16 caused the action to open?
17    A  Yes.
18    Q  Is it your opinion that when the action
19 opened far enough, there was still pressure in the
20 bore sufficient to propel the cartridge case rearward
21 with such energy that it pierced Mr. Batts' glasses
22 and entered his eye?
23    A  Yes.
24    Q  Is it your opinion that the bullet lodged in
25 the barrel because there was insufficient force to

Page 7

1  propel the bullet out of the barrel?
2     A  Yes.
3     Q  And is it your opinion that there was
4  insufficient force to propel the bullet out of the
5  barrel because the force went rearward to propel the
6  cartridge case out of the chamber?
7     A  Yes, it is.
8     Q  So is it your opinion that the barrel catch
9  and the barrel lug began to disengage before the
10 bullet left the cartridge case?
11    **A  I don't know.  I didn't determine where the**
12 **bullet was when the disengagement between the latch**
13 **and the barrel lug happened.**
14    Q  What was the pressure created by the incident
15 round?
16    **A  Well, I didn't measure that either, but**
17 **standard pressures would be less than 58,000 psi.**
18    Q  For Subsonic 300 Blackout rounds?
19    **A  Well, that's the SAAMI maximum for that**
20 **cartridge.  Depending on what the propellant was, it**
21 **would be more or less than that.  Well, not more than**
22 **that, but certainly less.  It could be less than**
23 **that.**
24    Q  Do you have an opinion as to the range of
25 what the pressure was from the incident round?

Page 8

1     **A  No.  I haven't tested any of the incident**
2  **rounds.  In my testing with exemplar ammunition**
3  manufactured by Hornady, the same bullet and subsonic
4  **round pressures were around 30,000 psi.**
5     Q  The pressures are different between subsonic
6  and hypersonic rounds; is that correct?
7     **A  I haven't measured the difference between the**
8  **two, but it could be, yes.**
9     Q  But it is your opinion that the disengagement
10 between the barrel catch and the barrel latch
11 occurred causing the action to open prior to -- or
12 before the bullet had an opportunity to exit the
13 barrel?
14    **A  Yes.**
15    Q  What is the range of pressures for a standard
16 factory-compliant subsonic 300 Blackout round?
17    **A  I've seen ranges on the industry literature**
18 **between probably around 15,000 to 35,000 psi for**
19 **subsonic.**
20    Q  You used the term I think "factory
21 pressures."  How do you define factory pressures?
22    **A  Those listed in factory handloading manuals.**
23    Q  Have you replicated Mr. Batts' incident?
24    **A  I have not.**
25    Q  Have you tried?

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 9

1    A   No.
2    Q   Why not?
3    A   The physical evidence I think shows exactly
4  what happened.  I haven't felt the need to use an
5  exemplar rifle to fire a dangerous condition that
6  might result in someone's injury.
7    Q   Can you think of any way to attempt to
8  replicate Mr. Batts' incident without endangering any
9  participants?
10   A   Certainly you could devise a system and fire
11 it remotely in an enclosed space so that it couldn't
12 injure anyone, yes.  I don't have access to that
13 facility.  It would have to be something that I would
14 specifically either design or retain someone else to
15 do.
16   Q   But in any event, in this case you did not do
17 that?
18   A   That's correct.
19   Q   If you were to do that in an attempt to
20 replicate Mr. Batts' incident, what would you do?
21 How would you do it?
22   A   I haven't given it consideration, but it
23 would be related to low engagement between the latch
24 and barrel lug, as well as firing a standard
25 cartridge, a standard subsonic 300 AAC Blackout

Page 10

1  cartridge.
2    Q   I noticed, Mr. Powell, in some of the videos
3  you produced to -- or that were produced to us
4  yesterday, they were videos of your test-firing your
5  exemplar in late May at a range; correct?
6    A   Yes.
7    Q   And I noticed that in some of those videos,
8  sir, that you activated the trigger, it appeared,
9  remotely by use of a string or a cord; is that
10 correct?
11   A   Correct.
12   Q   Why did you do that?
13   A   Because I was firing the firearm in a
14 non-standard method, by pouring oil down the barrel,
15 as had been done by Mr. Batts, and I was unsure as to
16 what would happen.  So I used a string to activate
17 the trigger and stood well away behind the screen.
18   Q   My understanding, and we'll get into this a
19 little bit later, but my understanding is that your
20 range firing involved 13 firings.  The first four
21 were without any oil in the chamber; correct?
22   A   Yes.
23   Q   The -- then you put oil in the chamber and
24 fired three rounds?
25   A   Correct.  Three different times basically.

Page 11

1    Q   Okay.  You then cleaned the bore with a bore
2  snake and a patch; correct?
3    A   No, sir.  After each series of three shots,
4  after applying oil in the barrel, I cleaned the
5  barrel, and I didn't use a bore snake but utilized
6  just a cleaning rod and patches and a bronze brush.
7    Q   Okay.  Then you poured -- then you placed
8  more oil for a second series of firings; correct?
9    A   A second series of three shots.  I would
10 apply more oil the first time and then fire three
11 shots and did that three times.
12   Q   Then after the second series of firing after
13 applying oil, you again cleaned the bore?
14   A   Yes, sir.
15   Q   And then applied oil again and fired three
16 more rounds?
17   A   Correct.
18   Q   Was the engagement of the exemplar rifle that
19 you were using for the range-firing the same
20 engagement for each of the 13 discharges?
21   A   Yes.  As best I could tell, it remained the
22 same during all of the discharges.
23   Q   And you were determining the amount of
24 engagement between the barrel catch and the barrel
25 lug by using an iPhone to record the engagement

Page 12

1  between the barrel catch and the barrel lug through a
2  hole you or someone else at your direction had
3  created in the side of the rifle?
4    A   Correct.  That model rifle has a viewport and
5  it's just small.  So I had had a machinist enlarge it
6  so I could get a camera and enough light in to take
7  pictures of it.  So I recorded it in slow motion with
8  the iPhone and then would visually look at it after
9  each test to make sure it was still latched.
10   Q   I noticed in one of the photographs you
11 produced to us, Mr. Powell, that at some point you
12 measured the length of engagement on the barrel lug
13 of the subject rifle.
14   A   Yes.  That was done off the CAT scan.
15   Q   Have you ever measured the length of
16 engagement as reflected by the wear pattern on your
17 exemplar rifle?
18   A   I don't recall.  I may have, but I certainly
19 looked at the engagement directly through the side
20 port.
21   Q   Okay.  Is it your opinion that viewing the
22 engagement between the barrel catch and the barrel
23 lug through the side port can determine for you how
24 much engagement there is between the barrel catch --
25 the surface of the barrel catch and the barrel lug?

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

---

Page 13

1    A  Sure.  That's a direct observation, looking
2  through the viewport.
3    Q  Is the barrel lug a flat surface?
4    A  Basically, yes.
5    Q  Is the barrel -- the surface of the barrel
6  catch, which engages with the barrel lug, is that a
7  flat surface?
8    A  I don't recall offhand.  It may be slightly
9  curved, but it's basically flat, yes.
10   Q  Do you consider this case to be one of a
11  failure of material?
12   A  No.  I believe that the materials that were
13  utilized in the construction of the subject rifle
14  were adequate.
15   Q  Were?
16   A  Were adequate.  I saw no -- no deviance of
17  those materials, nor did I test them for deviance
18  from the drawings, the engineered drawings from
19  Remington.
20   Q  Did you conduct a failure analysis in this
21  case?
22   A  Yes.
23   Q  Are there generally accepted procedures for
24  conducting a failure analysis?
25   A  There are different types of guidelines for

---

Page 14

1  conducting failure analysis projects, depending on
2  the project.
3    Q  Did you follow any such guidelines in your
4  work in this case?
5    A  In general, yes.
6    Q  Which ones?
7    A  Well, I can't point to a specific one.  I
8  haven't researched that; but in general, all my
9  failure-analysis projects involve the evaluation of
10  the failure, the determination of measurements, and
11  what particularly caused a failure, and then at times
12  evaluating how that failure occurred through testing
13  of exemplars.
14   Q  Where did you get the exemplar that you have
15  used in this case?
16   A  I purchased it used as a -- from an online
17  seller.
18   Q  When you first get involved in a case,
19  Mr. Powell, and you're getting up to speed on the
20  incident, do you consider the different types of
21  scenarios that could have caused the incident
22  involved in the case?
23   A  Yes.
24   Q  And then as you proceed through your
25  analysis, do you then eliminate some of those

---

Page 15

1  possibilities?
2    A  Correct.
3    Q  In this case, what possible scenarios did you
4  first consider as to what caused or could have caused
5  the incident?
6    A  I think initially we -- I spoke to Mr. Meador
7  and discussed the case with him and discussed that
8  there could have been a material defect or failure
9  inside the rifle.  There could have been a
10  high-pressure round fired in the rifle.  Those are
11  the first two things we discussed and determined that
12  we wanted to radiograph the rifle to see if -- what
13  we could see inside the rifle, and we saw that it was
14  not latching correctly.
15   Q  Okay.  The second you said was a
16  high-pressure round.  What was the first possibility
17  that you mentioned?
18   A  A material defect, a failure of one of the
19  components inside the rifle.
20   Q  Okay.  And I think with regard to that first
21  possibility, a material defect, you ruled that out?
22   A  Well, we didn't see any broken parts inside
23  the rifle.
24   Q  And you told me a minute ago that you don't
25  believe that there is any failure of materials in

---

Page 16

1  this case?
2    A  That's correct.
3    Q  Okay.  And did you also rule out the second
4  possibility that there was a high-pressure round in
5  the rifle at the time of the incident?
6    A  Yes.
7    Q  How did you do that?
8    A  Evaluation of the materials of the rifle.
9  Once we could disassemble it and look at it in CAT
10  scan, there were no parts that would have been
11  damaged by high pressure such as the plastic trigger
12  guard, some of the other components that are
13  stretched out when a high-pressure round is fired.
14   Q  If there had been a high-pressure round that
15  caused the engagement between the barrel catch and
16  the barrel lug to disengage, you would expect to see
17  damage to both of those surfaces; correct?
18   A  You would expect to see a lot of damage, yes.
19   Q  And you did not see a lot of damage on either
20  of those surfaces of this rifle; correct?
21   A  On any of the surface where you would expect
22  to see high-pressure damage.
23   Q  Did you see any damage that you believed to
24  have been caused as a result of the incident on the
25  surface of the barrel catch?

---

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 17

1    A  Well, just that it showed that it was not
2  engaging fully.  There was no physical damage other
3  than the markings to show that it wasn't engaging
4  correctly.
5    Q  Specifically referring to the incident as
6  causing damage, did you see any damage on the barrel
7  catch that in your opinion was caused by the
8  incident?
9    A  It was difficult to tell if it was the
10  incident; but it was in previously-fired rounds, you
11  could see small particle compression and damage on
12  the barrel lug particularly.  Not specifically the
13  catch but the barrel lug.
14    Q  Where on the barrel lug specifically?
15    A  Near -- near the end.  That first 40 or
16  50/thousandths of engagement, you saw particles
17  mashed up and -- gosh, I don't know how better to
18  describe it, but something totally different than you
19  would during normal engagement.
20    Q  So are you saying that that was caused by the
21  incident?
22    A  It was caused by firing the rifle when the
23  engagement was not correct.
24    Q  What is your understanding of the number of
25  times this rifle had been fired?

Page 18

1    A  As far as I know, three times.
2    Q  Is it your understanding that the rifle was
3  new on the day of the incident?
4    A  That's what Mr. Batts testified to, correct.
5    Q  So, Mr. Powell, if I understand the sequence
6  of events in your opinion, the incident cartridge --
7  Mr. Batts inserted the incident cartridge into the
8  chamber; correct?
9    A  Yes.
10    Q  He then closed the barrel, and the barrel
11  catch and the barrel lug engaged?
12    A  Yes.
13    Q  Correct?
14    A  To a small extent.
15    Q  Do you have an opinion as to the extent of
16  the engagement at the time that Mr. Batts loaded the
17  incident round and closed the barrel?
18    A  I think based on my evaluation of the
19  markings on the barrel lug -- that's my supplemental
20  report -- I believe it was like 60/thousandths of an
21  inch.
22      Yes, .0601 inches.
23    Q  And what's the basis for your opinion that
24  that was the extent of the engagement at the time of
25  the incident?

Page 19

1    A  Measurement of the engagement on the CAT
2  scan, as well as evaluation of the damage on the
3  latch and the barrel lug.
4    Q  What -- we'll get back to that in a second.
5      So after Mr. Batts closed the barrel, there
6  was some engagement between the barrel catch and the
7  barrel lug; correct?
8    A  I believe so, yes.
9    Q  He then cocked the hammer?
10    A  Correct.
11    Q  He then pulled the trigger; correct?
12    A  Yes, correct.
13    Q  That drove the firing pin into the primer;
14  correct?
15    A  Yes.
16    Q  The primer detonated?
17    A  Yes.
18    Q  Correct?  The round then developed pressure
19  of approximately 30,000 psi?
20    A  Correct, based on my measurement of the
21  exemplar and evaluation of the components that the
22  ammunition was manufactured from.
23    Q  So the incident round in your opinion
24  developed a pressure of approximately 30,000 psi?
25    A  Correct.  I obviously haven't measured it,

Page 20

1  but I believe that's correct.
2    Q  And that's based on your testing of Hornady
3  factory rounds with your exemplar?
4    A  Correct.
5    Q  The bullet then began to go down the barrel;
6  correct?
7    A  Correct.
8    Q  At some point, the barrel catch and barrel
9  lug disengaged, and the action of the rifle began to
10  open; correct?
11    A  Correct.
12    Q  The pressure still in the bore caused the
13  brass to be ejected rearward into Mr. Batts; correct?
14    A  Yes.
15    Q  And when that happened, the pressure inside
16  the bore was no longer and the bullet could no longer
17  travel down the barrel; correct?
18    A  Correct.
19    Q  Do you agree that in a case in which you're
20  conducting a failure analysis, often a number of
21  factors frequently interrelated must be understood to
22  determine the cause of the failure?
23    A  Yes.
24    Q  Do you agree that the analyst must carefully
25  examine and evaluate all evidence available, then

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 21

1 prepare a hypothesis of what could have caused the
2 incident?
3    **A   In general, yes.**
4    Q   What was your hypothesis of what could have
5 caused Mr. Batts' incident?
6    **A   That the barrel was improperly latched as a**
7 **result of manufacture.**
8    Q   Was that the only hypothesis that you
9 considered?
10   **A   Well, we considered all possibilities until**
11 **the CAT scans were completed and the rifle was**
12 **disassembled and examined.**
13   Q   When you say "all possibilities," you've
14 mentioned to me before a failure of parts?  Breakage.
15   **A   Correct.**
16   Q   You mentioned to me an overpressured shell.
17   **A   Correct.**
18   Q   And then you've also mentioned the -- what
19 you believe to be insufficient engagement?
20   **A   Of the latch, correct.**
21   Q   Of the latch.  Were those the only three
22 possibilities that you considered?
23   **A   Yes.**
24   Q   And when did you rule out the first
25 possibility?  Namely, that some part had failed or

Page 22

1 broken?
2   **A   When we could examine the internal components**
3 **first via x-ray and then via CAT scan.**
4   Q   My understanding from your file, Mr. Powell,
5 that in December of 2016, you had the subject rifle,
6 Mr. Batts' rifle, and your exemplar rifle x-rayed; is
7 that correct?
8   **A   Yes.**
9   Q   You then with Mr. Watkins, our expert, at
10 North Star Laboratories in Minnesota in November of
11 '17 had the subject rifle, Mr. Batts' rifle,
12 CAT-scanned; correct?
13   **A   Correct.**
14   Q   Did you rule out the first possibility that
15 the -- that there was a failure of material or broken
16 material after you x-rayed the subject rifle in
17 December of '16?
18   **A   No.  The x-rays are not sufficiently accurate**
19 **in order to determine the -- all of the different**
20 **components inside the rifle.  You could just see the**
21 **improper engagement.**
22   Q   At the time of the CAT scan in November of
23 2017, did you then rule out the first possibility?
24 Namely, that there could have been a breakage or
25 failure of parts?

Page 23

1   **A   Yes, after the evaluation of the CAT scan,**
2 **correct.**
3   Q   And when did you rule out the second
4 possibility, that is, of an overpressured shell?
5   **A   After the disassembly and examination at**
6 **North Star Imaging, as well as the CAT scan.**
7   Q   Do you agree, Mr. Powell, that if the failure
8 can be duplicated under controlled, simulated service
9 conditions, much can be learned about how the failure
10 actually occurred?
11   **A   The testing can help you evaluate how things**
12 **occurred, whether it's testing that shows a negative,**
13 **such as the testing I did, showing an improperly**
14 **latched rifle doesn't open, as well as testing if you**
15 **want to try to duplicate the dangerous condition of**
16 **Mr. Batts, it can also tell you something.**
17   Q   Well, you would agree that if you can
18 replicate the incident, much can be learned about how
19 the failure actually occurred?
20   **A   It can, yes.**
21   Q   Mr. Powell, with regard to your opinion that
22 Mr. Batts was using proper factory-compliant
23 ammunition at the time of the incident, I take it
24 that that includes your opinion that he was using the
25 proper propellant?

Page 24

1   **A   As far as I know, he was using a ball**
2 **propellant of the appropriate amount within this**
3 **cartridge case.  And by factory -- by "industry**
4 **compliant," I think what I would prefer to say is**
5 **that his cartridge loads would have met the**
6 **requirements from SAAMI for that particular**
7 **ammunition.**
8   Q   Uh-huh.  How did you determine that Mr. Batts
9 was using an incident round that had the proper
10 propellant?
11   **A   From looking at the ammunition, which was**
12 **CAT-scanned and later disassembled.**
13   Q   Okay.  Was the ammunition actually
14 CAT-scanned or just x-rayed?
15   **A   Well, it was done in the CAT scan.  It's**
16 **often called a digital radiograph, but it's a much**
17 **higher resolution because it's done with a microfocus**
18 **x-ray. So you can actually see the propellant within**
19 **the shell.**
20   Q   Now, the round that was broken down, that was
21 done when Mr. Watkins saw you on March 26th of this
22 year, 2019; correct?
23   **A   Correct.**
24   Q   When did you come to the conclusion that the
25 propellant in the incident round was the correct

EXHIBIT 3

---

Page 25

1 propellant?
2   **A When I initially saw the rounds in their**
3 **CAT-scan or DR evaluation.**
4   Q After Mr. Batts -- strike that. After
5 Mr. Watkins tore down one of the rounds that was
6 provided to you through Mr. Meador, did you do any
7 type of research to determine what type of propellant
8 was in that round?
9   **A I looked through the types of propellant**
10 **literature and photographs that I had, and I could**
11 **not identify that particular propellant. It's**
12 **similar to an Accurate 1681, a small-ball propellant.**
13 **It is very similar to propellants that are used in**
14 **ammunition; but its exact nomenclature or**
15 **terminology, I couldn't determine.**
16   Q And Mr. Watkins tore down a round. Just so
17 the record is clear, it was one of the rounds that
18 was provided to you by Mr. Meador and with the
19 representation that it was one of the rounds that
20 Mr. Batts had with him on the day of the incident;
21 correct?
22   **A That's correct.**
23   Q So we are taking -- we're assuming that
24 Mr. Batts is being accurate and truthful about that
25 round -- those rounds being with him on the day of

---

Page 26

1 the incident; correct?
2   **A Yes. I don't know anything other than what**
3 **Mr. Batts tells me.**
4   Q Okay. Have you spoken to Mr. Batts at all in
5 connection with this case?
6   **A I may have spoken to him early on. I don't**
7 **specifically recall talking to him, but I certainly**
8 **haven't talked to him in a year or so.**
9   Q All right. Do you have any recollection of
10 any conversation with Mr. Batts?
11   **A No. I'm sure the only conversation I would**
12 **have had with him is how he obtained the rifle and**
13 **the ammunition and what -- if he did anything else**
14 **when he fired it. And of course he's been deposed**
15 **since then, and he didn't tell me anything different**
16 **than what he said in his deposition.**
17   Q So you did in fact speak with Mr. Batts?
18   **A I don't -- I don't recall specifically**
19 **speaking with him. All I can remember is I may have.**
20 **I speak to a lot of different people over the years.**
21   Q Other than conversations you've had with
22 Mr. Meador, have you spoken with anyone else about
23 this case?
24   **A No, sir.**
25   Q After the high-resolution digital radiograph

---

Page 27

1 at North Star in November of 2017 taken of the
2 rounds, did you conduct any independent research
3 about the propellant that you believed to have been
4 in those rounds?
5   **A No, not other than simply looking once he had**
6 **broken it open to see if I could identify it. I**
7 **could only identify in the digital radiographs that**
8 **it was a small-ball propellant, I think as I indicate**
9 **in my report.**
10   Q So at the time the digital radiographs were
11 done in November of 2017, did you then conclude at
12 that time that the propellant in those rounds was the
13 proper propellant for those rounds?
14   **A Yes. In my opinion, it appeared to be the**
15 **proper propellant for those rounds.**
16   Q Is it your opinion that the incident
17 cartridge, the incident round, produced enough
18 pressure to propel the bullet out of the barrel if
19 the engagement had been greater than what you believe
20 it to have been?
21   **A If the engagement had kept the breech closed**
22 **on the rifle, it would have propelled the bullet out**
23 **of the bore, yes.**
24   Q Did you determine, Mr. Powell, that the
25 incident round, the cartridge case and the bullet

---

Page 28

1 attached to it, were -- was of proper dimension?
2   **A Well, I've never seen the cartridge case.**
3 **The bullet appeared to be of proper dimensions, yes.**
4   Q Having not seen the proper -- excuse me.
5 Having not seen the incident cartridge case, do you
6 have an opinion whether that cartridge case was of
7 proper dimension?
8   **A When he chambered it, it seemed to go into**
9 **the chamber appropriately. So it would appear to**
10 **have been the correct dimensions.**
11   Q And that's based on the video that you
12 reviewed?
13   **A Correct.**
14   Q Anything else?
15   **A No.**
16   Q Would you have liked to have seen the
17 incident cartridge case?
18   **A Yes.**
19   Q Why?
20   **A Because there are many things you can tell**
21 **from an incident cartridge case.**
22   Q Such as what?
23   **A Dimensions, the pressure that it's been**
24 **exposed to, the different kinds of -- well, not**
25 **machining, but certainly handling and production**

EXHIBIT 3

Page 29

1  characteristics used to load the shell and to seat
2  the bullet in the case, as well as the type of primer
3  used.
4     Q   In your opinion, was the incident round
5  equivalent to the factory ammunition such as you used
6  in your range-testing?
7     A   I believe so.  That's why -- that's why I
8  used that factory ammunition.
9     Q   Do you believe that Mr. Batts was using
10 factory ammunition?
11    A   No.  He was using ammunition that had been
12 remanufactured.
13    Q   Reloaded?
14    A   Well, reloaded, handloaded, remanufactured,
15 yes.  The cases were not headstamped by a particular
16 manufacturer.  They appeared to be once-fired cases.
17    Q   Do you have the pink or red box of ammunition
18 there?
19    A   Yes, sir.  Right here.
20    Q   We don't need to -- can you take it out of
21 the bag, Mr. Powell?
22    A   Certainly.
23    Q   And that has an exhibit sticker on it.  Can
24 you tell us what the exhibit sticker is?
25    A   Yes.  The exhibit sticker is Number 24.

Page 30

1     Q   And for the record, that was marked at
2  Mr. Batts' deposition as Exhibit 24, and that appears
3  to be a red plastic or pink -- I don't know what
4  color you want to use.  I'll call it red -- plastic
5  ammo box with now eight rounds of ammunition;
6  correct?
7     A   Correct.
8     Q   When it was first provided to you, was --
9  there was one extra round in there; correct?
10    A   Yes.
11    Q   And in March of this year, that was the round
12 that Mr. Watkins tore down with you being present;
13 correct?
14    A   Correct.
15    Q   And you have maintained the components of
16 that round, namely the cartridge case, the bullets
17 and the propellant; correct?
18    A   Yes.  You mean after he disassembled them?
19    Q   Yes.
20    A   Yes.
21    Q   Yes, sir.  So what we have today is we have
22 six polymer-tip rounds and then two -- are those
23 hollow-points?
24    A   Yes.
25    Q   How many different types of cartridge cases

Page 31

1  are there for the six polymer-tip rounds in that box?
2  Or for that matter, we'll go back to how it was
3  presented to initially.  That is, there were seven
4  polymer-tip rounds.  How many different cartridge
5  cases were there?
6     A   Three.  Three different headstamped labels.
7     Q   For just the polymer-tip rounds?
8     A   Yes.
9     Q   And what were those three, sir?
10    A   WCC 11, WCC 10 and LC 04.
11    Q   And those cartridge cases would have all been
12 reformed or reshaped for purposes of a round of 300
13 Blackout ammunition; correct?
14    A   Correct.
15    Q   One of the rounds that you measured, if I am
16 reading your report correctly, seem to be longer than
17 what the specifications called for; is that correct?
18    A   Yes.
19    Q   And which round was that?  Do you know?
20    A   The LC 04.
21    Q   Did you ever place that round into your
22 exemplar to determine if it would fit into the
23 chamber?
24    A   I did not.
25    Q   Did you -- did you ever place it in your

Page 32

1  exemplar at all for any reason?
2     A   No, I've not placed any of those in my
3  exemplar.
4     Q   Would you agree, then, that the polymer-tip
5  rounds that were provided to you were rounds that had
6  been remanufactured or reloaded by somebody?
7     A   Yes.
8     Q   And you understand that Mr. Batts claims that
9  he acquired or purchased these rounds from a gun show
10 in Fort Worth, I believe?
11    A   I think that's correct.
12    Q   Have you personally done any research to try
13 to determine who that seller was?
14    A   No.
15    Q   Have you inquired of anybody to try to
16 determine who that seller was?
17    A   I have not.
18    Q   You said that the propellant in the
19 polymer-tip rounds was a small-ball propellant?
20    A   Correct.
21    Q   And how did you confirm that to be the case?
22    A   Well, you could see it on the CAT scan; and
23 then when Mr. Watkins opened up the round, you could
24 see it visually.
25    Q   At the time of the digital radiography at

Page 33

1  North Star in November 2017 taken of the rounds, was
2  it at that time that you confirmed in your own mind
3  that the propellant in these polymer rounds was the
4  proper propellant?
5     **A   Yes.  It appeared to be exactly what I**
6  **expected to see.  That's a small-ball propellant**
7  **filled up near the base of the bullet.**
8     Q   And therefore, do you also confirm that the
9  amount of propellant in these rounds was the
10 appropriate amount?
11    **A   Yes.**
12    Q   Did -- we now know, with the video that was
13 provided to you a couple months ago, that Mr. Batts
14 fired a first round and the bullet stuck at the -- in
15 the barrel halfway -- roughly halfway up the muzzle;
16 correct?
17    **A   Correct.**
18    Q   What caused that?
19    **A   A squib load.  An underpressure load.**
20    Q   What caused the underpressure?
21    **A   I don't know.  Insufficient or contaminated**
22 **propellant or absence of propellant.**
23    Q   Did you rule out that the incident round was
24 either contaminated or insufficient?
25    **A   Yes.**

Page 34

1     Q   How?
2     **A   Because of the amount of pressure it**
3  **produced.**
4     Q   How much pressure was produced by the
5  incident round?
6     **A   I don't know.  I wasn't there to measure it.**
7  **I don't know how much exactly, but a considerable**
8  **amount, as you saw from the actions of the rifle, its**
9  **recoil and the ejection of the case into Mr. Batts'**
10 **eye.**
11    Q   In your opinion was the engagement between
12 the barrel catch and the barrel lug on Mr. Batts'
13 rifle the same on the first round he fired, where he
14 got the squib round -- or excuse me -- he experienced
15 the squib load and the incident round?  Do you follow
16 my question?
17    **A   Yeah, could you ask the question again,**
18 **please?**
19    Q   Yeah, I will.  Is it your opinion that the
20 engagement between the barrel catch and the barrel
21 lug was the same on Round Number 1, the squib load,
22 as it was on the incident -- at the time of the
23 incident round?
24    **A   I didn't measure it, but it would have been**
25 **very -- something very similar, yes.  Low engagement.**

Page 35

1     Q   Can propellants that appear to have the same
2  shape develop different pressures?
3     **A   Yes.**
4     Q   Do you reload?
5     **A   Yes, I have.**
6     Q   Do you -- what calibers do you handload?
7     **A   Primarily 223 and 30-aught-6.**
8     Q   When you handload, is it important to match
9  the propellant with the bullet that you are using?
10    **A   Well, you usually have a different -- a**
11 **selection of different propellants that you can use,**
12 **and I try to select a propellant that will largely**
13 **fill the case when I select a propellant to start**
14 **using.**
15    Q   How do you -- how do you determine what the
16 -- what the correct propellant is for a particular
17 bullet?
18    **A   You look in reloading manuals provided by**
19 **propellant and bullet manufacturers, to start.**
20    Q   Is it important to use the correct propellant
21 with a particular bullet?
22    **A   Well, there is a number of correct**
23 **propellants that you can use.**
24    Q   Okay.
25    **A   But yes, it's important to use the correct**

Page 36

1  **amount of propellant for a particular bullet size and**
2  **shape.**
3     Q   For a particular bullet, you often have a
4  choice of propellants; correct?
5     **A   Correct.**
6     Q   But there are also, for particular bullets,
7  propellants that you should not use?
8     **A   Correct.**
9     Q   Why?
10    **A   Some propellants have different burning**
11 **characteristics, and those burning characteristics**
12 **may make a bullet inaccurate or cause excessively**
13 **high pressures to result in a barrel rupture.**
14    Q   Not only do the pressures differ, but it also
15 differs over time; correct?
16    **A   Yes.  The burning characteristics as far as**
17 **when the peak pressure is developed and over what**
18 **length of time, that's correct.**
19    Q   There is a time-pressure curve?
20    **A   Yes.**
21    Q   And it can, if you -- if one is using the
22 incorrect propellant for a particular bullet, create
23 a squib load?
24    **A   Generally speaking, in my ex -- in my**
25 **experience, squib loads are created by either**

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

---

Page 37

1  contaminated propellant or virtually using not enough
2  propellant.  I've never seen a squib load created by
3  using the proper amount of an incorrect propellant.
4      Q   And you have ruled out the incident round
5  having contaminated powder, or propellant, or the
6  incorrect amount because of the video showing the
7  force that the cartridge case was ejected rearward
8  with?
9      A   Well, you see the rifle interaction.  You see
10  it recoil.  You see it -- the pressure of the breech
11  -- you see the rifle breech opening and the pressure
12  pushing the cartridge out at high velocity.  So it
13  appears to be a normally fired cartridge of a rifle
14  that's not latched correctly.
15      Q   Because as we --
16      A   In my opinion.
17      Q   As we covered earlier, your opinion is that
18  the incident bullet stuck in the barrel because the
19  pressure had been released rearward through the
20  chamber when the action opened?
21      A   Right.
22      Q   You have ruled out that -- if I understand
23  your sequence of events correctly, you have ruled out
24  that the bullet stuck in the barrel first, which in
25  turn created a rearward amount of pressure back

---

Page 38

1  toward the cartridge case; correct?
2      A   I have ruled out the bullet, some -- some
3  obstruction in the barrel stopping the bullet?  Is
4  that what you're asking?  I don't -- yes, I've ruled
5  that out.  There is no evidence of anything in the
6  barrel --
7      Q   Let me --
8      A   -- that caused the bullet to stop and create
9  excessive pressure like a barrel -- bore obstruction,
10  for example.
11      Q   Let me rephrase it.  We agree that the
12  incident bullet stuck in the barrel; correct?
13      A   Yes.
14      Q   It is your opinion that it stuck in the
15  barrel because the force created by the round exited
16  rearward through the chamber and propelled the
17  cartridge rearward -- the cartridge case rearward;
18  correct?
19      A   Correct.
20      Q   You have ruled out, then, that the incident
21  round, the incident bullet, stuck in the barrel
22  because of contaminated propellant or insufficient
23  propellant; correct?
24      A   Correct.
25      Q   You have ruled out that the bullet, the

---

Page 39

1  incident bullet, stuck in the barrel because of the
2  use of incorrect propellant; correct?
3      A   Correct.
4      Q   What testing have you done to rule out those
5  possibilities?
6      A   Examination of the bullet with a CAT scan, as
7  well as measurement and examination of the bullet
8  once it was removed from the bore.
9      Q   And what about the CAT scan of the bullet --
10  let me back up for a second.  Was the bullet that was
11  lodged in the barrel CAT-scanned or was that digital
12  radiography of the --
13      A   Well, I guess I refer to it as a CAT scan.
14  It's done with the same piece of equipment, but it's
15  just captured in a 2D form.  So if you want to call
16  that a digital radiograph, you can, or DR.  But it's
17  done with a microfocus x-ray so that you can zoom in,
18  zoom out, make measurements off of it.
19      Q   And what about the bullet after it was
20  removed from the barrel?  What significance was that?
21      A   You could measure it, determine that it was
22  the correct caliber of bullet that was made out of
23  the correct components and that it should have not
24  been lodged in the bore as a result of some kind of a
25  bore obstruction.

---

Page 40

1      Q   I'm not talking bore obstruction, Mr. Powell.
2  I'm talking about the use of incorrect or
3  insufficient amount or contaminated propellant.
4      A   Well, then it would --
5      Q   You -- my understanding is that you have
6  ruled out the possibility of contaminated propellant,
7  incorrect propellant or insufficient amount of
8  propellant as causing the bullet to stick in the
9  barrel.  Am I correct on that?
10      A   Right, because those are the conditions that
11  would have resulted in a low-pressure discharge that
12  we might -- that we're calling the squib, and we
13  didn't see that in the video.
14          We have a video of the actual cartridge
15  firing.  You see the rifle recoiling and the latch
16  unlatching with high pressure.  So it was not
17  contaminated propellant nor the wrong propellant.  It
18  appeared to be a normal-fired bullet that the
19  inappropriately latched barrel opened during the
20  firing of the cartridge.
21      Q   And that is based on your viewing of the
22  video of the incident?
23      A   Yes.
24      Q   Okay.  My question is:  What tests, if any,
25  have you conducted to rule out any propellant

---

EXHIBIT 3

Page 41

1 abnormality, whether it be contaminated, incorrect
2 type or insufficient amount, as causing the bullet to
3 lodge in the barrel?
4   A  The evaluation of the bullet to see what
5 would have caused it to lodge in the barrel, and it
6 appeared to be a normally fired bullet under normal
7 pressure because of the interaction between the rifle
8 and the cartridge case.
9       So that testing as a result of the
10 examination of the CAT scans, as well as the
11 examination of the bullet; and from that evidence,
12 you can infer that there wasn't a -- it wasn't a
13 squib load.  It wasn't contaminated propellant.  It
14 was a normally fired high-pressure cartridge.
15   Q  So the video and the examination of the
16 bullets and the radiography, those are the things
17 that form your basis?
18   A  Yes.
19   Q  Form the basis for your opinion that this was
20 not a squib load?
21   A  Correct.
22   Q  Beyond that, though, you have not conducted
23 any tests to rule out that possibility, have you?
24   A  Well, it wasn't necessary to.  It's obvious
25 that it wasn't contaminated propellant or

Page 42

1 low-pressure propellant or high pressure, for that
2 matter.
3   Q  Based on the video, showing the --
4   A  Correct.
5   Q  -- round being fired and then based upon the
6 appearance of the bullet?
7   A  The appearance of the bullet, the examination
8 of the bore in CAT scan, yes.
9   Q  You're sure about that?
10   A  I am.
11   Q  Have you determined specifically, Mr. Powell,
12 what the proper propellant was or is for a 300
13 Blackout round subsonic?
14   A  There are a variety of them.
15   Q  Name some of them for me, please.
16   A  Accurate 1681 would be one that I'm familiar
17 with.
18   Q  Have you identified -- through the
19 radiography and the examination of the propellant
20 removed from the round that Mr. Watkins tore down,
21 have you identified or narrowed down to any -- a
22 small list of possibilities of what exactly that
23 powder was -- or propellant was?
24   A  I think I answered that question earlier.  I
25 have not identified that specific powder.

Page 43

1   Q  Is it possible to create a squib load by
2 using an improper propellant?
3   A  Of -- you mean thinking you're going to load
4 10 grains of a particular propellant and you load 10
5 grains of the wrong propellant?  I don't think so.
6 Normally most propellants in that range are going to
7 develop enough pressure to push the bullet out the
8 barrel.
9   Q  So is it your opinion that if one uses the
10 improper propellant for a bullet, that the bullet
11 will never lodge or get stuck in the barrel?
12   A  Well, not anything -- not any that I'm aware
13 of.  There may be some very slow-burning propellants
14 that perhaps this primer won't ignite, and you might
15 get a squib load like that, but then you would leave
16 a lot of unburned propellant in the firearm.  I
17 didn't see any of that.
18   Q  Are you familiar with Accurate propellant?
19   A  In general, yes.
20   Q  Are you familiar with Accurate 2230 or 2520?
21   A  No.
22   Q  Do you consider examination of the bullet in
23 the bore, just an examination of those items, tests?
24   A  Sure.  It's a visual inspection and
25 measurement.

Page 44

1   Q  So in your view, a test would include an
2 examination, visual inspection of a piece of
3 evidence?
4   A  Visual examination is certainly a type of
5 nondestructive testing, as well as measurement, as
6 well as evaluation of x-rays and CAT scans.  All of
7 those are tests.
8   Q  Would propellant for a 308 caliber rifle be a
9 correct propellant or proper propellant to use for a
10 300 Blackout bullet at 208 grains?
11   A  I wouldn't think so, no.
12   Q  Why not?
13   A  I think it may -- generally 308 propellants
14 are slower because it's a much -- much larger
15 capacity case.
16   Q  About three times the capacity, is it not?
17   A  I haven't measured it, but they are much
18 larger.
19   Q  If one had used a 308 propellant, a slower
20 burning propellant such as you have described, in a
21 smaller cartridge case such as a 300 Blackout
22 cartridge case, what would you expect to happen?
23   A  I don't know.  It depends whether or not it
24 would be ignited by the standard primer in that case.
25   Q  Would you agree that propellant for a 300

Charles Wayne Powell - June 19, 2019

Page 45

1  Blackout cartridge case needs to be a faster burning
2  propellant than that used for a 308?
3     A  I would think so, yes.
4     Q  Would you agree that a propellant intended
5  for a 308 cartridge case using a 300 Blackout round
6  could cause a squib load?
7     A  I don't know.  I haven't tested that.
8     Q  Okay.  When tests are run, are you generally
9  looking at a test to -- whatever you're testing,
10  you're looking at something that's either going to
11  fail or pass that test?
12     A  Not necessarily.
13     Q  Why would you run a test, then?
14     A  Because you're seeking data.  You don't have
15  to have a pass/fail value on that data.  You can
16  conduct a test to see what a particular test result
17  produces.
18     Q  How did you determine that the barrel catch
19  was engaged with the barrel lug when Mr. Batts pulled
20  the trigger on the incident round?
21     A  Examination and measurement of the damage on
22  the lug itself.  On the lug and the latch, the latch
23  surface.
24     Q  We talked about this a little bit earlier;
25  but with regard to the damage to which you refer,

Page 46

1  where on the barrel lug is that damage?
2     A  It's towards the tip end of that lug.
3     Q  What I would call the edge?  Does that make
4  sense to you?
5     A  Well, it's not on the corner edge, but it's
6  on the rear portion of the upper surface of the lug.
7     Q  Okay.  We'll look at some pictures in a
8  little bit.
9        Other than the -- what you've described here
10  as damage on the lug and the catch surface, the
11  barrel catch surface, is there any other basis for
12  your conclusion that the barrel catch was engaged
13  with the barrel lug when Mr. Batts pulled the trigger
14  on the incident round?
15     A  No.  You just see the physical evaluation of
16  those two surfaces.
17     Q  Okay.  How did you determine that the force
18  of the shot caused the barrel lug to disengage from
19  the barrel catch?
20     A  Because you see the damaged and
21  microscopically disturbed material at that edge
22  created by the last shot that that rifle fired.
23     Q  Other than that damage that you just
24  mentioned, is there any other basis for your
25  conclusion that the force of the shot caused the

Page 47

1  barrel lug to disengage from the barrel catch?
2     A  No.
3     Q  What was the force?
4     A  I don't know.
5     Q  Over what period of time was it applied?
6     A  During the period of time that the shell
7  discharged.
8     Q  What was that?
9     A  I haven't measured it off the video.  A
10  very short period of time.  Milliseconds.
11     Q  Do you know how long in a 300 Blackout --
12  200-grain, 300 Blackout round takes to exit a 16-inch
13  barrel under normal circumstances?
14     A  No.
15     Q  Do you have an estimate?
16     A  Several -- several milliseconds.
17     Q  What's the range?
18     A  I -- I don't know.
19     Q  More than three?
20     A  Probably more than three.  Less than 10.
21     Q  Is that the best estimate you can give?  More
22  than three, less than 10 milliseconds?
23     A  Yes, and that's an estimate.
24     Q  When this incident happened, was there any
25  actuation of the barrel release?

Page 48

1     A  There was no actuation by Mr. Batts of the
2  barrel release, if that's what you're asking, nor did
3  I see any forces that would have released the barrel
4  absent the pressure from the cartridge.
5        In other words, there was no inertial force
6  of the rifle movement that would have caused the
7  barrel release -- the barrel release to depress
8  itself, for example.
9     Q  So in your opinion, the depression -- there
10  was no depression of the barrel release that caused
11  the barrel catch and barrel lug to disengage;
12  correct?
13     A  Correct.
14     Q  Did the disengagement cause the release to
15  move?
16     A  I don't know.
17     Q  Do you have an opinion regarding the velocity
18  of the cartridge case when it left the chamber?
19     A  No.  I haven't calculated that.
20     Q  And I believe you said the length of
21  engagement at the time of this incident was roughly
22  60/thousandths of an inch?
23     A  Yes.
24     Q  And that's based on what again?
25     A  The smeared and damaged material on the

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 49

1  barrel catch and the barrel lug.
2     Q  How much force was required to open the
3  action with that much engagement?
4     A  I don't know.  I haven't measured that.
5     Q  If you -- what was the engagement in your
6  opinion of the exemplar rifle that you have?
7     A  I believe over double the 60/thousandths.  So
8  let's see what value I got.
9        It was measured to be .145 inches.
10     Q  Say that again.  I'm sorry, Mr. Powell.
11     A  .145 inches.
12     Q  And that's based on the CT scan?  Or I'm
13  sorry.  That's based on the radiography of the
14  exemplar?
15     A  No.  That's based on measuring the engagement
16  through the view hole.
17     Q  When you say measuring the engagement through
18  the viewing hole, how did you do that?
19     A  With a microscope, measuring microscope.
20     Q  And so if I understand it correctly, .145
21  inches.  So the barrel catch was .145 inches over the
22  barrel lug?
23     A  Correct.
24     Q  So the front edge of the barrel lug was
25  contacting the barrel catch?

Page 50

1     A  Yes.
2     Q  But is there in your exemplar contact for the
3  entire .145 inches?
4     A  That's the length of engagement.  What do you
5  mean by "contact"?
6     Q  The surface of the barrel catch is contacting
7  the surface of the barrel lug for the entire .145
8  inches.
9     A  Well, I didn't measure point-to-point
10  contact.  Let's see here.
11        The barrel lug is largely straight.  As I
12  recalled earlier, I think the barrel catch has a
13  slight curve to the surface.  So it's not going to
14  make a perfect contact all the way along the length.
15     Q  Okay.  And I think you told me earlier that
16  you have not measured the wear -- the wear pattern on
17  the surface of the barrel lug of your exemplar; is
18  that correct?
19     A  I photographed it, but I haven't, quote,
20  measured -- I measured the length of it.
21     Q  Right.
22     A  But haven't measured --
23     Q  Right.
24     A  -- anything beyond that.
25     Q  Overlap does not equate to contact; would you

Page 51

1  agree with that?
2     A  Yes.
3        MR. DANEKAS:  Mr. Chaney would like to take a
4  short break so we'll take about a five-minute break.
5        VIDEOGRAPHER:  Off the record at 11:15.
6        (Recess held)
7        VIDEOGRAPHER:  We're back on the record at
8  11:29.
9     Q  (By Mr. Danekas)  Mr. Powell, do -- are you
10  aware of any literature in the engineering field that
11  describes or defines testing as a visual examination
12  and measurement?
13     A  I'm sure that the -- there are standards for
14  visual testing, visual testing of components for
15  determining different types of characteristics.
16     Q  When you refer to the phrase "visual
17  testing," that means somebody such as yourself, an
18  engineer, is visually looking at a -- in this case,
19  parts of a rifle?
20     A  Yes, with a knowledgeable eye looking for
21  deformations, fractures, characteristics that would
22  help explain a particular condition, yes.
23     Q  But I'm having a difficult time grasping the
24  concept of that visual examination of a piece of
25  evidence is actual testing.

Page 52

1     A  Well, the American Society for Testing --
2  American Society for Nondestructive Testing I'm sure
3  has a series of specifications regarding
4  nondestructive visual testing.  I don't have them
5  with me, but I feel certain that they still -- those
6  still exist.
7        And over the break, I was looking in my
8  reloading information in my file.
9     Q  Yes, sir.
10     A  And I think I may have referred in this -- in
11  my testimony today as a -- propellant as an Accurate
12  1681, and it's actually an Accurate 1680.  I added an
13  extra "1" to it.
14     Q  Okay.  So are you saying that the propellant
15  in the polymer-tip rounds provided in this case was
16  an Accurate 1680?
17     A  No.  You've asked me various questions today
18  about propellants.
19     Q  Yes.
20     A  Some of my answers involved the propellant
21  Accurate 1680, and I think I referred in mistakenly
22  referred to it as 1681.
23     Q  All right.  So --
24     A  And I just wanted to correct my testimony.
25     Q  Understood.  So in prior testimony when you

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 53

1  were referring to the Accurate 1681, you were
2  intending to refer to Accurate 1680?
3  **A  That's correct.**
4     Q  All right.  Thank you.  Did you ever consider
5  testing your exemplar rifle by test-firing it with an
6  overlap between the barrel catch and the barrel lug
7  of 60/thousandths of an inch?
8  **A  I looked at doing that, thought it would be**
9  **difficult to hold it to the level that I wanted to do**
10 **it; and ultimately, because of the characteristics I**
11 **found in the subject weapon, I felt it wasn't**
12 **necessary to render my opinions in this case.**
13    Q  Why did you consider doing it with your
14 exemplar?
15 **A  Because that was the engagement I determined;**
16 **and even though it's dangerous, I wanted to see if**
17 **there was some possible way I could do that with the**
18 **exemplar firearm; and to maintain safety, I wasn't**
19 **able to do that and didn't feel it was necessary.**
20    Q  Okay.  With regard to the first part of that
21 -- so the reason you didn't do it is, number one, is
22 you couldn't determine how to do it safely; and the
23 second reason is based on the characteristics of the
24 subject rifle; you didn't think it was necessary?
25 **A  Correct.**

Page 54

1     Q  With regard to the first reason that you
2  couldn't do it safely, I think we touched upon this
3  earlier.
4  **A  Well, we touched on both of those.  That's**
5  **correct.**
6     Q  Okay.  And the first -- and there would be a
7  way of conducting it safely if you really wanted to
8  do that testing; correct?
9  **A  Possibly, yes.**
10    Q  And with regard to the second reason, you
11 didn't think testing an exemplar, setting it at --
12 your exemplar setting it at 60/thousandths engagement
13 was necessary because based on the characteristics of
14 the Batts rifle and the video you saw, you didn't
15 think there was any necessity for that type of test
16 with the exemplar?
17 **A  That's correct.**
18    Q  Is it accurate to say that your conclusion
19 that the exemplar engagement -- that the barrel catch
20 disengaged from the barrel lug on the Batts rifle is
21 based on your viewing of the Batts video of the
22 incident, as well as the radiography and measurement
23 of the engagement of the subject rifle?
24 **A  Yes, and the microscopic examination of the**
25 **damage that was present on the lug and catch from the**

Page 55

1  **Batts rifle.**
2     Q  Let's put the damage aside.  Let's assume for
3  purposes of my question here, hypothetic, let's
4  assume that there was no damage that you are
5  describing.  Would that alter your opinion as to the
6  cause of this incident?
7  **A  I don't know.  I haven't considered that.  I**
8  **mean, I'm looking at all the evidence at once.**
9     Q  Are you saying, Mr. Powell, that any person
10 who viewed Mr. Batts' incident video and measured the
11 engagement of the -- measured the engagement between
12 the barrel catch and the barrel lug and looked at the
13 surface of the barrel lug microscopically would
14 arrive at the same conclusion you have?
15 **A  Correct.**
16        MR. MEADOR:  Objection.  Speculation.
17    Q  (By Mr. Danekas)  Correct?
18 **A  I would expect them to, yes.**
19    Q  In considering those three items, what
20 engineering expertise did you bring to the table in
21 that analysis?
22 **A  My engineering evaluation of components over**
23 **the history of my failure-analysis work, as well as**
24 **my expertise in measuring components and evaluation**
25 **of damage materials.**

Page 56

1     Q  If you had -- if you had tested your exemplar
2  by setting the engagement at 60/thousandths and
3  firing the factory ammunition, would you expect the
4  -- would you expect the barrel catch and the barrel
5  lug to disengage and the action to open as it did in
6  the Batts' incident?
7  **A  I would expect them to be damaged.  I don't**
8  **know if it would open the first time in the -- as it**
9  **did in the Batts incident.  I would have to compare**
10 **and look at if those same types of particles were**
11 **present in the exemplars that were in the Batts rifle**
12 **on that engagement surface.**
13    Q  Did the -- strike that.  I take it that you
14 were unaware that Mr. Batts used any lubricant or oil
15 in the chamber until you saw the recently recovered
16 video?
17 **A  Correct.**
18    Q  In your opinion, did the oil play any role in
19 causing this -- the incident?
20 **A  No.**
21    Q  If you were to test your exemplar with
22 60/thousandths of engagement between the barrel catch
23 and the barrel lug, would your setup for that testing
24 be different than what you utilized in your field
25 testing in late May?  In late May.

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

1    A  It would not have differed insofar as
2  protecting myself and anybody else around the firing
3  of the rifle, if you could hold it to that particular
4  value.
5    Q  If I understand you correctly, the exemplar
6  you spoke of, the .145 inches, that is -- that is the
7  length of overlap between the barrel catch and the
8  barrel lug; true?
9    A  In the exemplar firearm, correct.
10   Q  In the exemplar, yes.
11   A  Yes.
12   Q  As you sit here today, do you know the length
13  of the actual engagement between the barrel catch and
14  the barrel lug in your exemplar?
15   A  I haven't looked at it since the test.  I
16  would expect it still to be .145.
17   Q  But didn't we agree that overlap is not the
18  same as contact?
19   A  We did.
20   Q  Are you saying that overlap is the same as
21  engagement?
22   A  Yes, as I've used those terms today.
23   Q  Okay.  So overlap equals engagement, but that
24  does -- neither of those equates to contact?
25   A  Correct, because as we discussed about the

1  difference between contacting as a curved surface
2  with a flat surface.
3    Q  If the Batts rifle, the subject rifle, had
4  had .145 inches of overlap, slash, engagement, would
5  the incident have occurred?
6    A  No.
7    Q  What is spec for engagement between the
8  contact barrel catch and the barrel lug?
9    A  I don't remember what it is specifically
10  offhand.  Do you want me to look it up?
11   Q  Please.
12   A  Well, this is going to be a bit.  Do you want
13  me to -- because I have a picture of the position of
14  the barrel catch with the indicator notch and where
15  it should be, and then I'm going to have to compare
16  that to the drawings of the component.
17   Q  Go ahead.
18   A  Okay.
19       MR. DANEKAS:  Yeah, we can go off the camera
20  while he is finding that.
21       VIDEOGRAPHER:  Off the record 11:42.
22       (Recess held)
23       VIDEOGRAPHER:  We're back on the record at
24  11:48.
25   Q  (By Mr. Danekas)  Okay.  Mr. Powell, I think

1  before we broke briefly, I had asked you what the
2  specification was for the engagement of the barrel
3  catch with the barrel lug.
4    A  I measured it on my exemplar rifle, the
5  barrel catch in it, to be a minimum of .088 inches.
6    Q  You say you measured it on your exemplar?
7    A  Yes.  If I place the edge of the indicating
8  notch on the latch, at the edge of the barrel catch,
9  then the remaining amount of overlap or engagement
10  would be .088 inches.
11   Q  Okay.  So if there was overlap or engagement
12  between the barrel catch and the barrel lug of .088
13  inches or greater, that would meet or exceed
14  specification; correct?
15   A  Yes, based on my evaluation of this barrel
16  catch, correct.
17   Q  Okay.  If at the time of the incident the
18  overlap or engagement of the incident rifle had been
19  .088 inches, would the incident have occurred?
20   A  No.  That latch should have been able to
21  withstand a normal firing.
22   Q  But the 60/thousandths of overlap or
23  engagement, as you've described in your opinion, was
24  not able to withstand the firing?
25   A  Not with the presence of those little

1  particles that were present on that surface, no.
2    Q  All right.  Well, let's explore that.  If the
3  length of engagement with the incident rifle had
4  been .88 [sic] inches or greater, all things else
5  being equal, I think you just told me that the
6  incident would not have occurred; correct?
7    A  Yes, absent any type of contamination between
8  the surfaces, and the subject rifle did have that
9  contamination.
10   Q  And I didn't catch that last part.
11   A  Did have that contamination.
12   Q  The incident rifle did have the
13  contamination?
14   A  It did.
15   Q  Okay.  Well, let me ask you to assume that
16  the condition of the Batts rifle is the same as your
17  exemplar but for the 60/thousandths of overlap or
18  engagement.  Follow me?
19   A  I do.
20   Q  Would the incident have occurred?
21   A  I don't know.
22   Q  And you don't know because you haven't tried
23  testing it; correct?
24   A  That's correct.
25   Q  Okay.  Now, assume -- assume that the subject

EXHIBIT 3

Page 61

1  rifle, the Batts' rifle was within spec, minimum of
2  88/thousandths of engagement or overlap. Everything
3  else being equal in the subject rifle, would the
4  incident have occurred?
5      A  With the contamination that I observed
6  present?
7      Q  Yes.
8      A  Present there?  I don't know.
9      Q  You haven't tested for that either; correct?
10     A  That's correct.  I haven't felt it was
11 necessary to, to evaluate what the Batts rifle did
12 when it fired on the day of his injury.
13     Q  Right.  Well, and you haven't felt it was
14 necessary because you viewed the video.  You saw the
15 incident happen.  You measured the engagement or
16 overlap; and in your opinion, through visual
17 microscopic examination of the surfaces, you found
18 these abnormalities you've described; right?
19     A  That's correct.
20     Q  And based on those three things, you
21 concluded that the accident occurred because of
22 inadequate engagement; correct?
23     A  Correct.
24     Q  But you conducted no testing to determine if
25 that conclusion is correct or not.

Page 62

1      A  No.  I did do the testing that you just
2  described, and it is correct.
3      Q  Okay.  The test --
4      A  Because we saw what happened right on the
5  video; right?
6      Q  Yes, we did.  We saw what happened.  And the
7  testing -- I don't think I described any testing; but
8  as I understand it, Mr. Powell, you're saying that
9  the measurement of the engagement overlap, along with
10 the visual microscopic examination of the surfaces,
11 constitute testing?
12     A  Correct, together with the evaluation of the
13 CAT scans and the digital radiographs, correct.
14     Q  Okay.  So beyond the evaluation of the CAT
15 scan, the radiograph and the microscopic visual
16 examination of the surfaces, have you conducted any
17 other testing to rule in or rule out your hypothesis
18 that inadequate engagement caused this incident?
19     A  Well, I conducted additional range-testing,
20 as you're aware --
21     Q  Uh-huh.
22     A  -- after the video was presented to me
23 showing Mr. Batts applying oil down the barrel of his
24 rifle, and we had no unlatching engagements in that,
25 with the exemplar rifle, with the appropriate

Page 63

1  engagement.
2      Q  Why did you conduct that range-testing with
3  your exemplar that we've talked about?  The four
4  shots you fired without oil and then the three series
5  of three shots?
6      A  It's been reported in various literature,
7  books and reloading manuals that fluids in the
8  barrels of firearms: Oil, water, and other types of
9  contaminates, can cause overpressurization of the
10 barrel, and I wanted to eliminate that from happening
11 -- from -- eliminate it or include it in, if it was
12 something that affected the firing of Mr. Batts'
13 rifle.
14     Q  So your hypothesis was -- for this testing
15 was that the application of the oil might have
16 increased the pressure of the incident round?
17     A  Yes, to the extent that it would unlatch.
18     Q  Okay.  And that's why you ran that testing?
19     A  Correct.
20     Q  When you did this testing, you understood
21 from the prior radiography and measurements that in
22 your view the engagement overlap on the subject
23 rifle, Mr. Batts' rifle, was 60/thousandths of an
24 inch; correct?
25     A  Correct.

Page 64

1      Q  Why didn't you then, when you ran the oil
2  testing, utilize 60/thousandths of an inch of
3  engagement or overlap with your exemplar rifle?
4      A  Because I was trying to determine if a
5  properly latched rifle and the oil would have
6  unlatched, and it did not.  So the Batts rifle that
7  has less than half of the proper engagement, by the
8  Remington documents, is -- is inadequately latched.
9      Q  How do you know that?
10     A  Because they gave me the specification.  They
11 told me that if that indicator mark is not covered on
12 the barrel lug, then that catch is a no-go.
13     Q  I understand that based on your measurements
14 on the specs, that the engagement or overlap on the
15 Batts' rifle was below spec.  That's your view;
16 correct?
17     A  It is.
18     Q  Okay.  Does that necessarily equate in your
19 view to a dangerous condition?
20     A  It does.
21     Q  How do you know that?
22     A  Because it's out of spec.
23     Q  So anything that is out of spec is, without
24 question, in your view, a dangerous condition?
25     A  In the case of a barrel latch, yes.

EXHIBIT 3

Page 65

1    Q   Okay.  Your hypothesis and the reason you ran
2 your field-testing was to determine if the
3 application of oil in a rifle engaged at
4 145/thousandths of an inch, with a factory round,
5 would open; right?
6    A   Correct.
7    Q   And your testing revealed that with the
8 application of oil and the use of a factory round, an
9 engagement of approximately 145 -- .145 inches, the
10 action would not open?
11    A   Correct.
12    Q   Have you run any testing similar to what --
13 these field tests that you did, that we just
14 described, have you run any field test to rule in or
15 rule out that a rifle engaged at 60/thousandths would
16 open with use of a factory round and the use of oil?
17    A   Well, Mr. Danekas, as we've discussed a
18 number of times today, I have not run any tests with
19 the engagement at that low value that was exhibited
20 by the subject rifle.  I didn't feel it was necessary
21 to because I could see the damage created on those
22 surfaces; and based on my testing and evaluation of
23 the things we've already discussed, I felt
24 comfortable in showing that that rifle was defective
25 and opened up as a result of that low engagement.

Page 66

1 We've discussed that several different times today.
2    Q   Did you attempt to determine if what you are
3 saying was damage on the surfaces of the lug and the
4 barrel catch was a result of the incident or a result
5 of wear?
6    A   Well, it definitely wasn't the result of
7 wear, which is the removal of material because of the
8 surface contact between two materials.  It was
9 actually small compressed particles that were present
10 on that location.
11    Q   Would you agree, Mr. Powell, that if there --
12 if there had been zero engagement or overlap between
13 the barrel catch and the barrel lug, that that would
14 be even less robust engagement as what you have
15 observed on the Batts rifle?
16    A   It would be no engagement, if that's what
17 you're asking.
18    Q   Yes.
19    A   It's no engagement versus a small, defective
20 amount of engagement.
21    Q   Yeah.  That would be even worse?
22    A   Yes.
23    Q   And you would expect that with zero
24 engagement, if a factory round was fired through a
25 rifle with zero engagement, you would expect the

Page 67

1 action to open?
2    A   Yes.
3    Q   And you would expect the cartridge case to be
4 propelled rearward with force that would go through
5 eyeglasses and into somebody's eye?
6    A   I would expect it to be -- to be expelled at
7 force from the rear of the barrel; and whether it
8 goes into glasses or eyes depends on angle and impact
9 velocity.
10    Q   Did you determine the force or velocity of
11 the cartridge case that was expelled when the
12 incident occurred?
13    A   I did not.
14    Q   What is a contact vector?
15    A   I'm sorry?  A contact --
16    Q   What is a contact vector?
17    A   A contact vector?
18    Q   Yes.
19    A   I don't recognize that term.
20    Q   Did you perform any dynamic analysis of the
21 locking mechanism on the Batts rifle?
22    A   No.
23    Q   Did you perform any engineering analysis of
24 the locking mechanism?
25    A   Yes.

Page 68

1    Q   What?
2    A   The testing we've already discussed, sir.
3    Q   All right.  Is it accurate to say,
4 Mr. Powell, that the only test-firing of any rifle
5 you've done in connection with this case was the
6 field-testing that you did in late May with your
7 exemplar that you talked about?
8    A   Yes.  There were some additional firings, not
9 on videotape, just to zero in the scope; but other
10 than that, no.
11    Q   When was that test -- was that done at the
12 same time as what we've seen on video?
13    A   I think it was done the -- the zeroing of the
14 scope was done on May 25th, and then the testing with
15 the oil was done on May 28th of this year.
16    Q   And the test-firing you did on May 24th
17 that's not on video, how many test rounds were fired?
18    A   I don't recall offhand.  There were -- when I
19 submitted these videos to you -- where is my range
20 videos?
21       There was testing done on May 25th, and there
22 were two video takes made then, where I was just
23 watching to see if my cellphone would show
24 slow-motion views of that, and at that same time I
25 fired a number of rounds to zero the scope.

**Charles Wayne Powell - June 19, 2019**

Page 69

1    Q   And in any of those -- and I think we have
2  the two videos you took on May --
3    A   Yes.
4    Q   -- 24th.
5    A   Yes.
6    Q   At any time on May 24th, did the action open?
7    A   No.  The action has never opened from firing
8  on the exemplar rifle.
9    Q   Have you performed any mechanical engineering
10 analysis of the locking mechanism?
11   A   No.
12   Q   Okay.  Let's do a little housekeeping.  Then
13 we'll take a break for lunch.
14       I want to go through the deposition notice
15 and rider briefly which we marked as -- I pre-marked
16 some exhibits, Bob, so there may be some I don't use.
17 So if I'm skipping around numbers, it's not to worry.
18 But Exhibit 1 is -- I have one for you and one for
19 Mr. Powell.
20   A   The original is going to go to the court
21 reporter or...
22   Q   Do you have the original on there?
23   A   I have the one that was sent to me, yes.
24 It's not marked.
25   Q   Well, we marked one as an -- Exhibit Number

Page 70

1  1?  The one that she is -- yeah.
2    A   These go to the court reporter?
3    Q   They will.  They will, yeah.
4    A   Okay.  I don't want to keep anything that's
5  not supposed to be mine.
6        MR. DANEKAS: We'll make --
7        MR. MEADOR: Oh, she won't let you leave with
8  it --
9        MR. DANEKAS: She won't let you leave, yeah.
10       THE WITNESS: Okay.
11   Q   (By Mr. Danekas)  Mr. Powell, we've marked as
12 Exhibit 1 our Second Amended Notice of your
13 deposition for today.  You have seen this document?
14   A   I have.
15   Q   I know that Mr. Meador sent me a couple of
16 objections which, for purposes of this deposition, I
17 have no quarrel with, Bob.  Subject to those
18 objections, Mr. Powell, have you produced either
19 electronically or today everything on this notice?
20   A   Yes.
21   Q   Let me go through a couple of these
22 specifically.  Let's see.  Terry, before we get too
23 far down the road, let me do this.  Start with --
24       REPORTER: 38.
25       MR. DANEKAS: Yes, you're good.  I don't care

Page 71

1  what Dale says about you; you know that?
2        REPORTER: We're going to have to change his
3  mind.
4        MR. DANEKAS: Mark these beginning with 38
5  onward.  If you could hand those to Mr. Powell.
6        MR. MEADOR: Are those the notes produced
7  today for the depo?
8        MR. DANEKAS: 38 is, yeah.
9    Q   (By Mr. Danekas)  Mr. Powell, Exhibit 38 are
10 some notes that you produced this morning before we
11 started the deposition; is that correct?
12   A   Yes.
13   Q   And these notes in Exhibit 38 were not
14 produced prior to today, as I understand it; is that
15 correct?
16   A   Yes.  Yes.  Pardon me.
17   Q   Okay.  The last two pages seem to be notes
18 you took from a review of Mr. Batts' deposition; is
19 that correct?
20   A   That's correct.
21   Q   When did you review his deposition to take
22 these notes?
23   A   It looks like that was done on May 13th,
24 2019.
25   Q   Is that the first time you reviewed his

Page 72

1  deposition?
2    A   Yes.
3    Q   When did you first receive his deposition?
4    A   Shortly there -- shortly before that.
5    Q   By what method?
6    A   Electronic.
7    Q   Letter or electronic?
8    A   It was e-mailed to me.
9    Q   Have you ever seen the video of his
10 deposition?
11   A   I have not.
12   Q   Have you ever -- have you ever asked to see
13 it?
14   A   No.
15   Q   Have you seen the -- or -- strike that.  Have
16 you read the deposition of his wife?
17   A   I have not.
18   Q   On Exhibit 38, what are the other notes that
19 you have there?  And you can go through them fairly
20 quickly I think and describe what they are.
21   A   Do you want me to describe them page by page?
22   Q   Yeah.
23   A   Okay.
24   Q   You can be pretty brief; and if I want to
25 interrupt you -- if I need to interrupt you, I will.

EXHIBIT 3

Page 73

1   A  Page 1 is measurements of cartridge case
2  walls and the breech end of the barrel of the
3  exemplar rifle in getting dimensions that would use
4  to calculate pressures.
5     Page 2 shows pressures recorded during the
6  range-testing, as well as some calculations and
7  measurements used to estimate the thrust loads
8  created during those firings.
9     The next page is measurements made on the
10 exemplar rifle to ensure that it was going to be safe
11 to use.
12    The next page is the calculated thrust loads
13 from the different small Fuji Prescale film that were
14 attached to the fired cartridge cases for the
15 range-firing on May 28th.  At the bottom were some --
16 two calculations for a 223 Remington and a 30-aught-6
17 looking at what the thrusts might be if the
18 cartridges are not adhering to the walls of the
19 chamber.
20    The next page is just again a summary of
21 velocity pressure and thrust loads measured during a
22 range-firing.
23    And then the next two or three pages were
24 notes that I made there at the range when the
25 test-firing was going on.

Page 74

1     And then the last two pages are the notes I
2  made during the review of the deposition of Jon
3  Batts.
4   Q  Okay.  Exhibit 39 is a copy of a folder from
5  your file entitled "Technical Literature -- 300 AAC
6  Blackout"?
7   A  Yes.
8   Q  And I think most, if not all of this
9  material, was provided previously, but I thought I
10 saw a couple of things in there that may not have
11 been.
12  A  The ones that would not have been provided
13 previously, I think I listed in my subsequent report
14 -- pardon me.  Supplemental engineering report, and
15 that was from -- there is a section in here from
16 "Modern Reloading" from Richard Lee and "Handloading
17 Guide" from Western Powders.  Those would be in this
18 particular folder.
19  Q  All right.  And Exhibit 40 is a copy of your
20 folder entitled "Radiography"; is that correct?
21  A  Yes.
22  Q  And one of the reasons I mention this is I'm
23 not sure I'd seen this invoice from TGR Industrial
24 Services.  It's dated December 21, 2016, for -- it's
25 entitled "RT Testing."  You had the -- your exemplar

Page 75

1  and the Batts rifle x-rayed on December 12, 2016;
2  correct?
3   A  Correct.  You had asked as part of the
4  exhibits to bring to the deposition were I think my
5  returned check and any paperwork I had --
6   Q  Correct.
7   A  -- with TGR, and this is it.
8   Q  I understand.  Is that the only x-ray you had
9  taken of either your exemplar or the Batts rifle
10 until the North Star exam in November of 2017?
11  A  Yes.
12  Q  Okay.  Exhibit 40, is it?
13  A  41 would be next.
14  Q  41.  Okay.  41 is a copy of your folder
15 entitled "Thrust Load of Breech, slash, Lugs."
16  A  Yes.
17  Q  And that includes a copy of the article you
18 mentioned earlier regarding analysis -- using these
19 stickers or film on the cartridge case to attempt to
20 measure thrust?
21  A  Yes.
22  Q  42 is a copy of your folder entitled "Strain
23 Gage," and I'd asked for you to bring information
24 concerning the strain gage you used for your
25 field-testing; correct?

Page 76

1   A  Correct.
2   Q  And 43 is information Fuji Prescale film, and
3  that has some information regarding that.  These
4  graphs in Exhibit 43, are these specific to this case
5  or just illustrative?
6   A  Well, they are illustrative, but they were
7  also utilized during the initial evaluation of the
8  thrust loads.  You basically use a color chart to
9  prepare the areas of the impact-loading on the film,
10 and then use that color determination with a
11 particular chart for the type of film and the type of
12 impact and get a value, and then you use that value
13 to calculate pressure and, thus, load.
14  Q  Okay.  Looking at the Exhibit 1 -- excuse me.
15 Exhibit 1, your notice of your deposition, the first
16 item is asking for all information regarding -- or
17 relating to your testing that replicates, validates
18 or supports the deponent's -- that's you -- your
19 opinions.
20    Other than your examination, visual
21 examinations of the rifle and the bullet and the
22 shell and your review of the radiography and the CT
23 scans and your review of the video showing the
24 incident and the field-testing that you recently
25 conducted utilizing the oil, is there any other

Charles Wayne Powell - June 19, 2019

Page 77

1  information that in your view supports your opinions
2  about the rifle and the cause of the incident?
3      A  And the microscopic examination --
4      Q  I meant to --
5      A  -- of the surfaces.
6      Q  I intended to include that.  Anything else?
7      A  No.
8      Q  Number 2 is any information that does not
9  validate or support your opinions.
10     A  I do not have any.  If there were some there,
11 I would have brought it.
12     Q  3 is asking for records relating to
13 compensation paid for your involvement in this
14 lawsuit, and you have produced invoices.
15     A  Right.
16     Q  Is there anything else?
17     A  That's it.
18     Q  We'll get to that.  4, we've taken care of.
19     5 asks for any information regarding your
20 testing of the subject rifle or any other
21 Handi-Rifle.  Using your definition of testing,
22 you've produced all items responsive to number 5?
23     A  I have.
24     Q  6 is all transcripts of testimony,
25 statements, reports, photographs, exhibits and videos

Page 78

1  concerning the incident or the condition of the
2  subject rifle that you have reviewed or relied upon.
3  You've produced all of that today?
4      A  I have.
5      Q  The only testimony that you reviewed is
6  Mr. Batts' testimony; correct?
7      A  Correct.
8      Q  There were a couple of investigative reports
9  from the U.S. Army.  Have you seen those?
10     A  I've seen one.
11     Q  You've seen one.  Is that the game warden
12 report where he refers to a witness who says that he
13 refers to Mr. Batts using a clearing rod to remove a
14 bullet from the barrel?
15     A  I believe so.  It's a -- it's an e-mail --
16 I'm trying to get a number.  It's got a case number
17 on it.  And it's a -- I think it was done by Tony
18 Randall, Police Tech Services tech, and let's see who
19 signed the back one.  Chief -- a game warden chief at
20 Fort Hood, a Mr. Al Lankford.
21     Q  Lankford.  When did you receive that?
22     A  I probably received it near the time I
23 received his deposition.
24     Q  Which I think you told me --
25     A  Somewhere in May.

Page 79

1      Q  -- was in May of 2019?
2      A  May of 2019, correct.
3      Q  Is there any significance of the game
4  warden's report for your opinions in this case?
5      A  Well, I don't think it adequately describes
6  what happened in Mr. Batts' injury.
7      Q  What do you mean by that?
8      A  They indicate that when he opened the breech,
9  the round fired.  I think it's just the opposite.
10 The round fired and the breech opened, as the video
11 shows.
12     Q  Okay.  There is also reference in the game
13 warden's report to a statement of somebody who said
14 that Mr. Batts had used a clearing rod to remove a
15 round from the rifle before the incident occurred.
16     A  Correct.
17     Q  Is that of any significance to you?
18     A  Well, I saw the video that was presented, I
19 think it's called Recover 7, that showed Mr. Batts
20 doing exactly that, so I think that's accurate.
21     Q  When did you first become aware of that
22 recovered video?
23     A  Just right before my previous deposition
24 date, when it was sent to me.  Let me see if I've got
25 that date here.

Page 80

1      I don't see that I have a copy of it here on
2  my computer.  I've looked at it.  I don't know why I
3  don't have a copy on here, but it would have been
4  just right before I did the range-testing, so middle
5  of May 2019.
6      Q  You received then both the game warden's
7  report and the recovered video in roughly mid-May of
8  2019?
9      A  Correct.
10     Q  I understand, Mr. Powell, that in light of
11 there be -- the recovered video, that you wanted to
12 do additional testing; is that correct?
13     A  Yes.
14     Q  And is that additional testing what we've
15 talked about already, the field testing where you
16 applied oil to the chamber?
17     A  That's correct.
18     Q  Was that the only additional testing that you
19 wanted to do after receiving the recovered video in
20 mid-May?
21     A  Yes.
22     Q  If you had received the game-warden report
23 earlier but not the recovered video, would you have
24 wanted to do any additional testing?
25     A  Not necessarily.  The game-warden report

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 81

1   was -- you know, had all kinds of things in it that I
2   didn't think were accurate. So I don't know if the
3   report, that he had used a range rod to remove, that
4   I would consider particularly accurate; but certainly
5   either the deposition testimony or in this case the
6   video would have certainly prompted me to believe
7   that that was true.
8     Q  Okay. Other than the action opening -- that
9   the round ejected when Mr. Batts opened the action,
10   as you alluded to in the game-warden report, is there
11   anything else in that report that you considered to
12   be inaccurate?
13     A  Well, that entire area description, where it
14   says, "He was firing his firearm. The round did not
15   fire. When the breech was open, the round fired." I
16   think that entire description, I do not think is
17   accurate.
18       But the description of his injury and how
19   that occurred, I think that's all accurate: The
20   breech opened; the case came back and hit his eye.
21   And they talk more about the people that were
22   present, how they inspected the rifle and advised him
23   to have it inspected by a gunsmith, and that type of
24   thing is all fine.
25     Q  Based on review of the recovered video,

Page 82

1   Mr. Batts did use some type of rod to remove the
2   stuck bullet; right?
3     A  He did. He fired a squib load that showed
4   low recoil, and the bullet ended up poking out the
5   end of the muzzle of his rifle, and then he used a
6   clearing rod to push that out, and then I think a
7   bore snake to clean the bore out.
8     Q  You talked about a game-warden report and
9   some of the aspects you consider to be not accurate.
10   In reviewing a case, based on your review of the
11   physical evidence and examinations you might do and
12   testing that you might do, do you sometimes evaluate
13   whether certain statements and/or testimony is
14   accurate or inaccurate?
15     A  Sure, based on the physical evidence.
16   Absolutely.
17     Q  You had in your possession, as I understand
18   it, Mr. Powell, the SD card that was in Mr. Batts'
19   GoPro camera at the time of his incident; correct?
20     A  Correct.
21     Q  What did you do with that SD video card?
22     A  I downloaded the video that was on it that
23   showed the injury from Mr. Batts, and that's it. And
24   then held on to it until I gave it back to
25   Mr. Meador.

Page 83

1     Q  How did you download it?
2     A  I just stuck it into my computer and
3   downloaded it.
4     Q  What -- your computer is a Windows-based
5   computer?
6     A  Yes.
7     Q  So you put the SD card in your computer, the
8   same computer you have here with you today?
9     A  I think so, yes.
10     Q  And so you -- how did you copy it? Did you
11   open Windows Explorer?
12     A  I probably did, yes.
13     Q  Okay. So you brought up the contents of the
14   SD card; correct?
15     A  Correct.
16     Q  Did you notice any other videos on the SD
17   card?
18     A  There was other material on the SD card, yes.
19     Q  How did you know which video to download?
20     A  I already had a copy of the video e-mailed to
21   me, and then I used that to get the original video,
22   of that video, hoping it would be better quality.
23     Q  The copy that was sent to you -- strike that.
24   The video on the SD card was numbered GOPR 5588, was
25   it not?

Page 84

1     A  Yes, it was.
2     Q  Did you notice at the time you put the SD
3   card in your computer that there was also a video
4   called GOPR 5586?
5     A  No. I didn't make any notes of that. I just
6   wanted that particular video.
7     Q  I take it, Mr. Powell, that other than
8   downloading the video of the incident from the SD
9   card, that you did nothing else with the SD card?
10     A  Correct.
11     Q  You did not delete any video that was on the
12   SD card; correct?
13     A  Correct.
14     Q  How many times did you have the SD card in
15   your computer?
16     A  That was a year or so ago. I don't recall.
17   Certainly once. I doubt that I put it in there more
18   than once.
19     Q  Are you now aware that there was a video that
20   was at some point deleted from that SD card?
21     A  You know, I don't know anything about
22   deletions. I just know that someone has presented to
23   me a video titled "Recover" -- I think there may have
24   been a number, like "Recover 7," and I received that
25   video, and I was told it was on that SD card. That's

EXHIBIT 3

Page 85

1 all I know.
2    Q   The box of the ammunition that we have you
3 referred to earlier in the yellow -- yellow, geez --
4 the red box?
5    A   Yes.
6    Q   There is a number on there, on the box.  Is
7 that a number that you placed on the box?
8    A   That 160201?
9    Q   Yes.
10   A   It is.
11   Q   And that's your file number; and if I can
12 discern your approach, 16 refers to the year?
13   A   Correct.
14   Q   02 refers to the month?
15   A   Yes.
16   Q   And 01 refers to the day?
17   A   No.  The 01 would just be how many cases came
18 in that month.  That would be the first case that
19 came in, in February of 2016.
20   Q   So sometime in February, you opened a file in
21 this matter?
22   A   Correct.
23   Q   It just happened to be the first file you
24 opened in February of 2016?
25   A   That's correct.

Page 86

1    Q   Mr. Batts in his deposition identified that
2 number on that ammo box as his.  Do you have any
3 explanation as to why he might have done that?
4    A   No.
5    Q   No doubt in your mind that that's your
6 writing on the box?
7    A   Correct.
8    Q   And that box -- when the ammo was presented
9 to you, that ammo was in that box?
10   A   Correct.
11   Q   Did you bring -- I'm looking at Item Number
12 33 in this Notice of Deposition.  Did you bring the
13 spent cartridge cases from your test-firing?
14   A   Yes.
15   Q   All of them?
16   A   Yes.
17   Q   And did you bring the high-pressure
18 sensitive-film disks that you mentioned?
19   A   I have photographs of them.  As I mentioned
20 to Mr. Meador, those were supposed to have been
21 returned earlier in this week, but now I'm told they
22 are due for delivery today, and so they are not here
23 with me.
24   Q   Returned from whom?
25   A   From Sensor, Incorporated.  They used their

Page 87

1 digitometer to get more accurate thrust values.
2    Q   And number 35, you have produced all the
3 video and photographs of the test-firing?
4    A   I have.
5    Q   We had your deposition scheduled in February
6 of this year, and it was continued.  Do you know why?
7    A   I think because my client wanted me to do the
8 additional testing.
9    Q   In February?
10   A   In February?
11   Q   Yes.
12   A   I don't recall in February.  I thought -- I
13 don't recall that it was...
14   Q   All right.
15   A   I mean, things have happened in the case that
16 I don't -- I'm not aware of.  So I don't know why it
17 was canceled in February.
18   Q   We'll take care of a little more housekeeping
19 and then we'll take a break.  Bob?
20      MR. MEADOR: Sure.
21   Q   (By Mr. Danekas)  This is Exhibit 8.  If you
22 can hand that to Mr. Powell.  This is his paper file,
23 Bob.
24      MR. CHANEY: A copy for you, Bob.
25      MR. DANEKAS: Do you want it?

Page 88

1      MR. MEADOR: Oh.  Thank you.  I'm sorry.
2    Q   (By Mr. Danekas)  Exhibit 8 is a copy of your
3 paper file?
4    A   Yes.
5    Q   I will just ask you a few questions about it.
6 Let's go to the invoices toward the end first.
7    A   It's on Bates page --
8    Q   Yeah, I have actually Bates-labeled them
9 so --
10   A   Yes.
11   Q   -- we can refer to them easier.
12   A   So number 79.
13   Q   They begin on page 79?
14   A   Correct.
15   Q   And your invoices run through 80 -- strike
16 that.  91?
17   A   Yes.
18   Q   Okay.  Do you have any invoices subsequent to
19 what is depicted on page 91?  They run through March
20 of 2019.
21   A   I think there was one additional invoice that
22 was added, if I'm not mistaken.
23   Q   Do you have that with you today?
24   A   Yes, I would have it with me if that's
25 correct.  Maybe you have it already.  I think you

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 89

1   already have it here.  91.
2      Q   Page 91 is the last --
3      A   Yeah.
4      Q   -- invoice?
5      A   That's correct.
6      Q   And the last entry for that is from March 24
7   of 2019, and we know that you've been busy with all
8   your test-firing in May.
9      A   Correct.
10     Q   But you've not issued an invoice since then?
11     A   Have not.
12     Q   Have you kept track of your time?
13     A   I'm sure I have, yes.
14     Q   Okay.  How much time do you think you've
15  spent on this case since March 14th of 2019 until
16  today?
17     A   The only thing I think I've done is reviewed
18  the report, the deposition, test-firing, so perhaps
19  another 20 hours?
20     Q   Okay.  Let's go to your invoices.  I'm not
21  going to go through each and every entry, but I have
22  a few questions.
23     A   Sure.
24     Q   Page 80 -- they start on page 79.  Your first
25  contact with the case in this case was February 1 of

Page 90

1   2016; correct?
2      A   Correct.
3      Q   You purchased your exemplar on February 15 of
4   2016?
5      A   Yes.
6      Q   Page 80 of this exhibit reflects the
7   radiographs taken of the rifles on December 12;
8   correct?
9      A   Correct.
10     Q   Page 81 indicates that on February 14 of
11  2017, you disassembled the exemplar rifle?
12     A   Yes.
13     Q   Is that the first time you had disassembled
14  it?
15     A   Yes.
16     Q   Now, on page 82, on March 1 of 2017, you have
17  an entry for "Test exemplar rifle."  It looks like
18  you billed two hours for that.  Do you see that?
19     A   I do.
20     Q   What did you do to test the exemplar rifle?
21     A   It looks like I reloaded some test ammunition
22  and must have test-fired it.
23     Q   Do you have any records of that test-firing
24  --
25     A   No.

Page 91

1      Q   -- by way of document, photographs or video?
2      A   I do not.
3      Q   Why did you test-fire the exemplar?
4      A   To see if it was safe to fire.
5      Q   How many rounds did you fire?
6      A   Not very many.
7      Q   What kind of ammunition did you use?
8      A   It looks like I used exemplar Hornady 300
9   Blackout and some additional Hornady bullets and
10  propellant.
11     Q   Okay.  And on March 3rd, you billed three
12  hours for reloading test -- "Reload test ammunition."
13  Did I read that correctly?
14     A   You did.
15     Q   How many rounds did you reload?
16     A   Not very many.  Less than 10.
17     Q   Do you have any records of that?
18     A   I do not.
19     Q   Any photographs or videos of that?
20     A   I do not.
21     Q   You had exemplar Hornady 300 Blackout
22  ammunition.  What grain of bullet did you use?
23     A   208 AMAX bullets.
24         (Reporter interruption)
25         THE WITNESS: 208 AMAX, A-M-A-X, bullets.

Page 92

1      Q   (By Mr. Danekas)  What cartridges did you
2   use?  Cartridge cases.
3      A   Cartridge cases?  Hornady.
4      Q   What propellant did you use?
5      A   I think that was the 1680.
6      Q   Why did you reload as opposed to buy factory
7   ammunition?
8      A   I just wanted to vary the amount of
9   propellant in it from small to large, to see.
10     Q   Why?
11     A   To see if it made any difference.
12     Q   Why was that important to you?
13     A   To see -- to see if the test exemplar rifle
14  was safe to fire.
15     Q   Why would the -- why would the amount of
16  propellant in the rounds have determined for you
17  whether the exemplar was safe to fire?
18     A   You know, I don't recall anything about this.
19  This is two years ago.  So other than -- other than
20  what I've told you, that's all I recall.
21     Q   But you kept no records of this?
22     A   No, I did not.
23     Q   Why not?
24     A   I don't know.  It's too long ago.
25     Q   Well, that's why you keep records, isn't it?

**Charles Wayne Powell - June 19, 2019**

Page 93

1    A  It is usually.  It's surprising to me that
2  this was done, so I don't -- I don't recall.
3    Q  Do you recall how many rounds you reloaded?
4    A  Less than 10.
5    Q  Do you remember the -- you already told me
6  the type of propellant.  Do you remember the amounts
7  of -- the amount of propellant you used?
8    A  Probably from -- well, not "probably."  No,
9  since I don't have the records, I can't tell you
10  exactly, but somewhere between five to 10 grains.
11    Q  In these 10 rounds or less that you fired,
12  did the exemplar open?
13    A  No.  It's never opened in any test.
14    Q  So this test-firing of your exemplar rifle,
15  you took no photographs of it?
16    A  No.
17    Q  You took no videos of it?
18    A  No.
19    Q  And you created no records of it?
20    A  Correct.
21    Q  Did you think that at the time you were
22  conducting the test-firing in March of 2017 that the
23  amount of propellant could have been a factor in this
24  incident?
25    A  No.

Page 94

1    Q  Was it your understanding in March of 2017
2  that Mr. Batts was firing factory-compliant
3  ammunition?
4    A  Was it in my opinion that he was firing
5  factory --
6    Q  Yes.
7    A  -- compliant?
8    Q  Yes.
9    A  Yes.
10    Q  So why did it cross your mind to alter or
11  vary the amount of propellant in these rounds that
12  you loaded?
13    A  Well, when I'm evaluating our test rifle, I'm
14  shooting a low amount of propellant to start off
15  with, and then I'm increasing it, watching to see if
16  anything occurs that might indicate the rifle is not
17  safe to fire, up to a full load.
18    Q  Did you experience any squib loads?
19    A  No.
20    Q  Why did you choose the 1680 propellant?
21    A  That's a common propellant used in 300
22  Blackout.
23    Q  Was anyone present when you conducted the
24  test-firing?
25    A  No.

Page 95

1    Q  Now, this was work you did in connection with
2  this case; correct?
3    A  Yes.
4    Q  And you billed Mr. Meador for test -- testing
5  it?
6    A  I did.
7    Q  Do you believe it to be professional for an
8  expert in litigation to run tests and not keep any
9  records of it?
10    A  In this case, I'm just evaluating a test
11  exemplar rifle.  I think -- I do this all the time
12  trying to determine if the exemplar is going to be
13  one that I can utilize in further testing.
14    Q  Can you explain for me why you billed for
15  reloading the ammunition on March 3rd -- and that's
16  the reloaded ammunition used in the test-firing;
17  correct?
18    A  Yes.
19    Q  And yet two days earlier is when you billed
20  for actually testing the exemplar rifle.  Why is
21  that?
22    A  I can't -- I can't tell you that.  I don't
23  know.
24    Q  Do you still have any of the components?
25  Because I think this was one of the things we asked

Page 96

1  for in our notice.  Do you have any of the components
2  that you used to reload this test ammunition in March
3  of 2017?
4    A  Sure.
5    Q  Is it here with you?
6    A  No.  This isn't a test.  This is just
7  evaluating the exemplar rifle to see if it could be
8  used.
9    Q  Well, looking at Exhibit 1 again, Mr. Powell,
10  numbers 26 and 27, 26 asks for, "Any and all
11  ammunition reloaded by Deponent."  That's you.  "Or
12  at his request, on his behalf, or under his
13  supervision in connection with Deponent's involvement
14  in the Batts Lawsuit, including but not limited to
15  that ammunition referred to in SSEC's invoice for
16  March 3, 2017."
17        26 asks for, "Any and all ammunition
18  cartridges, primers, and propellant acquired,
19  reviewed, used, or considered by Deponent in
20  connection with his involvement in the Batts Lawsuit,
21  including but not limited to such items referred to
22  in SSEC's invoice for March 3 of 2017."  And you're
23  telling me that none of the reloaded ammunition or
24  any of the components are with you today?
25    A  I have no -- I have none of the ammunition.

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 97

1  All the ammunition was fired.
2      Do I have cartridges, primer and propellant?
3  I do have those and bullets and their boxes and cans,
4  but you're right.  I forgot to bring those.
5    Q   How did you fire this ammunition when you
6  were testing it to see if the exemplar was safe to
7  fire?
8    A   I chambered around and pulled the trigger.
9  Cocked it and pulled the trigger.
10   Q   If you were trying to determine if it was
11 safe, why would you not activate the trigger
12 remotely?
13   A   Because I'm starting off with a very low
14 load.
15   Q   Did you pull -- physically pull the trigger
16 with each of these test-firings?
17   A   Yes.
18   Q   But this was -- you were trying to determine
19 if it was safe to fire; right?
20   A   Sure.  So I evaluate the cases and the
21 primers and evaluate the behavior of the firearm as I
22 test-fired.
23   Q   And I think you told me that you did not have
24 a squib load during this test-firing.
25   A   No.

Page 98

1    Q   Was anyone with you?  Did I ask you that?
2    A   You did, but no one was with me.
3    Q   Is there any other examinations, inspections
4  or testing that you've done in this case for which
5  you have no records?
6    A   You know, I don't know of any testing that
7  I've done in this case that I have no records.  I've
8  brought everything.  I would not have considered this
9  testing, but just simply evaluation of the exemplar
10 firearm to see if I can use it in tests.
11   Q   Did you photograph or video the testing?  I
12 know you don't have photographs or video now, but did
13 you photograph or video the test-firing that you were
14 doing?
15   A   No.  I just went out to see if this was --
16 this was a rifle.  If I felt that it was behaving
17 abnormally, I would have not used it and gotten a
18 different exemplar.
19   Q   Let's finish the invoice and we'll go to
20 lunch.  On April 25, 2017 --
21   A   Which page are you on?
22   Q   This is on page 83.
23   A   83.
24   Q   You billed an hour for "Prepare for testing."
25 What testing were you preparing for?

Page 99

1    A   To evaluate the rifle and the ammunition,
2  making measurements.
3    Q   To evaluate the rifle, meaning what?
4    A   Meaning looking -- looking at the components
5  of the rifle and determining whether or not, again,
6  if my test-firing showed anything unusual about the
7  exemplar rifle.
8    Q   When you say "Prepare for testing" here on
9  April 25, you're referring to testing of the exemplar
10 rifle?
11   A   Yes.
12   Q   Which is what -- but hadn't you already
13 test-fired it six weeks or so earlier?  Seven weeks
14 earlier?
15   A   Right.  I don't think it was seven weeks.  I
16 think it was a month before.
17   Q   March 3 to April 29 -- April 25.  I'm sorry.
18   A   Right.  So a month later, yes.
19   Q   So your next entry from April 25 is not until
20 May 19, almost a month later.
21   A   Correct.  And there, I think I'm measuring
22 the exem -- the subject rifle.
23   Q   And ammunition?
24   A   Yes.
25   Q   The test-firing that you did with the

Page 100

1  exemplar, that was or was not testing in connection
2  with your work in this case?
3    A   It's not testing.  It's evaluation of the
4  exemplar rifle to see if it can be used in testing.
5    Q   Okay.  So test-firing of the rifle was not
6  testing, but visual examination and measurement of
7  parts of the rifle was testing?
8    A   We're talking about apples and oranges.
9  We're talking about test evaluation of a defective
10 rifle versus test-firing of an exemplar rifle to see
11 if it can be used in this testing.
12   Q   You were speaking of an evaluation and
13 measurements of something you considered to be
14 defective before you even analyzed it, didn't you?
15 Isn't that the case?
16   A   No.  We had seen the lack of engagement
17 between the barrel latch and the barrel lug.  I think
18 by that time we'd already examined the radiographs,
19 if I'm not mistaken.  Yeah.
20   Q   Yeah, the radiographs were in December of
21 '16.
22   A   So we already suspected that there was
23 something defective about the rifle because it had
24 low engagement.
25   Q   So based on the radiographs alone, it was

**Charles Wayne Powell - June 19, 2019**

---

Page 101

1  your working assumption that the rifle was defective?
2   A  Yeah, because the engagement was inadequate.
3   Q  Okay.  And was it your working assumption,
4  based on the radiographs alone, that it was defective
5  and therefore unreasonably dangerous?
6   A  Well, based on all the other work that was
7  done in the case, I came to those conclusions, that's
8  correct.
9   Q  But in December of 2015, had you arrived at
10  the conclusion that the load engagement was an
11  unreasonably dangerous condition?
12   A  If that low engagement was as a result of
13  manufacture, yes, I told Mr. Meador that I thought
14  that's what the case was, but we needed to do more
15  evaluation to confirm that.
16   Q  Go to page 91, Mr. Powell.  I've highlighted
17  a couple of dates -- or a few dates there.  Do you
18  see that?
19   A  I do.
20   Q  January 4 of '19, you have five hours for
21  reviewing file materials, take photographs and
22  photomicrographs; correct?
23   A  Yes.
24   Q  And I know that you were getting ready to
25  submit your initial report.  Is January 4th of 2019

---

Page 102

1  the first time you took any photomicrographs?
2   A  I don't know.  I'd have to go -- go through
3  my list and see.
4   Q  And on January 13 and 14, seven hours each
5  day you worked on your report; correct?
6   A  Correct.
7   Q  January 24th of 2019, you billed for a
8  telephone conference with Mr. Meador regarding
9  testing.  Do you see that?
10   A  I do.
11   Q  What testing did you discuss with Mr. Meador
12  on January 24, 2019?
13   A  The testing I had done in the case.
14   Q  What was that?
15   A  Everything that had been placed into my
16  report.
17   Q  Okay.  So any -- what you consider to be
18  testing would have been included in your first
19  report?
20   A  Well, everything that I included in testing,
21  absent the range-testing, yes, is in my first report.
22     I don't know what the time frame was.  We may
23  have been talking about testing insofar as -- when
24  was the CAT scans done?
25   Q  November of 2017.

---

Page 103

1   A  Okay.  Well, then that's not what we're
2  talking about then.
3     VIDEOGRAPHER:  10 minutes.
4     THE WITNESS:  I'm not sure what the testing
5  is that we're discussing there.
6   Q  (By Mr. Danekas)  Well, four days later, you
7  have a, "Telephone conversation with Mr. Meador
8  regarding cancellation of testing scheduled for this
9  week."  Do you have any recollection of what testing
10  you discussed with Mr. Meador in January of '19 that
11  apparently was canceled?
12   A  No.
13   Q  It is true, is it not, that the only
14  test-firing of any rifle you did in this case prior
15  to your January report was the testing of the
16  exemplar for which you have no records, no
17  photographs, no videos?
18   A  That, I do not consider testing.  That is
19  evaluation of that.
20   Q  Okay.
21   A  And I think -- I think, looking at this and
22  my other tests, maybe the examination of the subject
23  rifle by Mr. Watkins is what we were discussing on
24  the 24th and 28th of January in 2019 if that -- if
25  that testing had been canceled for some reason.

---

Page 104

1   Q  You're referring to --
2   A  The March examination by Mr. Watkins, where
3  --
4   Q  You two eventually connected on March 26th at
5  what time -- at which time he removed the bullet from
6  the barrel?
7   A  Yeah.  I think that was scheduled earlier.
8   Q  Okay.
9   A  And was canceled, and we did that later.
10   Q  All right.  It is true, though, that in
11  connection with this case, you had done no
12  test-firing of any rifle prior to your January 2019
13  report?
14   A  That's correct.
15   Q  And it is true that as of today, the only
16  test-firing you have done of any rifle in connection
17  with this case was the range-firing you did in May
18  about -- with the exemplar involving the application
19  of oil?
20   A  Correct.
21     (Reporter interruption)
22     THE WITNESS:  Oil.
23     MR. DANEKAS:  Application of oil.  He's
24  almost done, and let's take a short lunch break?  How
25  about 1:30?

---

EXHIBIT 3

Page 105

1    **MR. CHANEY:** That works.
2    **THE WITNESS:** Approximately.
3    **VIDEOGRAPHER:** Off the record at 12:51.
4        (Lunch recess held)
5    **VIDEOGRAPHER:** We're back on the record at
6    1:35.
7    Q   (By Mr. Danekas) Mr. Powell, as I understand
8    it, after receiving and reviewing the recovered video
9    showing Mr. Batts experiencing a squib load with the
10   first round he fired from his rifle, you decided that
11   you needed to do some testing with your exemplar
12   rifle; is that correct?
13   **A   Yes.**
14   Q   Had you considered doing any test-firing with
15   your exemplar rifle prior to May of 2019?
16   **A   Not based on the physical evidence that I had**
17   **detected in the subject rifle, no.**
18   Q   Okay.  Then why was it necessary in your mind
19   in March of 2017 to fire the exemplar rifle to
20   determine if it was safe to fire if you weren't
21   intending to fire it?
22   **A   Well, I wanted to see if there was the**
23   **potential, if I needed to fire it, that I could.  You**
24   **know, we're trying to evaluate a rifle that has**
25   **certain characteristics in it and created certain**

Page 106

1    **pieces of evidence when it fired and injured**
2    **Mr. Batts; and based upon my testing and evaluation**
3    **of that evidence, I didn't feel it was necessary to**
4    **go ahead and fire that exemplar rifle; but**
5    **ultimately, it was determined I needed to, and it was**
6    **ready to go.**
7    Q   So on your invoice for March of 2017 when you
8    state "Test of exemplar rifle," you really meant to
9    say "Evaluate exemplar rifle"?
10   **A   Well, I abbreviated what I did; but yes, in**
11   **essence evaluating that rifle to see if I'm going to**
12   **use it in any kind of testing, and it just -- the**
13   **word "test" just got into the invoice.**
14   Q   Having had the lunch break to reflect on it,
15   do you have any explanation as to why your entry for
16   testing the exemplar rifle with ammunition that you
17   loaded yourself is on the invoice two days before you
18   had billed for actually reloading the test
19   ammunition?
20   **A   No.**
21   Q   While we have Exhibit 8 out, turn to Bates
22   page 23.  I've highlighted a couple of these things
23   for you so we can get to them quickly.
24       Is the chart at the top -- I've highlighted
25   the word "Powder" there --

Page 107

1    **A   Yes.**
2    Q   -- under "208 grain."  And the last powder or
3    propellant listed there is Accurate 1680.  Do you see
4    that?
5    **A   I do.**
6    Q   Is this the document that you used to
7    determine that you should be loading your test shells
8    with 1680 propellant?
9    **A   This and others, yes.**
10   Q   Was Accurate 1680 the only propellant that
11   you used?
12   **A   Yes.**
13   Q   Go to page 34.  This is part of the
14   "Reloading Handbook, 50th Edition" that you have in
15   your materials; correct?
16   **A   Correct.**
17   Q   And down below, in the box, there is a
18   warning.  Do you see that?
19   **A   I do.**
20       **MR. CHANEY:** I'm sorry, Steve.  What page are
21   you at?
22       **MR. DANEKAS:** Page 34, Bob.
23   Q   (By Mr. Danekas)  The last two paragraphs
24   there read, "The individual assumes all risks for the
25   safety of reloaded ammunition.  Improperly loaded

Page 108

1    ammunition, or the failure to follow all necessary
2    precautions, may result in serious personal injury
3    and/or death to the shooter or bystanders.  There are
4    many precautions to which the reloader need adhere."
5    Did I read all that correctly?
6    **A   You did.**
7    Q   Do you agree with those statements there?
8    **A   I do.**
9    Q   Do you agree with the statement that one
10   should not use ammunition if the person does not know
11   the source of the ammunition?
12   **A   Yes, I personally do, yes.**
13   Q   I'm sorry?
14   **A   I personally do, yes.**
15   Q   Moving up to page 51, this is notes from --
16   it looks like it's dated November 28th of 2017.  Do
17   you see that in the upper right-hand corner?
18   **A   Yes.**
19   Q   This is the day you were at North Star in
20   Minnesota?
21   **A   Uh-huh, yes.**
22   Q   I have highlighted over in the left column
23   some writing there; and if I'm reading your writing
24   correctly you wrote, "Noted on second set of images
25   of subject rifle, fire control latch is only

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 109

1  partially engaged still.  It may be, quote, more,
2  close quote, engaged than when I radiographed it."
3  Did I read that correctly?
4  **A  Yes, except it says -- the first -- third**
5  **word in there is -- I think -- I can't remember if**
6  **you said -- but it's supposed to say, "2D."  "Noted**
7  **on 2D set of images."  I don't think you read the 2D**
8  **as that.**
9  Q  Okay.  As in two-dimensional?
10  **A  Yes.**
11  Q  Okay.  Was the 2D images of the subject rifle
12  performed after the CT, the 3D CT?
13  **A  They were all performed -- oh, that's a good**
14  **question.  I think they were probably done after the**
15  **CT.**
16  Q  What are you referring to where you're
17  saying, "It appears that there was" -- that it was,
18  quote, "more engaged than when I radiographed it"?
19  **A  I radiographed it approximately a year**
20  **earlier.  I can't remember the exact dates, but it**
21  **was my visual evaluation of the 2D setup and images**
22  **that it looked like the engagement may be more than**
23  **what I had seen in my radiographs earlier.**
24  Q  You took possession of the Batts rifle in
25  February of 2016.

Page 110

1  **A  Correct.**
2  Q  Between February of 2016 when you first took
3  possession of it until the exam at North Star in
4  November of 2017, the rifle remained in your
5  possession?
6  **A  Yes.**
7  Q  Correct?
8  **A  Yes, that's correct.**
9  Q  And how many times did you open and close the
10  action on the Batts rifle during that time period?
11  **A  Once.**
12  Q  When?
13  **A  I think I made a note of it.  Let's see.**
14  **Well, I don't see that note at this time.**
15  **It's my recollection that I opened it once and then**
16  **closed it and then left it that way so we could**
17  **radiograph it, and then I just simply left it in that**
18  **same condition as when I radiographed it until it was**
19  **CAT-scanned.**
20  Q  For what purpose did you open the action and
21  then close it?
22  **A  I don't know.  I think I was looking at the**
23  **movement of the actuating lever for the latch**
24  **mechanism.  It appeared to be below, that it wasn't**
25  **fully engaging, and that's what it showed on the**

Page 111

1  **radiograph, and I pushed it down to see and then**
2  **closed it back.**
3  Q  When did you take -- first take any
4  photographs of the Batts rifle?
5  **A  Well, I don't see any photographs here.**
6  **Let's look at the contact sheets.  Yeah, here we go.**
7  **It looks like November 28th, 2017.**
8  Q  Which was at North Star; correct?
9  **A  Well, that's what I'm looking to see.  Is**
10  **that the North Star -- I surely took some earlier**
11  **than that.**
12  **That's all I see.**
13  Q  When you say, "That's all I see," you're
14  referring to the photographs from November --
15  **A  I'm --**
16  Q  -- of '17?
17  **A  I'm looking at the dates the photographs were**
18  **taken in my file.**
19  Q  Uh-huh.
20  **A  And I'm looking for images earlier than 2017,**
21  **and those are the earliest images I see.**
22  Q  So you had the Batts rifle for roughly 21
23  months before you took any photographs of it; is that
24  correct?
25  **A  Correct.**

Page 112

1  Q  Page 57 on Exhibit 8, I have highlighted in
2  the margin there.  I just couldn't quite make out
3  what you wrote in the margin of that note, in the
4  margin of that piece of paper I should say.
5  **A  This is in Batts Powell 57?  Is that what**
6  **you're asking?**
7  Q  Yes.
8  **A  Is that the correct page?**
9  Q  Yes.
10  **A  Well, it says, "Fired LC 13 plus primer.**
11  **95.7 grain."**
12  Q  What is that referring to?
13  **A  I have no idea.**
14  Q  At the bottom of that page, I've got a green
15  dot toward the bottom.  What is that section of that
16  page below the line?  What does that refer to?
17  **A  It looks like I'm trying to determine what**
18  **the weight of the WCC 10 cartridge might include and**
19  **what weight bullets might be on that particular**
20  **cartridge.**
21  Q  Going to page 61 of Exhibit 8.  You have a
22  drawing there --
23  **A  Okay.  I just recalled.  You were asking**
24  **about what I had put into the margin on Powell 57.**
25  Q  Page 57 of this exhibit?

EXHIBIT 3

Page 113

1    A  Uh-huh.
2    Q  Yes.
3    A  I pulled an LC 13 cartridge case from one of
4  the bags of cases I had saved to handload, and I
5  weighed it so I could get an estimate of what the
6  cartridge case and the primer would weigh, and it's
7  95.7 grains.
8    Q  Going to page 61, you have a drawing of what
9  appears to be the barrel lug of your exemplar rifle;
10  is that correct?
11    A  Yes.
12    Q  And on the right end of that barrel lug, you
13  have drawn a line, and does that say, "Worn coating"?
14    A  Yes.
15    Q  W-O-R-N?
16    A  Yes.
17    Q  And what's the arrow to the rest of it, where
18  you've got written below?  Something "in coating."
19  What does that say?
20    A  "Lines," L-I-N-E-S, "in coating.
21  Intermittent contact."
22    Q  What does that mean?
23    A  That means that there are longitudinal
24  markings in the engagement length on the exemplar
25  rifle.

Page 114

1    Q  Well, let's talk about terminology again.
2  You have used the word "intermittent contact," using
3  the word "contact" here, and I think you told me
4  earlier that that does not equate with engagement;
5  correct?
6    A  Correct.
7    Q  So are you referring to contact here or
8  engagement?
9    A  Contact.  It's where the markings of the --
10  of the latch have been making marks on the barrel
11  lug.
12    Q  You would agree that you can determine the
13  length of engagement between the surfaces by the wear
14  marks on the respective surfaces; correct?
15    A  Yeah.  What that length of engagement could
16  be, yes.
17    Q  But you've not measured -- you've not
18  measured the width of these contact surfaces on your
19  exemplar, I think you told us; is that correct?
20    A  I think I did at some point, yes.
21    Q  Where is that?
22    A  Well, I don't see the pictures here.  It was
23  my recollection that I had taken microscopic
24  photographs of the exemplar lugs and measured them on
25  a microscope, but I don't see that data here.

Page 115

1    Q  I didn't either.
2    A  So ultimately I made the measurement on the
3  -- through the viewport.
4    Q  Through the?
5    A  Viewport.
6    Q  Viewport.  But that measurement through the
7  viewport wasn't the contact.  It was the overlap, was
8  it not?
9    A  Well, the contact is just -- are markings
10  that are present on there, and the overlap is how
11  much engagement is actually present.  So that's what
12  we were interested in showing, as well as on the
13  subject rifle.
14    (Reporter interruption)
15    THE WITNESS: The subject rifle.
16    Q  (By Mr. Danekas)  Is the evidence of contact
17  by the marks on the surfaces important?
18    A  Yes.
19    Q  Why?
20    A  Well, they are just more evidence of the
21  amount of engagement between the two components.
22    Q  But it's -- but contact does not equate to
23  engagement.
24    A  Well, contact is where the two surfaces are
25  touching.

Page 116

1    Q  Right.
2    A  And engagement is what determines the action
3  of the latch to hold the barrel down.
4    Q  Let's go to page 69 of this exhibit.  At the
5  bottom of the page, there is an e-mail from
6  Mr. Meador to you dated March 29, 2016, and this is a
7  month or so after you first got involved in the case;
8  correct?
9    A  Yes.
10    Q  And Mr. Meador writes, "Sergeant Batts
11  indicated that the attached photo shows the type of
12  projectile and the rounds he was firing at the time
13  of the rifle failure.  He indicated that he pulled
14  one of the ballistic tip rounds and found a bullet
15  weight of around 200 grains with 9 grains of powder
16  in the subsonic round."  Did I read that correctly?
17    A  You did.
18    Q  Do you know why he, Mr. Meador, sent you this
19  e-mail?
20    A  I think I had asked him what bullet that
21  particular ammunition was loaded with, and I
22  disagreed with his assessment that it was an ELD-X
23  bullet.
24    Q  Did you inquire as to what round Mr. Batts
25  had pulled?

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 117

1    A  No.
2    Q  Do you know to this day the source of the
3  round that Mr. Batts had pulled the round out of?
4    A  I do not.
5       Well, I think you see some of our
6  conversations in this same e-mail, where I'd asked --
7  I told him the ELD bullets are a relatively new
8  bullet design, and my conversation with him was about
9  I didn't think they were ELD bullets.
10   Q  Has anyone ever told you that Mr. Batts
11  reloaded the rounds that were -- he was using on the
12  day of the incident?
13   A  No.
14   Q  When you took possession of the rifle and the
15  rounds and the SD card, did you fill out any sort of
16  intake form for that?
17   A  No.
18   Q  Do you usually?
19   A  I think there would have been a receipt that
20  was -- that was done.  Yes, I usually do a receipt,
21  an evidence transfer receipt.
22   Q  I see you did an evidence transfer receipt in
23  February of 2019 when you conveyed the materials back
24  to Mr. Meador for purposes of Mr. Batts' deposition,
25  but what I didn't see is any evidence of your receipt

Page 118

1  of the evidence in February of '16.
2    A  Yeah.  I didn't see one either.
3    Q  When did you first view the video of the
4  incident?
5    A  It was very early on in the case so in 2016
6  -- let's get the invoice here.  It would have been in
7  the first part of February 2016.
8    Q  And you received that via e-mail from
9  Mr. Meador?
10   A  I did.
11   Q  Was that the entire video?
12   A  It's the entire video he sent me, yes.
13   Q  Well, you later got the SD card.
14   A  Correct.  I think --
15   Q  Prior to getting the SD card, you had already
16  seen a video; correct?
17   A  Correct.
18   Q  Was there any difference in the two videos?
19   A  Not that I recall, no.
20   Q  And how long was the video that you were
21  provided?
22   A  How many minutes?  I don't know.  I can look
23  real quick if you like.
24   Q  Sure.
25   A  It looks like the one I received from

Page 119

1  Mr. Meador was 42 seconds long, and the one I
2  downloaded off of the SD card was much longer.  Five
3  minutes and one second.
4    Q  You received the SD card at the same time you
5  received the rifle and the ammunition; correct?
6    A  Correct.
7    Q  And you put the SD card in your computer and
8  downloaded the incident video; correct?
9    A  Correct.
10   Q  How did you know, again, which video to
11  download from the SD card?
12   A  When I downloaded -- when I pushed the SD
13  card into the computer, it shows pictures of what's
14  present on the SD card, and I downloaded the one that
15  matched up to the video that I'd been sent.
16   Q  Including a -- what do they call those?  A
17  photo?  A frame of the video?
18   A  Yeah, whatever the icon is that Windows
19  shows.
20   Q  And you watched the entire five minute and
21  one second?
22   A  I did.  I watched that a couple of times, but
23  the last part of it is related to what happened after
24  he was injured, and so I haven't paid a lot of
25  attention to that.

Page 120

1    Q  How many times have you watched the entire
2  video?
3    A  I have no idea.  Maybe -- the part where he
4  was injured, maybe 20 times, something like that.
5    Q  How many times have you watched the entire
6  video?
7    A  Once or twice.
8    Q  When is the last time you watched the entire
9  video?
10   A  I don't know.
11   Q  What is your understanding of the number of
12  bags that Mr. Batts took to the range on the day of
13  the incident?
14   A  I don't recall.
15   Q  Do you know how many bags are shown on the
16  video?
17   A  Not offhand, no.
18   Q  How many shots did Mr. Batts fire from the
19  H&R rifle that day?
20   A  Three.
21   Q  Mr. Batts testified that he did not record
22  the first shot.  Do you remember that?
23   A  Let me look at his -- my notes.
24      On page 56 of his deposition he says he took
25  20 rounds of 300 Blackout to the range on the date of

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 121

1   the injury, fired two, and then the incident.  Three
2   rounds fired in total.
3       Q   You're looking at the notes of his
4   deposition?
5       A   Notes that I took while reading his
6   deposition, yes.
7       Q   Do you have his deposition with you today?
8       A   I do.  I have it up right now.
9       Q   Okay.  Page 57, lines 3 to 5.
10      A   Okay.  Page 57, I'm there.
11      Q   Lines 3 to 5.
12      A   Yes.
13      Q   He says he did not record the first shot he
14  took with the rifle; correct?
15      A   It says, "QUESTION:  Did you fire a round out
16  of this rifle before you started video-recording
17  shooting this rifle?"
18          The answer is, "Yes, sir."
19      Q   We know now from the recovered video that he
20  did in fact record that first round.
21      A   Yes.
22      Q   What in Mr. Batts' deposition did he say he
23  did after he fired the first round from the H&R
24  rifle?  Page 80.
25      A   Okay.  I'm at page 80.

Page 122

1       Q   Lines 3 to 12.
2       A   Line -- do you want me to read it into the
3   record?
4       Q   No, you don't read it into the record.
5   Just read it to yourself.
6       A   Okay.
7       Q   Mr. Batts said after he fired the first round
8   at 75 yards, the range went cold.  He went and
9   inspected the target, saw that the round had hit
10  behind the target; is that correct?
11      A   Yes.
12      Q   From looking at the recovered video, do you
13  agree that Mr. Batts did not go down-range after the
14  first shot, and obviously the first round never hit
15  behind the target because it never exited the rifle.
16  Would you agree with that?
17      A   I do.
18      Q   How many times have you watched the recovered
19  video, the video of the first shot?
20      A   Somewhere in the 10- to 20-time area.
21      Q   When was the last time?
22      A   I looked at it probably in early May, right
23  after I received it.
24      Q   That's the last time you looked at it?
25      A   Uh-huh.  Yes.

Page 123

1       Q   In his deposition, Mr. Batts said the first
2   two rounds fired normally, did he not?
3       A   Do you have that on there?  I don't have
4   that.
5       Q   Page 79, lines 17 to 19.
6       A   Correct.
7       Q   Would you agree that the first round he fired
8   did not fire normally?
9       A   Yes.
10      Q   Mr. Batts at his deposition said that the
11  recoil from the first round and the second round was
12  the same.  Page 101, lines 17 to 21.
13      A   Yes, he said that.
14      Q   Do you agree that, viewing the recovered
15  video, as well as the video of the incident, that the
16  recoil from the first shot and the second shot was
17  not the same?
18      A   I would agree with that, yes.
19      Q   Mr. Batts said in his deposition that he had
20  never experienced a squib load.  Do you remember that
21  testimony?
22      A   I do not.
23      Q   Page 19, 6 through 13.
24      A   Yes, he says that.
25      Q   You agree -- I think you mentioned this in

Page 124

1   your supplementary report -- that the recovered video
2   shows that he experienced the squib load with the
3   first round he fired?
4       A   I agreed that that's correct.
5       Q   Mr. Batts said in his deposition he did not
6   use any lubricant.  Page 94, 9 through 11.
7       A   Yes, I read he says, "Had you used any of
8   that lubricant," referring to CLP, "on the H&R rifle
9   that day?"  And he said, "No, sir."
10      Q   And we know from the recovery video that he
11  did use some?
12      A   Yes.
13      Q   That's what prompted your testing in May?
14      A   Correct.
15      Q   Have you inquired of anybody about the
16  differences between Mr. Batts' testimony and what is
17  shown by other evidence in this case?
18      A   I told my client that his testimony is
19  different than what the evidence was in this case.
20      Q   Okay.  Is that important to you?
21      A   Well, I'm working and testifying onto the
22  physical case in the case irrespective of what
23  Mr. Batts says.
24      Q   Is that what you usually do in a case,
25  Mr. Powell?  You rely on the physical evidence more

Charles Wayne Powell - June 19, 2019

1  so than the testimony of the shooter?
2   **A  I rely on all of it.**
3   Q   Okay.
4   **A  And if it conflicts, I try to look at it and**
5  **determine which I think is correct.**
6   Q   Would you agree that physical evidence trumps
7  testimony?
8   **A  Physical evidence is something I can**
9  **evaluate, whereas testimony is what somebody is**
10  **saying.  So I'm not saying it trumps it, but I'm**
11  **saying that they are both considered when you're**
12  **evaluating a particular piece of evidence.**
13   Q   Well, you've been involved in a lot of
14  firearms cases; correct?
15   **A  Correct.**
16   Q   Many of them, most of them, have involved
17  claims of accidental discharges; correct?
18   **A  A lot of them have, yes.**
19   Q   And there is testimony given by the person
20  handling the rifle, whether that's the plaintiff or
21  someone else; correct?
22   **A  Correct.**
23   Q   And occasionally, based on your examination
24  of all the evidence in those cases, in the physical
25  evidence you conclude sometimes that the gun handler

1  has not testified accurately; correct?
2   **A  Correct, in both ways.  Sometimes he has**
3  **testified accurately.**
4   Q   I understand.  But based on your experience,
5  there are cases where a gun handler's testimony is
6  not accurate, not true; correct?
7   **A  Correct.  Well, and to be fair, it's not just**
8  **the gun handler, but sometimes police officers and**
9  **investigating officers and other people that write**
10  **reports about this.  That's correct.**
11   Q   I understand.  My question is with regard to
12  the gun handler.  In all the experience you've had,
13  there are occasions where testimony of the gun
14  handler does not match the rest of the evidence,
15  including the physical evidence?
16   **A  That's correct.**
17   Q   And sometimes that gun handler is mistaken or
18  forgetful?
19   **A  It's different.  That's -- I'm not going to**
20  **try to put motives as to how people testify or why**
21  **they -- whether they can't remember, whether they are**
22  **trying to help out someone that's taking their**
23  **deposition.  I -- I just go by what they say.**
24   Q   It's also a possibility that the gun handler
25  is giving testimony to avoid accepting responsibility

1  for the incident; correct?
2   **A  I try not to make those kind of**
3  **characterizations on it.**
4   Q   But if you find in a case where the physical
5  evidence, in your analysis of the case, cannot match
6  the testimony of the gun handler, you rely on your
7  analysis and what the physical evidence shows, do you
8  not?
9   **A  Typically, yes.**
10   Q   Have you made -- we talked about the red box
11  that was marked at Mr. Batts' deposition and, when
12  first presented to you, had seven polymer-tip rounds
13  and two hollow-tip rounds; right?
14   **A  Correct.**
15   Q   And I think you just alluded to some
16  testimony by Mr. Batts that he said that he took 20
17  rounds of ammo -- of 300 Blackout ammunition to the
18  range that day.
19   **A  That's what he say -- he said in his**
20  **deposition.  That's correct.**
21   Q   And do you recall that he said there were 10
22  rounds of polymer tip and 10 rounds of hollow points?
23   **A  Without looking at them, I think that's**
24  **correct.**
25   Q   All right.  And do you remember that he said

1  he had them in a, what I'll call a light gray ammo
2  box?
3   **A  Yes.**
4   Q   Do you recall that he testified that after he
5  acquired these 20 rounds of 300 Blackout ammunition
6  from the gun show, that he took them home, took them
7  out of whatever container they were in and put them
8  into this gray ammo box?
9   **A  Again, I think that's correct.  I don't**
10  **recall specifically.**
11   Q   We know, or at least the evidence suggests,
12  that Mr. Batts fired three rounds of the polymer-tip
13  bullets that day; correct?
14   **A  He fired three rounds, that's correct.**
15   Q   And his testimony was that they were all
16  polymer-tipped?
17   **A  Yes.**
18   Q   So that would have left seven rounds of
19  polymer-tip bullets?
20   **A  Correct.**
21   Q   And seven rounds were provided to you for
22  examination in February of 2016?
23   **A  Correct.**
24   Q   There is no evidence, and he indicated I
25  believe, that he did not fire any of the hollow-point

Charles Wayne Powell - June 19, 2019

Page 129

1   rounds that day; correct?
2     **A  I don't specifically recall.**
3     Q   Do you recall his testimony that the gray
4   ammo boxes disappeared after the day of the incident?
5     **A  I don't -- I don't recall his testimony about**
6   **them disappearing.  I think he couldn't locate them.**
7     Q   Have you made any inquiry, Mr. Powell,
8   regarding -- well, let me back up.  If we're
9   conducting arithmetic, if you had 20 total rounds and
10  he fired three, that leaves 17 rounds; right?
11    **A  Yes.**
12    Q   And you were provided with nine?
13    **A  Correct.**
14    Q   Have you made any inquiry as to what happened
15  to the other eight?
16    **A  No.**
17    Q   Have you made any inquiry of what happened to
18  the spent casings for the first two rounds?
19    **A  Yes.**
20    Q   What inquiry have you made?
21    **A  I asked my client if he could provide those.**
22    Q   And the answer was?
23    **A  They don't exist.**
24    Q   Did you ask what happened to them, why they
25  don't exist?

Page 130

1     **A  He said that his client couldn't find them.**
2     Q   Why did you ask for them?
3     **A  So I could evaluate them.**
4     Q   And what would you have evaluated with regard
5   to the spent cases for the first two rounds he fired?
6     **A  The same thing you look at on all spent**
7   **cases.  You look at dimensional characteristics,**
8   **primer characteristics and identification.**
9     Q   Have you asked to see the -- have you asked
10  to see the round that Mr. Batts apparently tore down,
11  removed the bullet from?
12    **A  I have not.**
13    Q   Is that of any interest to you?
14    **A  If he still has it, yes.**
15    Q   Why would that be of interest to you?
16    **A  To see if it's the same as those that he**
17  **provided to me since he thinks it's a different**
18  **bullet.**
19    Q   Have you made any inquiry at all about why
20  the recovered video was not on the SD card provided
21  to you in February of 2016?
22    **A  No.  I don't know anything about the**
23  **recovered video other than my client presented it to**
24  **me and said that it was found on the subject chip, SD**
25  **card.**

Page 131

1     Q   Were you at all curious as to why it had been
2   found at such a late date?
3     **A  No.  I was glad it was found; but other than**
4   **curious as to why it was found at a later date and**
5   **not earlier, I just get evidence as it comes to me.**
6     Q   So you have no knowledge whatsoever of --
7   from any source of why that video was not on the SD
8   card when it was provided to you in February of '16?
9     **A  I do not.**
10    Q   Have you ever been told that Mr. Batts does
11  not have a memory of the events leading up to and
12  surrounding the incident?
13    **A  The only thing I know about Mr. Batts is what**
14  **he said in his deposition.  I don't recall him saying**
15  **that, but he was injured pretty severely, so he may**
16  **not.**
17    Q   Well, my question is:  Have you ever been
18  told by anybody that Mr. Batts does not have a memory
19  of the events leading up to and surrounding the
20  incident?
21    **A  Oh, my client may have mentioned something**
22  **about his memory in our -- just a general**
23  **conversation; but again, I'm just relying on what he**
24  **says in his deposition.**
25    Q   Did he say in his deposition anywhere that he

Page 132

1   did not have a memory of the events leading up to and
2   surrounding the incident?
3     **A  Not that I recall.**
4     Q   Would you agree that he never lost
5   consciousness?
6     **A  Again, if it's in his deposition, that would**
7   **be what I would know, but I don't know offhand.**
8     Q   Were you contacted about the recovered video
9   before you actually received it?
10    **A  No.**
11    Q   You received it via e-mail?
12    **A  I did.**
13    Q   Where is that e-mail?
14    **A  I don't still have that e-mail.**
15    Q   You deleted the e-mail?
16    **A  Yes.**
17    Q   Because I didn't see it in any of the
18  materials provided.
19    **A  No.  I don't often keep e-mails.**
20    Q   What did the e-mail say?
21    **A  "Here is a video that was recovered from**
22  **Mr. Batts' SD card."**
23    Q   That was it?
24    **A  That was it.**
25    Q   You watched the video?

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

1    A   And I watched the video and called my client.
2    Q   Okay.  And what was the conversation you had
3  with Mr. Meador at that point?
4    A   Told Mr. Meador that he had experienced a
5  squib load and that after the squib load he cleaned
6  his rifle and then put oil down the barrel.
7    Q   And at no time then or thereafter, I guess,
8  did you ever inquire as to why this video was coming
9  to light so late in the process?
10   A   No.
11   Q   Weren't you a bit curious?
12   A   No.  I'm not generally curious about when I
13  get evidence.  I just accept what's given to me.
14   Q   With regard to the oil that Mr. Batts used
15  that you saw in the video, would the amount of the
16  oil matter?
17   A   I think it matters to an extent, and I tried
18  to duplicate exactly what this did, and I probably
19  put more oil down the barrel than he did.
20   Q   Do you have an opinion as to how long it
21  took, from the instant the firing pin struck the
22  primer, for the barrel lug to disengage fully from
23  the barrel catch?
24   A   No.  I haven't measured the time it took, the
25  milliseconds, the fractions of milliseconds it took

1  before it --
2    Q   Is that not --
3    A   -- disengaged.
4    Q   Is that not important?
5    A   No.
6    Q   Do you have an opinion how long it was from
7  the time the firing pin first struck the primer to
8  when the action opened far enough to allow the
9  cartridge case to begin to propel rearward?
10   A   No, I have no opinion.  I have not made that
11  measurement.
12   Q   And that is not important to you either?
13   A   No, sir.  No, sir, not as I sit here.
14   Q   And I don't know if I asked you this question
15  earlier or not.  Did the bullet move before the
16  action began to open?
17   A   I don't know.  I haven't made that
18  measurement.
19   Q   If the bullet had exited the barrel, would
20  the incident have occurred?
21   A   Possibly, but I don't know.  I haven't made
22  that test.
23   Q   Why did the action not open with his first
24  shot, the one depicted on the recovered video?
25   A   There must have been sufficient engagement

1  between the barrel lug and the latch to keep it from
2  opening.
3    Q   Was that engagement any different than on the
4  third or incident round?
5    A   It must have been because it didn't open on
6  that round.
7    Q   Why did the action not open with the second
8  shot?
9    A   Well, I thought you -- the first shot is the
10  squib load?
11   Q   Yes.
12   A   Okay.  The squib load, it didn't open because
13  there was no pressure.
14   Q   Let's go back so the record is clear.
15   A   Okay.
16   Q   We're talking about three shots.  Number one
17  is the -- the first shot is the one on the recovered
18  video, the squib load.
19   A   Okay.
20   Q   Number two is the first shot shown on the
21  incident --
22   A   First shot with the oil in the barrel.
23   Q   With the oil in the barrel.  And the third
24  shot is the incident?
25   A   Correct.

1    Q   Okay.  With regard to the first shot, the
2  squib load shown on the recovered video, why did the
3  action not open?
4    A   There was sufficient engagement between the
5  barrel lug and the latch, at the pressure that
6  cartridge had, to keep it from opening.
7    Q   Why did the action not open with the second
8  shot?
9    A   Again, there was sufficient engagement to
10  keep it from opening under the pressure of that
11  cartridge.
12   Q   Was the pressure of that cartridge, the
13  second shot, any different than the pressure from the
14  third or incident round?
15   A   They appear to be equivalent pressures.
16   Q   Was the engagement of the barrel lug and the
17  barrel catch the same on the second round as it was
18  on the third or incident round?
19   A   No.
20   Q   So the engagement between the barrel catch
21  and the barrel lug varied, differed --
22   A   It would vary --
23   Q   -- between Round 2 and Round 3?
24   A   It would vary every time he opened the barrel
25  to put a new cartridge in.  It would change minutely.

EXHIBIT 3

Page 137

1   REPORTER: It would change?
2   THE WITNESS: Minutely.
3   Q   (By Mr. Danekas)  Okay.  How do you know
4   that?
5   A   Because that's -- that's the nature of that
6   particular mechanism.  It doesn't always return
7   exactly to the same position.
8   Q   So then how do you know what the engagement
9   was for the incident round?
10  A   I know it was low enough that it allowed the
11  rifle action to open.
12  Q   What was the range of engagement for this
13  rifle from Shot Number 1, the squib load, through
14  Shot Number 3, the incident round?
15  A   I don't know.  You can't tell.
16  Q   Did you not tell me earlier this morning that
17  the engagement at the time of the incident was
18  60/thousandths?
19  A   I told you I think that's the measurement I
20  made when we CAT-scanned it, and that it appeared to
21  be defective, and it was probably about at the
22  engagement when that shot was fired.
23  Q   If reassembled, could the Batts rifle, the
24  subject rifle, be fired?
25  A   Yes.  Dangerously.

Page 138

1   Q   Well, you could take precautions, could you
2   not?
3   A   Yes.
4   Q   As you did with your test -- your test-firing
5   in May, you fired the rounds -- after you applied the
6   oil, you fired those remotely with a cord or a
7   string, did you not?
8   A   I did.
9   Q   So the subject rifle could be fired and it
10  could be fired so as to protect those participating
11  in that test-firing; correct?
12  A   Correct.
13  Q   Have you ever suggested to Mr. Meador or to
14  anyone, for that matter, that the subject rifle be
15  test-fired?
16  A   No.
17  Q   Why not?
18  A   Because it would change the characteristics
19  and appearance of the different components.
20  Q   Which you have documented already; correct?
21  A   Correct, but Mr. Meador may want the option
22  to take that rifle in front of a jury with a
23  microscope and show them on a screen what those
24  components look like.
25  Q   Has he said that to you?

Page 139

1   A   I have no idea what's in his mind.
2   Q   If reassembled and test-fired, could
3   Mr. Batts' rifle, the subject rifle, be tested to
4   determine if the incident could be replicated?
5   A   You can attempt to replicate it with an
6   exemplar rifle if you can get it to hold low
7   engagements successfully without altering the rifle
8   too much.
9   Q   Okay.  But you did not do that with your
10  exemplar; correct?
11  A   No.  I didn't feel there was need to, and I
12  wasn't sure how I was going to create a low
13  engagement without adding complexities that would
14  affect how the test would occur.
15  Q   If Mr. Meador would say to you, "Mr. Powell,
16  we have to run a test-firing of your exemplar rifle
17  to try to replicate the incident," how would you do
18  it?
19  A   At this point, I don't know.  I mean, the
20  best way to do it would be to refit a new barrel such
21  that the engagement is low.
22  Q   Can you think of any way to create reduced
23  engagement in order to run such a test-firing?
24  A   Not at this time, other than what I just
25  explained.

Page 140

1   Q   Okay.  Okay.  Was there brass on the breech
2   face?
3   A   Brass deposits?
4   Q   Yes.
5   A   Yes.
6   Q   That's a better question.  Were there brass
7   deposits on the breech face?
8   A   Yes.  You're --
9   MR. MEADOR: Which rifle?
10  Q   (By Mr. Danekas)  Were there brass deposits
11  on the breech face of Mr. Batts' rifle?
12  A   Yes, and the exemplar also.
13  Q   Were the brass deposits different on
14  Mr. Batts' rifle than on your exemplar?
15  A   Not that I recall, no.
16  Q   The photos that you produced seem to indicate
17  that the brass deposits on Mr. Batts' subject rifle
18  ran up the length, if you will, of the breech face,
19  whereas they were more centralized on your exemplar.
20  A   I don't specifically recall that.
21  Q   Can you take a look at your photos and tell
22  me if what I just said is true or not true?
23  A   Sure.
24  MR. DANEKAS: I'm going to give you a second
25  to do that, and I'm going to run to the restroom.  Go

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 141

1  off for three minutes.
2      **VIDEOGRAPHER:** Off the record at 2:30.
3          (Recess held)
4      **VIDEOGRAPHER:** We're back on the record at
5  2:34.
6      **THE WITNESS:** Wait a minute.  Wait a minute.
7  I went to the wrong thing here.
8      I have a clear -- are we back on the record?
9      **VIDEOGRAPHER:** Yes.
10     **MR. DANEKAS:** Yeah.
11     **THE WITNESS:** I have a clear view of the
12  brass present on the breech face of the subject
13  rifle.  I can't quickly locate a clear view of the
14  breech face of the exemplar rifle, after test-firing.
15     Q   (By Mr. Danekas)  Do the brass deposits on
16  the breech face on the subject rifle run up the
17  length of the breech face?
18     **A   Yes.  They run -- it runs in a stripe**
19  **basically, towards the top.**
20     Q   Okay.  What caused that?
21     **A   Offhand, I don't know.  That's where the**
22  **brass deposits sprayed during the firing of the**
23  **rifle.**
24     Q   Did you ever take a cast of the chamber?
25     **A   No.**

Page 142

1      Q   Did you ever notice any silver-colored
2  substance in and around the chamber?
3      **A   No.**
4      Q   Do you notice any carbon in the bore and at
5  the heel of the bullet?
6      **A   Of the subject rifle?**
7      Q   Yes, sir.  I'm talking about the bullet that
8  -- the incident bullet that lodged in the barrel of
9  the subject rifle.
10     **A   There is some dark coloration on the bullet,**
11 **but I don't know if it's carbon.  There was a lot of**
12 **oil that was used, so I don't know what that deposit**
13 **is.  But yes, there is some dark coloration on the**
14 **bullet that was removed from the bore.**
15     Q   Would that be consistent with a squib load?
16     **A   Carbon?  No.  It's consistent with oil in the**
17 **barrel.**
18     Q   Other than the radiographs taken at North
19 Star, have you had any radiographs or x-rays taken of
20 the ammunition provided to you?
21     **A   No.  I don't have the capability to examine**
22 **ammunition with a standard x-ray.  It has to be a**
23 **microfocus x-ray.**
24     Q   When did you expand the viewing hole, if you
25 will, in your exemplar?  And I think you may have an

Page 143

1  invoice entry for it.
2      **A   I don't recall having an entry for it, but on**
3  **--**
4      Q   Maybe I'm mis -- hold on.  Let's see.
5      **A   Okay.**
6      Q   Exhibit 8.
7      **A   8?**
8      Q   8.  This is your -- a copy of your,
9  quote/unquote, paper file, Bates numbered 81.
10     **A   Oh.  There we go.**
11     Q   You have an entry for February 14th of 2017.
12     **A   There it is, yes.  That's when it was done.**
13     Q   "Review file; disassemble exemplar rifle;
14 have receiver machined; reassemble exemplar rifle;
15 prepare for testing."  Did I read that correctly?
16     **A   You did.**
17     Q   So is that -- February 14th is when you had
18 the viewing hole enlarged for your exemplar rifle?
19     **A   Yes.**
20     Q   And then your entry there for February 14th
21 of 2017, "Prepare for testing," again what are you
22 referring to there?
23     **A   Testing and seeing if the hole made any**
24 **difference.  Immediately after that, on March 1st, is**
25 **when I did the evaluation of the rifle to see if it**

Page 144

1  **was still fine to shoot.**
2      Q   So your entry on February 14th, "Prepare for
3  testing," is really preparing for your evaluation --
4      **A   That's correct.**
5      Q   -- of the exemplar rifle to see if it was
6  safe to shoot?
7      **A   Correct.**
8      Q   Do you believe that test-firing of Mr. Batts'
9  rifle, the subject rifle, would be beneficial?
10     **A   It's not beneficial particularly to my**
11 **opinions.  I believe the physical evidence speaks for**
12 **what happened to that rifle at the time it injured**
13 **Mr. Batts, but I'm an engineer, and I enjoy testing**
14 **so I'm always willing to test something that may be**
15 **done safely.  Mr. -- my client may feel differently**
16 **about altering the evidence, but...**
17     Q   Have you suggested to Mr. Meador at any point
18 in time that he should consider testing the subject
19 rifle?
20     **A   I have not.**
21     Q   If testing were to show, Mr. Powell, that the
22 incident could not have occurred with a properly
23 loaded cartridge, would that change your opinion?
24     **A   It would depend on the testing; but yes, if**
25 **we can accurately show that it took a high-pressure**

EXHIBIT 3

Page 145

1 cartridge to do that, which I doubt because it
2 doesn't appear to be a high-pressure firing; but yes,
3 I'm always interested in looking at test results to
4 see.
5    Q   Would a round with improper dimensions of a
6 cartridge case, for instance, prevent the barrel lug
7 and barrel catch from engaging?
8    A   I'm sorry.  Could you say that again, please?
9    Q   Sure.  Would a round of ammunition within
10 proper dimensions -- I'll back up and rephrase it one
11 more time.  Could a round with improper dimensions
12 prevent the barrel lug and barrel catch from
13 engaging?
14       MR. MEADOR: On what rifle?  On any rifle?
15 On one of our rifles?
16    Q   (By Mr. Danekas)  On the H&R Handi-Rifle, 300
17 Blackout.
18    A   You can create a cartridge with dimensions
19 that would prevent it from latching, yes.
20    Q   If we were to assume that the incident
21 cartridge case was improperly sized that prevented
22 the barrel catch from engaging the barrel lug and the
23 gun was improperly loaded causing the bullet to stick
24 in the barrel -- okay?  Take those two assumptions --
25 what would happen?

Page 146

1    A   It depends.  I mean, that's not the evidence
2 in the case.  It depends on how you -- how you
3 develop and create your bullet.  You could make it do
4 a lot of different things.
5    Q   Why is that not the evidence in the case?
6    A   Because you see on video Sergeant Batts
7 placing the cartridge in the chamber.  It goes right
8 in, and he easily closes the action on the rifle.  If
9 the -- for example if the headspace was so excessive
10 it wouldn't close and latch, then he wouldn't be able
11 to close it.
12    Q   Have you tested that?
13    A   What?  Whether you could do that or not?
14    Q   Yes.
15    A   I have not put it back together and tried to
16 load ammo into the rifle but --
17    Q   Have you tested that with your exemplar?
18    A   No.  But I can tell you that I can create
19 excessively -- excessive headspace in a cartridge and
20 keep it from closing or going into battery.  I've
21 never done it on a Handi-Rifle, but I can certainly
22 do it on a bolt, on a bolt-action rifle.
23    Q   After Mr. Batts fired the first round that
24 was the squib load, would a reasonably careful user
25 of that ammunition continue to use that ammunition

Page 147

1 that he says he bought at a gun show?
2       MR. MEADOR: Objection.  Speculation.
3       THE WITNESS: Well, I think so.  In fact, I
4 think actually shooting after a squib load is
5 actually mentioned in the Handi-Rifle manual and how
6 to clear your rifle and continue shooting.
7       Personally, as an engineer, if I had a squib
8 load, I would probably stop right there and take my
9 rifle back to the shop and confirm all the dimensions
10 and then look at all the ammunition.
11    Q   (By Mr. Danekas)  Are you able to determine
12 from the incident video that the rifle locked up?
13 That is, there was some engagement between the barrel
14 catch and the barrel lug?
15    A   In the video, you only determine that
16 Mr. Batts closes the action on the rifle.  It closes
17 easily apparently in the video, but you can't see
18 inside the rifle to know what the engagement is.
19    Q   Can you create an excessive headspace
20 cartridge that would keep the rifle from locking but
21 still close?
22       MR. MEADOR: Objection.  Speculation.
23       THE WITNESS: I have not tried that, but I
24 don't think so, no.
25    Q   (By Mr. Danekas)  But you've not tried it?

Page 148

1    A   No.
2    Q   What is the headspace of a round?  How is
3 that defined?
4    A   It's the dimension from a data point on the
5 slope of the shoulder, for this type of ammo, to the
6 position of the breech face.  There is a dimension.
7 There is a maximum and minimum dimension called
8 headspace.
9    Q   Did you examine or observe the shoulders on
10 any of the rounds produced?
11    A   Yes.
12    Q   Did you observe any -- do you know what the
13 term "lazy shoulders" -- "lazy shoulder" means?
14    A   It means apparently someone hasn't re --
15 located the shoulder on the cartridge to within
16 proper headspace.
17    Q   Did you observe any lazy shoulders on any of
18 these cartridges?
19    A   One of the cartridges had about 5/thousandths
20 of an inch greater headspace than SAAMI max.
21    Q   I think I asked you about that earlier.  You
22 did not try to insert that round into your exemplar;
23 right?
24    A   Did not, no.
25    Q   The cartridges that were numbered 3 through

Charles Wayne Powell - June 19, 2019

Page 149

1  6, three of which was torn down by Mr. Watkins in
2  your presence, they were all resized 5.56 rounds?
3     A  Yes.
4     Q  And resizing 5.56 rounds or 300 Blackout can
5  are result in thick necks?
6     A  Can, yes.
7     Q  And thick necks can affect headspace?
8     A  No, not generally.
9     Q  It can affect the ability of the round to
10  seat in the chamber properly?
11     A  If it won't go into the neck of the chamber,
12  yes.
13     Q  Do you agree, Mr. Powell, that a user of
14  firearms should read the manufacturer's warnings and
15  instructions that come with the firearm?
16     A  Yes.
17     Q  It's a good rule to follow; correct?
18     A  Yes.
19     Q  Did you read Mr. Batts' testimony that he did
20  read the owner's manual that came with the rifle?
21     A  I don't exactly remember what he said, but I
22  believe he said he read parts of it or read through
23  it, yes.
24     Q  And you have reviewed the owner's manual for
25  this rifle, have you not?

Page 150

1     A  I have.
2     Q  You were provided with the, quote/unquote,
3  original?
4     A  A digital copy of it, yes.
5     Q  Do you have that handy?
6     A  Yes.
7     Q  I'll show you what I've marked as Exhibit 23,
8  Mr. Powell. Here you go, Bob. I'll represent to
9  you, Mr. Powell, as you can see from that exhibit, it
10  was marked as Exhibit 1 to Mr. Batts' deposition that
11  he identified as the owner's manual for the rifle.
12  And you have reviewed that in connection with this
13  case?
14     A  I have.
15     Q  And in the -- on the first page of this
16  manual, in the box that says, "Important," the second
17  sentence -- the second and third sentences read, "To
18  assure safe operation, any user of this firearm must
19  read and understand this manual before using the
20  firearm. Failure to follow the instructions and heed
21  the warnings in this manual can cause property
22  damage, personal injury, and/or death." Did I read
23  that correctly?
24     A  You did.
25     Q  Do you agree with that as being a sound

Page 151

1  statement?
2     A  Yes.
3     Q  Let's go to page 4. And it's typical in
4  manuals from Remington, they have the various
5  commandments of gun safety; correct?
6     A  Yes.
7     Q  And the fifth commandment has to do with
8  using proper ammunition; correct?
9     A  Correct.
10     Q  It's on page 4 of the owner's manual.
11     A  Correct.
12     Q  The second sentence in that -- on that page
13  says, "Using the wrong ammunition, mixing ammunition
14  or using improperly reloaded ammunition can cause
15  serious personal injury or death." Did I read that
16  correctly?
17     A  Yes.
18     Q  Do you agree with that statement?
19     A  I do.
20     Q  And then about a third of the way down the
21  page, there is a -- in handwriting -- not
22  handwriting. In red bold it says, "Reloading
23  Requires Extra Diligence." Do you see where we are?
24     A  Yes.
25     Q  And the last sentence of that paragraph says,

Page 152

1  "Never use ammunition, which has been reloaded by
2  someone else." Did I read that correctly?
3     A  Yes.
4     Q  Do you agree with that statement?
5     A  I do.
6     Q  And then a couple of paragraphs later, there
7  is a sentence that says, "Handloaded or reloaded
8  ammunition" --
9     A  I'm sorry. I'm not with you.
10     Q  Fair enough.
11     A  Okay. I've got it right where the paragraph
12  starts with "Firearms are designed"?
13     Q  Yes.
14     A  I'm with you.
15     Q  The next sentence says, "Handloaded or
16  reloaded ammunition that deviates, either
17  intentionally or accidentally, from load or component
18  recommendations can be very dangerous." Did I read
19  that correctly?
20     MR. MEADOR: Okay. I am going to object. He
21  is here today to talk about his expert opinions
22  related to the mechanics of the rifle, the mechanical
23  defect, the manufacturing defect. He is not here
24  today to render testimony about the propriety of
25  Remington's safety manual or whether he agrees with

EXHIBIT 3

Page 153

1  it.
2  Q   (By Mr. Danekas)  Okay.  Do you agree with
3  that statement?
4  A  Yes.
5      MR. MEADOR: Can I have a running objection
6  on all these so I don't have to continue --
7      MR. DANEKAS: Sure.
8      MR. MEADOR: -- interrupting your flow?
9  Q   (By Mr. Danekas)  And then the paragraph that
10 begins after the shaded area there, Mr. Powell, says,
11 "Not following these guidelines could result in
12 serious [sic] injury to yourself or severe damage to
13 your firearm."  Did I read that correctly?
14     MR. MEADOR: Same objection.
15 Q   (By Mr. Danekas)  Did I read that correctly?
16 A  Yes.
17 Q   You agree with that, as well; correct?
18 A  I do.
19 Q   Do you -- do you agree, Mr. Powell, that this
20 owner's manual provides adequate warnings concerning
21 the use of reloads?
22 A  Yes.
23     MR. MEADOR: Objection.  Form.
24 Q   (By Mr. Danekas)  Do you agree that Mr. Batts
25 did not follow the warnings in the owner's manual?

Page 154

1  A  I don't think he handloaded any ammunition.
2  He purchased it from a professional organization that
3  reloads ammunition as far as he -- as far as he knew.
4  Q   What did he know about the organization from
5  which he bought the reloads?
6  A  As I recall --
7      MR. MEADOR: Objection.  Speculation.
8      THE WITNESS: To some --
9  Q   (By Mr. Danekas)  What did he testify about
10 the organization from which he bought the reloads?
11 A  He testified that he knew the organization
12 had purchased reloaded ammunition or remanufactured
13 ammunition, since this is a company, before, and was
14 satisfied with their stuff, their work.
15 Q   Where did he testify in his deposition that
16 he had purchased ammunition from this company prior?
17 A  I'm sorry.  I thought that was his testimony.
18 Q   Well, if it is, tell me where it is.
19 A  I apologize.  I've done something to my
20 computer.  Do you have his deposition printed?
21 Q   I do not.
22 A  Let me see if I can restart this.  I
23 apologize.  I'm restarting my computer so I should be
24 back up here in a second.
25     I apologize.  I don't have it printed.  Are

Page 155

1  we on the record still?
2  Q   Yes.
3      VIDEOGRAPHER: Yes.
4      THE WITNESS: I don't have a printed copy.
5  My computer is doing something, trying to boot back
6  up, so I don't have a copy with me.
7  Q   (By Mr. Danekas)  Well --
8  A  Here we go.
9  Q   Okay.
10 A  It's still going to take awhile.  If you want
11 to go on, we can come back to that.
12 Q   It's going to be probably according to --
13 A  It's around page 30.
14 Q   Yes, because I'm looking at your notes as
15 well.
16 A  Correct.  But my notes say on page 30 he
17 purchased ammo for rifle at gun show in Fort Worth.
18 Page 32, purchased 20 rounds of 300 Blackout.  Page
19 36, this is the only 300 Blackout ammo he had ever
20 purchased.
21     I thought there was some testimony in there
22 that said he had purchased ammo from this dealer
23 before.
24 Q   That's your recollection?
25 A  That's my general recollection.

Page 156

1  Q   And if he had purchased ammunition from this
2  company before, it was appropriate for him to go
3  ahead and use that ammunition?
4  A  He felt that they were a good supplier.
5  That's why he continued to purchase ammunition from
6  them.
7  Q   Well, find -- open the deposition.
8  A  I am.
9  Q   Let's --
10 A  I want to.
11 Q   I want to find where he said that he
12 purchased it before and --
13 A  Yeah, I may be mistaken.  That's just my
14 general recollection.
15     Still working.  So if you would like to go
16 on, we can go on and come back.
17 Q   Let's wait a second and see if it pops up.
18 A  I'm guessing it's about five minutes away.
19 It's still working, loading programs.
20     Here we go.  Okay.  I have the deposition
21 open.
22 Q   Okay.  Find his testimony around page 30
23 where he's asked about --
24 A  It's doing the same thing on this particular
25 file.  It doesn't want to access this file.

EXHIBIT 3

**Charles Wayne Powell - June 19, 2019**

---

Page 157

1    MR. CHANEY: I probably have his deposition.
2  I can pull it up for him if that would be helpful.
3    MR. DANEKAS: You can.
4    THE WITNESS: It says, "Adobe Reader is not
5  responding."
6    MR. DANEKAS: I thought I had it, but I
7  don't.
8    THE WITNESS: Try a little different way
9  here.
10   MR. CHANEY: Would you like me to hand him my
11 computer so he can look?
12   THE WITNESS: I think I'm going -- I've got
13 it here.
14   MR. MEADOR: I don't have any problem with
15 that if he continues to have issues.
16   MR. CHANEY: Okay.  No problem.
17   THE WITNESS: Okay.  I'm on page 30 of the
18 deposition.  It talks about where he purchased it.
19 The gun show in Amon Carter Hall in Fort Worth.
20   MR. DANEKAS: Mitch, can you refer us to the
21 page and line where he speaks about his prior
22 experience, if any, with this dealer?
23   MR. CHANEY: Yeah.  He talks about it at page
24 31, starting at about line 12 and going on through
25 page 32 and 33.

Page 158

1    THE WITNESS: Trying to describe the person
2  in which he -- that sold him the ammunition.
3    You're correct.  I don't see any other
4  evidence that says he purchased ammunition from that
5  same vendor.  He just -- I think he said he purchased
6  ammunition at gun shows before.
7  Q   (By Mr. Danekas)  Right.  He also said that
8  he did not have any knowledge about the quality or
9  quality control from this seller of this particular
10 ammunition.
11 A   I haven't found that particular quote; but
12 whatever he said, he said.
13 Q   So the owner's manual told him not to use
14 ammunition reloaded by someone else, and he did, did
15 he not?
16 A   Yes.
17 Q   In fact, it was a source of ammunition, a
18 source that was unknown to him, was it not?
19   MR. MEADOR: Objection.  Form.  Calls for
20 speculation.
21   THE WITNESS: You'll have to ask Mr. Batts.
22 He didn't testify that he knew the person.
23 Q   (By Mr. Danekas)  In your opinion, would a
24 reasonably careful person have purchased this
25 ammunition and then used it?

Page 159

1    MR. MEADOR: Objection.  Form.  It's outside
2  the scope of his designation, report and role as an
3  expert in this case.
4    THE WITNESS: Ammunition is sold at various
5  venues.  Remanufactured ammunition is sold at gun
6  stores as well as in regular stores -- gun shows as
7  well as regular stores.  So people do utilize it and
8  test it.  I personally would not buy it.
9  Q   (By Mr. Danekas)  Why not?
10 A   Because I only shoot -- if it's going to be
11 remanufactured ammunition, the only one that's going
12 to -- whose ammo I'm going to shoot is mine.
13 Q   And that's a safe practice, is it not?
14 A   I believe so, yes.
15   MR. MEADOR: Objection.  Form.  Same as
16 before.
17 Q   (By Mr. Danekas)  Well, you are an
18 experienced -- you have experience with firearms, do
19 you not?
20 A   I do.
21 Q   You reload, do you not?
22 A   Yes.
23 Q   You were in the military and you were a range
24 officer, were you not?
25 A   Yes.

Page 160

1  Q   And it's your view, I think you told us that
2  you agree with the statements in this owner's manual
3  that it's a safe practice not to use ammunition
4  reloaded by others; correct?
5    MR. MEADOR: Same objection as before.
6    THE WITNESS: I believe that people do do
7  that.  I don't, and I believe it's safe if you -- it
8  would be safe if you would only shoot ammunition
9  that's been reloaded by yourself.
10 Q   (By Mr. Danekas)  You agree that Mr. Batts
11 did not follow the warnings and instructions that the
12 owner's manual provided to him?
13   MR. MEADOR: Same objection.
14   THE WITNESS: He -- he fired remanufactured
15 ammunition that he did not manufacture, that's
16 correct, so that would have been different than what
17 the warning in the manuals say; but in my opinion,
18 the ammunition was not a factor in causing his
19 accident.
20 Q   (By Mr. Danekas)  You would agree,
21 Mr. Powell, that the mere fact that this incident
22 occurred, just that fact alone, would not allow
23 someone to infer that there was a defect in the
24 rifle?
25 A   Just the fact that a rifle opened and that --

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 161

1 opened and allowed the cartridge to be ejected, only
2 through evaluation can you determine if there was a
3 defect in the rifle.
4    Q   Okay.  So the mere fact that the incident
5 occurred does not in and of itself, standing alone,
6 allow you to reach the conclusion that the rifle was
7 defective?
8    A   No.  You have to determine was the rifle
9 damaged, were the parts the correct parts, was the
10 ammunition correct, all those kind of factors that we
11 looked at in this case.
12    Q   The -- in your opinion, the defect in this
13 rifle was a manufacturing defect?
14    A   Correct.
15    Q   In your opinion, were there any design
16 defects in this rifle?
17    A   Certainly I'm -- I don't believe that the
18 manufacturer can be happy that they have a history of
19 this rifle firing and the action opening.
20        I haven't evaluated that design feature to
21 determine how that breech can be kept closed at all
22 costs, to the fact that it doesn't injure the hunter
23 when an error occurs in either the manufacture or the
24 use of ammunition, to keep him safe.
25        So there may be a manufacturing defect, but I

Page 162

1 haven't evaluated for that.
2    Q   So as you're sitting here today, and I've
3 looked at your initial report and your supplementary
4 report, you are not offering an opinion in regarding
5 a design defect?
6    A   Correct.
7    Q   You are offering an opinion that there was a
8 manufacturing defect?
9    A   Yes.
10    Q   And the manufacturing defect was the length
11 of engagement between the -- length of engagement
12 between the barrel catch and the barrel lug?
13    A   Correct.
14    Q   Did you arrive at any conclusion as to what
15 was causing the insufficient length of engagement
16 between the barrel catch and the barrel lug?
17    A   Just poor barrel fit.  The barrels are
18 individually fit to the receivers, and this one
19 wasn't fitted such that it could be lowered and the
20 engagement closed to the correct engagement length.
21    Q   Okay.  In your opinion, is that the only
22 reason for the insufficient length of engagement
23 between the barrel catch and the barrel lug?
24    A   Based on my evaluation of the components, I
25 believe that that's the primary reason for that

Page 163

1 occurring.  I didn't see any dimensional
2 irregularities in the catch or the lug or any of the
3 other components that interact with them.
4    Q   What is sufficient engagement to prevent the
5 action from opening from the force of a factory round
6 of ammunition?
7    A   The engagements specified by Remington.
8    Q   So anything less than Remington's spec would
9 allow the action to open when a factory-compliant
10 round is fired?
11    A   Has the potential to do that, that's correct.
12    Q   And how do you -- how did you determine that?
13    A   Because Remington has determined that that's
14 the safe engagement length for this rifle.
15    Q   Well, it's your opinion, then, that anything
16 below spec is not safe.
17    A   Correct.
18    Q   Because it has the potential to open.
19    A   That's correct.
20    Q   But how did you determine that other than
21 reviewing Remington's spec?
22    A   Because rifle components are manufactured to
23 be installed and to operate in a certain fashion,
24 determined by the manufacturer.  In this case
25 Remington.

Page 164

1    Q   Is it not possible, Mr. Powell, that a rifle
2 with length and engagement below spec would still
3 stay engaged when a factory round is fired?
4    A   Possibly.  But again, it's going to depend on
5 how much of that engagement is contact area and how
6 much isn't, if there is debris between them.  I mean,
7 there are a large number of factors that are going to
8 determine, once you get past that level of
9 engagement, whether the action is going to open or
10 not.
11        MR. DANEKAS: Read back that last answer,
12 please.
13        (Reporter reads, "Possibly.  But
14 again, it's going to depend on how much of that
15 engagement is contact area and how much isn't, if
16 there is debris between them.  I mean, there are a
17 large number of factors that are going to determine,
18 once you get past that level of engagement, whether
19 the action is going to open or not.")
20    Q   (By Mr. Danekas)  You mentioned earlier --
21 you mentioned a couple of times that there was what
22 you described as damage to the barrel lug.  Damage as
23 a result of the incident.  Am I understanding you
24 correctly?
25    A   You are.

EXHIBIT 3

**Charles Wayne Powell - June 19, 2019**

Page 165

1    Q   And was there or was there not any damage to
2    the barrel catch as a result of the incident?
3    **A   Not so -- not as much, no.  Just showing low**
4    **engagement.**
5    Q   Okay.  Did you -- did you note in any of your
6    -- either of your reports any what you perceived to
7    be damage to the barrel catch?
8    **A   I don't think I recall in either report that**
9    **I specified exactly how and where the damage was**
10   **between the two of them.  Just that they were both**
11   **damaged, primarily the lug on the barrel, and that**
12   **the particles were present between the two in the**
13   **engagement area.**
14   Q   Was there any manufacturing defect in your
15   opinion in the ammunition that Mr. Batts was using,
16   particularly the incident round?
17   **A   Not that I've seen, no.**
18   Q   You have both of your reports with you; is
19   that correct?
20   **A   I do.**
21   Q   And they have not changed since they were
22   provided to us, one in January and one earlier this
23   month; is that correct?
24   **A   Correct.**
25   Q   I have marked as Exhibit 2 your original

Page 166

1    report for purposes of the deposition.  There is
2    Exhibit 2.  Be careful the stapler.  And Exhibit 4 is
3    your supplemental report.  Mr. Powell, would you go
4    -- would you identify for me where in either of those
5    reports that you identify any what you perceive to be
6    damage to the barrel catch?
7    **A   Photograph 13 of the first report, page 28.**
8    **It says, "This is a microscopic photograph of the**
9    **seating surface on the subject barrel lug.  The right**
10   **end in this view is shown at higher magnification in**
11   **Photograph 14.  The defectively smooth engagement**
12   **surface is characterized by sliver colored metal**
13   **particles and rub lines representing different**
14   **engagement positions for barrel catch over the use**
15   **history of this subject rifle."  Then on page --**
16   Q   I'm sorry.  What page were you just reading
17   from?
18   **A   I'm sorry.  That's page 28 of the report.**
19   Q   28.
20   **A   Photograph 13.**
21   Q   Okay.  I see that, and that's a photograph,
22   is it not, of the barrel lug?
23   **A   Yes.**
24   Q   And it's not of the barrel catch?
25   **A   Correct.**

Page 167

1    Q   Okay.  And do you refer to the barrel catch
2    at all on this page?
3    **A   I don't think I do.**
4    Q   Okay.  My question is:  In either of your
5    reports, do you refer or mention anything about any
6    damage to the barrel catch?
7    **A   Not that I recall.**
8    Q   And what you're referring to in page 28 of
9    your report, you are showing a photo that you would
10   take -- a microscopic photo you had taken of the
11   surface of the barrel lug; correct?
12   **A   Correct.**
13   Q   And you are identifying that in your opinion,
14   that there is silver colored metal particles and rub
15   lines representing different engagement positions for
16   the barrel catch over the history of this subject
17   rifle?
18   **A   That's correct.**
19   Q   Okay.  Is this photograph that you're showing
20   and the description you're indicating here on page 28
21   of your original report, are you describing damage
22   caused by the incident?
23   **A   Yes, damage caused by the engagement.  Some**
24   **of it is from the incident.  Some of it would be from**
25   **the previous firings.  I can't distinguish between**

Page 168

1    **which came from the incident and which came from the**
2    **previous firings.**
3    Q   What is the damage that you are referring to
4    in this photograph?
5    **A   Ridges of smeared metal and microscopic**
6    **particles compressed in the engagement surface.**
7    Q   Is that damage caused by the -- when I say
8    caused by the incident, your opinion is that the
9    surfaces had some engagement and that the force of
10   the shot caused them to disengage; right?
11   **A   Correct.**
12   Q   Okay.  So as a result of that particular
13   incident, was there any damage caused to the barrel
14   lug?
15   **A   That's what we're looking at here.**
16   Q   Okay.
17   **A   And the answer is yes.**
18   Q   But aren't you describing there the fact that
19   because the surfaces had been engaged, you're
20   describing that these particles became what?
21   Embedded into the surface of the barrel lug?
22   **A   Yes.**
23   Q   Is that due to the force created by this shot
24   causing them to -- these two pieces to disengage, or
25   is what you're describing, the particles becoming

Page 169

1  embedded, caused by the engagement of the surfaces in
2  the first place?
3    **A   Well, the particles appear to be present**
4  **separate from the engagement themselves, that those**
5  **are related to the manufacturing of the rifle and**
6  **particles being migrated into this area.**
7      **Those particles don't look like they were**
8  **created by the scraping of the barrel lug off of the**
9  **catch surface.  They are not smeared on.  They are**
10 **physical discrete particles that are just simply**
11 **mashed into the surface.  They are similar to the**
12 **machining particles that you see on page 32 of that**
13 **particular report.**
14   Q   Well, if the surfaces were engaged, if the
15 barrel catch and the barrel lug were engaged at
16 approximately 60/thousandths of an inch at the time
17 of the incident, and the force of the shot caused
18 them to disengage -- and it would have been abruptly;
19 correct?
20   **A   Yes.**
21   Q   Wouldn't you expect to see damage to the
22 barrel lug beyond the fact that these metal shavings
23 are on the surface of the barrel lug?
24   **A   Well, you do.  You see -- you see ridge lines**
25 **of mash and scraped material, both right at the very**

Page 170

1  **edge and then set just back from that, as you see in**
2  **Photograph 14.  I'm calling them rubbed ridges that**
3  **represents damage that was created when the rifle was**
4  **fired.**
5    Q   Okay.  Let's turn on the monitor.
6      **VIDEOGRAPHER:** The button is on the bottom
7  right.
8      **MR. DANEKAS:** Did we hit the button on the
9  bottom right?
10     **THE WITNESS:** Is it coming up?  I don't see
11 an image.
12     **VIDEOGRAPHER:** I thought I saw it lit.
13     **THE WITNESS:** Does the button light up?
14     **MR. MEADOR:** It's lit now.
15     **THE WITNESS:** Yeah, it's lit now.
16     **VIDEOGRAPHER:** Yeah, you're on.
17     **MR. WATKINS:** There you go.
18   Q   (By Mr. Danekas)  So I'm showing you on the
19 monitor here, Mr. Powell, your Photograph 14 from
20 your original report; is that correct?
21   **A   Yes.**
22   Q   And this is a photograph you chose to insert
23 or to include in your first report because it shows
24 the items that you've described before:  The surface
25 of the edge of the lug and some metal shavings; is

Page 171

1  that correct?
2    **A   Yes.**
3    Q   And in particular, your description for this
4  photograph says, "The blue-green arrows point to the
5  rough poorly manufactured surface of the edge of this
6  lug.  The red arrows point to embedded metal shavings
7  and rubbed ridges of this defectively manufactured
8  engagement line."  I read that correctly?
9    **A   Yes.**
10   Q   Okay.  So let's look at the photograph --
11 this is, I'm presuming, since you included it in your
12 report, this is the best microscopic photograph of
13 the barrel lug that shows these metal shavings and
14 the rough surfaces; is that right?
15   **A   Yes.**
16   Q   So the blue-green arrows point to the rough
17 surface of the edge of the lug; correct?
18   **A   Correct.**
19   Q   And the edge -- what do you consider to be
20 the edge of the lug?
21   **A   That region that's shown in the photograph.**
22   Q   And the red arrows are pointing to metal
23 shavings?
24   **A   Yes.  Metal shavings and rubbed ridges.**
25   Q   Okay.  And so what we're -- what you're

Page 172

1  pointing to here in this photograph with these
2  blue-green arrows and the red arrows is what you've
3  described earlier a few times in the deposition as
4  damage caused by the incident?
5    **A   Well, the blue arrows are underneath the**
6  **coating, so those areas of damage would have been**
7  **created before the part was coated.  But the areas**
8  **that are white are those that were created by contact**
9  **with the locking lug.**
10   Q   Okay.  So that was caused by contact with the
11 locking lug; but if I understood you correctly, and
12 tell me if I'm wrong, that contact -- there was prior
13 contact between the locking -- between the barrel
14 catch and the barrel lug prior to the incident round
15 being fired; correct?
16   **A   Yes.**
17   Q   Because we know that Mr. Batts had at least
18 opened and closed the action two times before, for
19 his first two shots; right?
20   **A   Yes.  At least.  I mean, he may have closed**
21 **it more than that.**
22   Q   Understood.  And we went through his
23 deposition.  I think he said he'd opened it a few
24 times.  I don't remember the exact number of times,
25 before he used the rifle; okay?

EXHIBIT 3

Page 173

1    A  Okay.
2    Q  So here is my question.  Are you able to
3  identify any damage caused to this piece of metal,
4  the barrel lug, as a result of it being caused -- it
5  being forcibly disengaged from the barrel catch at
6  the time of the incident?
7    A  You mean distinguish that particular firing
8  as opposed to any other firing?
9    Q  Yes, sir.
10   A  No, you can't distinguish between the damage
11  of the different firings.  It's all right there
12  together at the edge of the barrel lug.
13   Q  Okay.  So --
14   A  So --
15   Q  I'm sorry.  I cut you off.
16   A  Go ahead.
17   Q  Go ahead.
18   A  So damage created to this lug area by firing
19  are the white areas that have cut through the coating
20  right there, and they are in small ridges, and I
21  can't distinguish which ridge represented the final
22  firing, but they are all -- they are all -- look bad.
23   Q  So what we're seeing here, this -- what you
24  determined to be abnormalities in the barrel lug,
25  they are created by the contact, the mating, if you

Page 174

1  will, between the barrel catch and the barrel lug?
2    A  Yes.
3    Q  If I --
4    A  That's what it's showing.
5    Q  If I were to ask you, Mr. Powell:
6  Specifically tell me what, if any, damage was caused
7  to the barrel lug by the event of it forcibly being
8  separated from the barrel catch at the time of the
9  incident, you could not identify for me any specific
10  such damage; is that correct?
11   A  Which -- no.  I can identify the damage.  I
12  can't tell you that specific speck that was created
13  on the last firing.
14   Q  Right.  That was my question.
15   A  That's correct.
16   Q  Okay.
17   A  It's all -- it's all showing that there was
18  low engagement and that the engagement is damaging
19  that surface and, at the last firing, they became
20  totally disengaged.
21   Q  Okay.  And -- okay.  Does the surface of the
22  barrel lug on the subject rifle differ from the
23  barrel lug -- the surface of the barrel lug on your
24  exemplar?
25   A  Yes.

Page 175

1    Q  How so?
2    A  The location of engagement is much narrower
3  because of the low engagement on the subject rifle,
4  and the particles and ridged contact that's present
5  on the subject rifle are smooth motion from rubbing
6  as the parts engage on the exemplar rifle.  There is
7  no indication that there is only momentary engagement
8  or small engagement on the exemplar rifle.
9    Q  Would you inspect -- would you expect
10  engagement between two metal surfaces to have
11  different -- maybe I'm not using the term correctly,
12  but friction coefficients if one is smooth on smooth
13  and the other is rougher surface against rougher
14  surface?
15   A  Surfaces could affect frictional forces
16  between components, yes.
17   Q  And wouldn't a -- I'm thinking of something
18  like sandpaper.  Wouldn't a rougher surface against a
19  rougher surface create more robust engagement than
20  smooth on smooth, all other things being equal?
21   A  No, not necessarily, and certainly not in
22  this case, if you're saying that you think that that
23  rougher engagement surface makes greater -- greater
24  resistance to opening forces.
25      REPORTER: Resistance to what forces?

Page 176

1      THE WITNESS: Opening forces between the
2  barrel lug and the barrel latch.
3    Q  (By Mr. Danekas)  Have you tested that?
4    A  No, I haven't.  I have not tested the
5  frictional forces between the two, no.
6    Q  So you can't say if you were to -- if you
7  were able to set your exemplar rifle to
8  60/thousandths of engagement, everything else being
9  equal with that exemplar rifle, and 60/thousandths
10  engagement with the subject rifle, you don't know as
11  you sit here which would have a more robust
12  engagement, if they were to differ at all?
13   A  I have not measured the frictional contact
14  between those four -- between those components so I
15  can't tell you.  I don't have an opinion one way or
16  the other.
17   Q  How would normal contact wear between the
18  barrel lug and the barrel catch look any different
19  than what we see in the Batts rifle, the subject
20  rifle?
21   A  You expect fuller contact, deeper contact
22  between the two, and you would expect smooth surface
23  markings between the two, not these -- these
24  fractured ridges at the edge of the -- of the barrel
25  lug like you see in the Batts rifle.

EXHIBIT 3

**Charles Wayne Powell - June 19, 2019**

Page 177

1    Q   When you say -- I think you used the word
2  "deeper contact."  What are you referring to?  The
3  length of engagement?
4    A  Yes.
5    Q   How do -- my recollection is that you on the
6  CT scan measured the length of the engagement, slash,
7  overlap a -- strike that.  My recollection is you
8  have a photograph, and I can show it to you if you
9  want.  Well, actually, I will.  Let's go to -- let's
10  see.
11    A  Are you talking about page 27 of my report?
12    Q   Bear with me.  It might be.  Let's see.  I'm
13  going to show you a printout of it so we have it for
14  the record, but it's Exhibit 21.  Is that a printout
15  of what you were referring to on a page of your
16  report or no?
17    A  It looks like the subject.  Is that what
18  we're looking at?  That's the subject barrel lug?
19    Q   It is, sir, yes.
20    A  Yes.
21    Q   And that's -- that is the same photo on -- in
22  your report?
23    A  It's not the same as my Photograph 14.  It's
24  the left side of Photograph 13.
25    Q   Okay.  I see in -- I'm going to show you on

Page 178

1  the monitor, sir.  That's the electronic version of
2  Exhibit 21.  That's a microscopic view of the subject
3  rifle's barrel lug, and we have some measurements on
4  that photograph; is that correct?
5    A  Correct.
6    Q   And those were placed -- were those placed by
7  you or by the technicians at North Star?
8    A  These images were not taken at North Star.
9    Q   Okay.  These were images that you took?
10    A  Yes.
11    Q   And you have a rod in the -- toward the
12  middle of the picture there.  Is that for purposes of
13  -- what is the purpose of that?
14    A  That's for scale.  It's a pin gauge.
15    Q   And so you have two measurements there for
16  the barrel lug.  You have one that says "0773
17  inches"?
18    A  Correct.
19    Q   What is that referring to?
20    A  That's the farthest mark from the edge of the
21  barrel lug that I could find.
22    Q   That's 77.3/thousandths of an inch?
23    A  Yes.
24    Q   And then you have another measurement toward
25  the right of the photograph that is 0716.  What is

Page 179

1  that referring to?
2    A  That is the furthest marking that I could
3  find on that part of the engagement surface.
4    Q   So what is the significance of the -- what
5  you're referring to here as engagement surfaces --
6  surface?
7    A  That at some point, the locking latch surface
8  had been that far back on the lug surface and created
9  a mark.
10    Q   So the range that you have measured here on
11  the subject barrel lug is from 71.6/thousandths to
12  77.3/thousandths?
13    A  In that area, that's correct.
14    Q   I have not seen -- and I think we covered
15  this before.  I have not seen your doing these types
16  of measurements on your exemplar barrel lug; is that
17  correct?
18    A  I'm sure I looked at that.  Photograph 15 of
19  my report, page 30, is the exemplar barrel lug.  And
20  if I don't have specific measurements on there, I'm
21  sure I just simply relied on the engagement that was
22  seen through the view hole on the side, but the
23  engagement surface is much greater and the markings
24  on it are very smooth than what I would expect.
25    Q   Well, are you saying that you are able to

Page 180

1  correlate -- by looking through the side view of the
2  overlap of the barrel catch with the barrel lug, you
3  were able to correlate that with the amount of
4  contact as reflected on Exhibit 21, the contact on
5  the surface themselves?
6    A  I could make that measurement, yes.  I
7  haven't done it here.  I certainly can do that.
8    Q   Okay.  But as you are sitting here and giving
9  your opinions, you have not measured the amount of
10  contact, actual contact on the barrel lug surface of
11  your exemplar; correct?
12    A  I haven't included it in my report.  I don't
13  know if I've made it or not.  If you want to hang on
14  just a second, I'll look and see if I have it
15  already.
16    Q   Sure.  I don't see it in your materials; but
17  if you have it, let me know.
18        VIDEOGRAPHER: We're at 18 minutes.
19        THE WITNESS: No.  You're right.  I haven't
20  gone through and made those measurements on the
21  micrographs.  I can do that if I need to.
22    Q   (By Mr. Danekas)  Well, what would you do to
23  calculate that?
24    A  It's not a calculation.  It's a measurement.
25  I just go back into the software and tell it to

EXHIBIT 3

Page 181

1 measure it.
2   Q   Is the wear pattern on the -- on your
3 exemplar different than the wear pattern on the
4 subject rifle's barrel lug?
5   A  Yes.  The contact pattern is very different.
6   Q   How so?
7   A  The contact pattern on the exemplar rifle is
8 smooth and deep, meaning there is a large engagement
9 length on it.  The contact patch on the subject rifle
10 is very short and contains metal particles and ridges
11 of material that have been scraped away.
12   Q   Had you had any experience with Handi-Rifles
13 prior to your involvement in this case?
14   A  I have had Handi-Rifles evaluated in my
15 office, not for this condition but for looking at
16 forces that allow the hammer to go forward when the
17 trigger is pulled.  If the hammer is cocked and there
18 is a transfer bar, in order to uncock it, you have to
19 pull the hammer back with a hammer spur, pull the
20 trigger and slowly allow the hammer to go forward.
21     I was asked at some point to evaluate forces
22 that allowed the hammer spur to slip out from
23 underneath the thumb and allow the rifle to fire when
24 the trigger was being pulled.  So I had three or four
25 in my office to look at those forces.

Page 182

1   Q   Did you utilize any of those in connection
2 with your work in this case?
3   A  No.  I no longer have those rifles.
4   Q   Okay.  As you sit here today, are you
5 prepared to offer any opinion concerning the defect
6 in this rifle other than the engagement between the
7 barrel catch and the barrel lug?
8   A  Well, you've asked me a lot of questions in
9 my deposition.  That was my primary opinion is I'm
10 here to give the opinions that I wrote into my two
11 reports.
12   Q   At this point in time, Mr. Powell, do you
13 have any further testing planned?
14   A  Not at this time, sir.
15   Q   I think I asked you this earlier, but it's
16 your opinion that the use of Mr. -- the use of oil by
17 Mr. Batts had no effect on the incident?
18   A  Correct.
19   Q   Is that correct?
20   A  That's correct.
21     MR. DANEKAS: Let's take a short break.
22     VIDEOGRAPHER: Off the record at 3:46.
23        (Recess held)
24     VIDEOGRAPHER: We're back on the record at
25 4:09.

Page 183

1   Q   (By Mr. Danekas)  Mr. Powell, so your opinion
2 you've mentioned a few times today is that the
3 incident round was properly loaded, that there was
4 compromised engagement between the barrel catch and
5 the barrel lug, and that the oil that Mr. Batts used
6 as shown on the recovered video had no effect on the
7 incident?
8   A  In general, that's correct.
9   Q   If -- I think you had indicated earlier that
10 you were -- you did not know of a way of doing a
11 test-firing with a rifle to adjust the engagement
12 down to, say, 60/thousandths.  Is that a fair
13 statement?
14   A  Short of fitting a new barrel, correct.
15   Q   Uh-huh.  If you could do that and you could
16 adjust the engagement down to 60/thousandths, do you
17 see any value of running a test by firing a factory
18 round of ammunition out of the rifle to see if the
19 action would open and propel the cartridge case
20 rearward with sufficient force to cause injury?
21   A  As we discussed several times in my
22 deposition today, as an engineer, I think all testing
23 is good.  If you could do it, I would like to see it.
24   Q   Okay.  If that test were able to be performed
25 and you set an engagement between the barrel catch

Page 184

1 and the barrel lug at 60/thousandths and you fired a
2 factory round out of the rifle and the action did not
3 open, what effect would that have on your opinion?
4   A  I don't know.
5     MR. MEADOR: Objection.  Form.  Calls for
6 speculation.  It's an incomplete hypothetical.  He's
7 already testified that in addition to the
8 60/thousandths, there were variations in the
9 surfaces, and he's testified about that repeatedly.
10     THE WITNESS: I would have to see the test.
11 I mean, you're giving me hypotheticals.  I mean,
12 that's -- that's not the evidence in this case.
13   Q   (By Mr. Danekas)  What if you'd ran a test
14 where you had zero engagement between the barrel
15 catch and the barrel lug and you shot a factory round
16 and that test showed that a cartridge case would not
17 be expelled rearward, would that affect your opinion?
18   A  I don't know.
19     MR. MEADOR: Same objection.
20     THE WITNESS: I'd have to see how the test is
21 run and --
22     MR. MEADOR: Calls for speculation and
23 incomplete hypothetical.  Let me make my objections.
24 It's an incomplete hypothetical and it calls for
25 speculation.  You can answer if you know.

Page 185

1       THE WITNESS: I would have to see the test.
2    Q    (By Mr. Danekas)  Well, assuming that you
3  could adjust the engagement down from 60/thousandths
4  down to zero, what else would you do to run that
5  test?
6    A   I don't know.  What if you ran the tests and
7  the shell ejected?  You're giving me hypotheticals.
8  I mean, you would have to run the tests and see.
9    Q    Your theory is that because of the engagement
10  -- poor engagement in the subject rifle, the force
11  created when a properly loaded round was fired caused
12  the barrel catch and the barrel lug to disengage
13  which caused the action to open; and during -- when
14  the action opened, there was still sufficient force
15  in the barrel to propel the cartridge rearward with
16  such force that it caused Mr. Batts' injury; correct?
17    A   Correct.  And leave the bullet in the barrel.
18    Q    And leave the bullet in the barrel, yes.  In
19  other -- we've covered this, I believe.  Other than
20  your visually examining and the evidence, the bullet;
21  the parts of the rifle, the radiographs, the CT
22  scans, you have done no testing to verify whether
23  that theory is correct or incorrect?
24    A   No.  I've evaluated the physical evidence,
25  the markings left on the lug, the markings left on

Page 186

1  the latch, the physical evidence of the videos, the
2  testing of the rifle with oil, the exemplar rifle,
3  with full lock-up.  All of that evidence shows what
4  happened in the video that shows the injury to
5  Mr. Batts.
6    Q    But you have not attempted to replicate the
7  incident, have you?
8    A   It's not necessary to replicate it.  I've got
9  the physical evidence from that rifle that fired, and
10  I don't have to fire it again to evaluate the
11  physical evidence and show that the engagement was
12  low beyond the specifications from Remington and that
13  the action opened up and injured him.
14    Q    So in this case, it is not necessary to try
15  to replicate the incident?
16    A   Not at this time, no.
17    Q    Well, might there be a need for you to run a
18  test to try to replicate the incident?
19    A   I don't know.
20      MR. MEADOR: Objection.  Form.  Speculation
21  and this has been asked and answered.  We're starting
22  to re-plow ground that we went over this morning
23  here, Steve.
24    Q    (By Mr. Danekas)  Go ahead.
25    A   I -- I don't know.  At this time, there is

Page 187

1  not.  At some future time, my client may ask me to do
2  that.
3      MR. DANEKAS: I apologize for doing this, but
4  let's take a two-minute break.
5      VIDEOGRAPHER: Off the record at 4:17.
6      (Recess held)
7      VIDEOGRAPHER: We're back on the record at
8  4:25.
9    Q    (By Mr. Danekas)  Mr. Powell, just for the
10  record, I think we have already marked these, but
11  Exhibit 2 is a copy of your report and Exhibit 4 is a
12  copy of your supplementary report; is that correct?
13    A   I don't have those numbers here in front of
14  me, but...
15    Q    Do we have those exhibits down there, Terry,
16  2 and 4?
17    A   Yes, I have them here.
18    Q    Let me just go through briefly some generic,
19  general stuff.  You are not a designer of firearms;
20  correct?
21    A   I am a materials engineer.  If asked to
22  design parts of firearms as far as the materials and
23  materials design go, I can.  I have specific
24  expertise in material safety -- in firearm safety
25  system and can evaluate and test and opine as to

Page 188

1  those types of systems.
2    Q    But you're not a designer of firearms?
3    A   No.  I'm a failure analyst.  I'm a materials
4  engineer.
5    Q    Is there a difference between a materials
6  engineer and a mechanical engineer?
7    A   Yes.
8    Q    What is that difference?
9    A   Mechanical engineers evaluate the mechanical
10  aspects of systems, and materials engineers evaluate
11  the material aspects of systems.
12    Q    You have no work experience designing
13  firearms; is that correct?
14    A   My work experience is in failure analysis.
15  I've never worked for a firearms company to design
16  firearms.
17    Q    Okay.  And have you ever written or authored
18  any articles relating to firearms or firearms design?
19    A   No.
20    Q    Have you ever written or authored any
21  articles relating to firearms function?
22    A   No.
23    Q    Have any firearms manufacturers ever hired or
24  retained you to assist in the design or manufacture
25  of a firearm or any part of a firearm?

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 189

1    **A   No, they have not.**
2    Q   Do you have any formal education in
3    ballistics?
4    **A   No.**
5    Q   What is ballistics?  What do you understand
6    that term to be?
7    **A   The evaluation of objects moving at high**
8    **speeds without additional propulsion.**
9    Q   That would include bullets and projectiles
10   fired from firearms?
11   **A   Yes.  Ballistic missiles.  Any type of an**
12   **object that is given a force and a velocity and it's**
13   **traveled through the atmosphere or space.**
14   Q   Other than a lawyer who is involved in a suit
15   against the firearms manufacturer, have you ever been
16   asked to evaluate the design of a firearm?
17   **A   I've been asked by an insurance company, yes.**
18   Q   In what context?
19   **A   To evaluate how firearms characteristics**
20   **allowed an out-of-battery explosion.**
21   Q   On one occasion?
22      **REPORTER:** Allowed a what?
23      **THE WITNESS:** Out-of-battery explosion.
24   Q   (By Mr. Danekas)  On one occasion?
25   **A   Yes.**

Page 190

1    Q   Other than that one occasion where an
2    insurance company asked you to evaluate the design of
3    a firearm, has anyone other than a lawyer suing a
4    firearms manufacturer asked you to do so?
5    **A   No.**
6    Q   Generally, you do not reconstruct accidents
7    involving firearms; is that correct?
8    **A   I have done some reconstruction, but**
9    **generally I have not in the last 10 years or so.**
10   Q   Let me ask you a couple of questions about
11   the product service files that you mention in your
12   first report, and you call out two of them:  One
13   beginning with a document that is numbered REM 00055
14   and REM 00130.  Do you know from -- I'll let you take
15   a minute to get that document or documents if you
16   want.
17   **A   You said 155?**
18   Q   No.  055.
19   **A   505.**
20   Q   00055.
21   **A   I don't see that one in my file right here.**
22   **Maybe it's right here.**
23   Q   I thought that's what you mentioned.
24   **A   Okay.  Go ahead.  The other one was 00130?**
25   Q   Yes.

Page 191

1    **A   Yeah, I have that here.  Here is 55.**
2    Q   Have you got it?
3    **A   Yeah.**
4    Q   You've reviewed those two documents?
5    **A   I have.**
6    Q   And you understand those to be what's called
7    product service files from Remington?
8    **A   Yes.**
9    Q   Are the two incidents described in those
10   documents in your view similar to this case?
11   **A   They are similar in that the rifle action**
12   **opened and a shell was ejected.**
13   Q   Would you describe what happened in this
14   case, the Batts case, as a shell being ejected or
15   expelled, if you distinguish between those two terms?
16   **A   In this case I would not -- if you want to**
17   **say expelled because if I say ejector -- ejected,**
18   **that implies that it's using the ejector of the**
19   **firearm.  Expelled is fine, but they are synonymous**
20   **in my mind.**
21   Q   Okay.  With respect to those two product
22   service files you reviewed, you obviously did not
23   examine either of those firearms; correct?
24   **A   Correct.**
25   Q   So you have no knowledge of whether the

Page 192

1    barrel catch was engaged with the barrel lug at the
2    time those rifles were discharged; is that correct?
3    **A   I only know what's in these particular**
4    **product service documents.**
5    Q   Okay.  So do you know whether the barrel lug
6    was engaged with the barrel catch in either of those
7    instances?
8    **A   Only what the Remington inspector said, that**
9    **it was minimum lock-up on the barrel catch.**
10   Q   Do you know whether either of those instances
11   -- incidents involved reloads or remanufactured
12   ammunition?
13   **A   No, I don't see any references to what type**
14   **of ammunition they were shooting.  One was a 243**
15   **Winchester rifle cartridge and the other a 44**
16   **Remington Magnum, pistol cartridge.**
17   Q   Both of those incidents involved different
18   calibers involved in this case; correct?
19   **A   Correct.**
20   Q   And that would involve different pressures
21   created in the chamber at the time the rounds were
22   fired; correct?
23   **A   Yes.  The letter attached to the statement**
24   **00130 -- it's on page 00133 -- says he was firing a**
25   **factory 243 round.**

EXHIBIT 3

Page 193

1   Q   Okay.
2   A   I'm not sure if they say in the other one.
3   Q   And based on your --
4   A   It doesn't say on this one that I see.
5   Q   And based on your review of the records, you
6   do not have an opinion as to what caused the action
7   to open in either of those instances; is that
8   correct?
9   A   No, that they identified the cause as minimum
10  lock-up on the barrel catch.  That's identified as
11  cause.
12  Q   All right.  And neither of those instances,
13  incidents, involved an injury to the shooter; is that
14  correct?
15  A   I don't know what injuries were caused.
16  Correct.  It just talks about the shots being
17  ejected, if you will, and hitting them in the face or
18  head.
19  Q   At what velocity were they ejected?
20  A   Don't know.
21  Q   Do you see any reference in either of those
22  cases where the case was ejected with such force to
23  create an injury, pierce skin or injure an eye?
24  A   No.  Just that they reference them both to
25  being a safety issue.

Page 194

1   Q   And do either of those instances involve a
2   situation where the bullet was left in the barrel?
3   A   I don't know.
4   Q   Do those -- either of those instances speak
5   about the surfaces of the barrel lug or the barrel
6   catch?
7   A   No.
8   Q   Do either of those instances mention the
9   degree of engagement between the barrel lug and the
10  barrel catch?
11  A   No.  Just at its minimum.
12  Q   Your degree from Oklahoma in '74 was in
13  metallurgical engineering?
14  A   Correct.
15  Q   And you equate that -- I think you used the
16  terms "metallurgical engineering" and "materials
17  engineering" interchangeably?
18  A   Yes.
19  Q   You do not have a degree in mechanical
20  engineering; correct?
21  A   Correct.
22  Q   Do you have any advanced training in dynamics
23  of mechanical parts?
24  A   Yes.  I've taken -- part of my engineering
25  background is in courses in engineering dynamics and

Page 195

1   statics, yes.
2   Q   How about any specialized training in
3   kinetics or kinematics?  Do you know what I'm talking
4   about?
5   A   I do.  Some of my physics courses would cover
6   kinematics, but I don't have any specialized training
7   beyond my college degree, but those are basic
8   subjects for all engineers.
9   Q   Uh-huh.  What is kinematics?
10  A   Basically the study of materials in motion.
11  Q   Materials in motion or the force to create
12  the motion?
13  A   Same thing, yes.  They are all interrelated.
14  Q   The armorers course that you have referenced
15  on your CV, the armorers course by Glock and Barrett,
16  were those one-day courses?
17  A   Yes.
18  Q   And as I understand it, you can sign up on
19  line and pay a fee and take the course?
20  A   Barrett, I had to go through and get approval
21  to attend that course, and the Glock as well.
22  Q   What kind of approval?
23  A   I had to demonstrate a need for attending the
24  class since it was with law enforcement, armorers.
25  Q   You're a registered professional engineer in

Page 196

1   Oklahoma?
2   A   Yes.
3   Q   I noticed on the back of your computer that
4   you had up for the deposition, you have a sticker
5   there that says National Society of Professional
6   Engineers; correct?
7   A   I'd forgotten.  Yes.
8   Q   What do you -- what is involved in becoming a
9   member of the National Society of Professional
10  Engineers?
11  A   Being a professional engineer.
12  Q   Do you have a professional engineer's stamp?
13  A   Seal?  Yes.
14  Q   Seal.
15  A   Yes.
16  Q   Yeah, they call it a seal.  Do you use that
17  in connection with litigation activities?
18  A   Not generally.  I'm not required to; but if
19  I'm sealing drawings, for example, or some official
20  documents, then I use my seal.
21  Q   Have you ever used the seal in connection
22  with litigation matters?
23  A   I don't recall.  I may have, yes, long ago.
24  Q   Why do you generally not use the engineering
25  seal in connection with litigation matters?

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 197

1    A  It's not required.
2    Q  In the state of Oklahoma, your specialty in
3  engineering, if I read the entry correctly, was in
4  metallurgical engineering?
5    A  Correct.
6    Q  And you are allowed in Oklahoma to designate
7  a primary practice, area of practice; correct?
8    A  Metallurgical engineering, yes.
9    Q  You're also allowed to designate secondary
10  areas of practice?
11    A  I don't -- no, I don't think so.  I think you
12  would have to take a separate test to do secondary
13  areas.
14    Q  A separate test to show that you're qualified
15  to designate other areas of practice?
16    A  I believe that's correct.
17    Q  That would include mechanical engineering?
18    A  Yes.
19    Q  And you've not taken any tests?
20    A  Correct.
21    Q  You're not registered under the state of
22  Oklahoma as having a specialty in mechanical
23  engineering; is that correct?
24    A  That's correct.
25    Q  I think you mentioned to me earlier that you

Page 198

1  first became -- or first testified, I think this was
2  before the deposition started, in the late 70's?
3    A  Correct.
4    Q  Since 1990, you have been at Support Services
5  Engineering Corporation; is that correct?
6    A  The late 90's, correct.  Pardon me.  The
7  early 90's.  I apologize.
8    Q  And that is a corporation of which you're the
9  sole owner?
10    A  Correct.
11    Q  And that has been the case since the early
12  90's?
13    A  Yes.
14    Q  And since you created Support Services
15  Engineering Corporation, have you ever designed or
16  manufactured any product?
17    A  No.
18    Q  In the past 10 years or so, most of your work
19  has been for attorneys?
20    A  Yes.
21    Q  Related to lawsuits or potential lawsuits; is
22  that correct?
23    A  Yes.
24    Q  In the last, say, three years, '16, '17 and
25  '18, would you estimate that 80 percent of your

Page 199

1  compensation has come from working on
2  firearms-related cases?
3    A  I -- I don't know.  I don't know what
4  percentage that is.  I've worked on some large
5  pipeline cases in that period of time, so 80 percent
6  sounds a little high.
7    Q  Is it more than 50 percent?
8    A  I would think so, yes.
9    Q  You've testified against various firearms
10  manufacturers; correct?
11    A  Yes.
12    Q  You've testified against Winchester?
13    A  Winchester Olin, correct.
14    Q  Uh-huh.  Thompson/Center Arms?
15    A  Yes.
16    Q  Marlin Firearms?
17    A  Yes.
18    Q  Freedom Arms?
19    A  Yes.
20    Q  Cobra Arms?
21    A  Yes.
22    Q  J. P. Sauer?
23    A  Yes.
24    Q  Lorcin?
25    A  Lorcin?

Page 200

1    Q  Lorcin, L-O-R-C-I-N?
2    A  Yes, I'm not sure -- it was a Lorcin pistol,
3  but I'm not exactly sure who the corporation was that
4  manufactured it at that time.
5    Q  R.G. Industries?
6    A  Yes.
7    Q  Smith & Wesson?
8    A  I don't recall testifying against Smith &
9  Wesson.
10    Q  Have you testified in any cases involving
11  Glock?
12    A  I've evaluated Glocks.  I've not testified
13  against any Glock products.
14    Q  How about Berettas?
15    A  I have not testified against any Beretta
16  products that I recall.
17    Q  Browning?
18    A  Not against any Browning, no.  Again, I've
19  evaluated those firearms, but I haven't been involved
20  in any testimony against them.
21    Q  All of your testimony in firearms cases has
22  been on behalf of the plaintiffs, those suing the
23  firearms manufacturers, and not on behalf of the
24  manufacturer; is that correct?
25    A  Yes.

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 201

1    Q   You have testified in other Remington
2   lawsuits; is that correct?
3    A   Yes.
4    Q   Have you ever concluded in any Remington case
5   that the firearm was not defective in design or
6   manufacture?
7    A   Yes.
8    Q   Which ones?
9    A   Well, I don't recall the specific cases, but
10  there have been a number of times when I've evaluated
11  firearms and told them that I didn't feel that the
12  firearm was the result of the injury that that person
13  received.
14   Q   Specifically Remington firearms cases?
15   A   Not just Remington but others as well, but
16  certainly Remingtons.
17   Q   But you don't remember any of the details?
18   A   Oh, recently, probably within the last year,
19  a Remington firearm was brought to me that had
20  suffered an out-of-battery explosion, and I felt that
21  the receiver had been altered, the receiver and bolt
22  had been altered, and that the failure was the result
23  of those alterations, for example.
24   Q   What Remington model was involved?
25   A   I think it was a 770.

Page 202

1    Q   In any of the -- in any of your firearms
2   cases, have you ever replicated the underlying
3   incident?
4    A   Sometimes, yes.
5    Q   When -- what factors do you take into account
6   as to whether to try to replicate an incident and
7   when you don't need to try to replicate an incident?
8    A   Generally, we're replicating incidences when
9   the firearm is not going to be altered for the
10  testing to replicate that particular failure.
11   Q   I'm sorry.  When the firearm is what?
12   A   Not going to be damaged.  It's not going to
13  be altered during the testing.
14   Q   So in those instances where you try to
15  replicate the incident, do you always use the subject
16  firearm?
17   A   Not always, no.
18   Q   So in those cases you have an option, in many
19  cases, do you not, to use exemplar firearms to try to
20  replicate the incident?
21   A   If you could do it safely, yes.
22   Q   And if you can do it safely, do you usually
23  then try to replicate the incident?
24   A   Sometimes.  It depends on the evidence.
25   Q   What are the factors you take into account

Page 203

1   based on the evidence as to whether you try to
2   replicate the incident or not?
3    A   Just the specific factors of that particular
4   investigation.
5    Q   Like what?  What are the factors you take
6   into account?
7    A   Fractures, damage, weapon behavior,
8   components damage or undamaged.  I mean all the
9   different aspects that you evaluate firearms for.
10   Q   Since the late 70's, you've testified now in
11  approximately 350 depositions?
12   A   I haven't counted them up.  I've typically
13  been deposed five to 10 times a year, so that sounds
14  about right.
15   Q   And since the late 70's, you have testified
16  at trial about 70 times?
17   A   One to two times a year over 40 years, so it
18  could be 70 times.  I haven't counted them.
19   Q   In the last 10 years, have you testified on
20  behalf of any defendant in any litigation?
21   A   Yes.
22   Q   What?
23   A   I don't recall offhand, but I've testified
24  for defendants.
25   Q   Do you recall the last time you testified on

Page 204

1   behalf of a defendant?
2    A   No.  I'd just have to go look it up.
3    Q   Currently, a hundred percent of your time is
4   spent on litigation matters?
5    A   Currently, that's correct.
6    Q   How long has that been the case?
7    A   For the last four or five years.
8        MR. DANEKAS: Bob, do you have some
9   questions?  I think I'll pass the witness for right
10  now.  Thanks.
11       MR. MEADOR: Let's break till 5 so I can
12  figure out a couple of things.
13       VIDEOGRAPHER: Off the record at 4:49.
14           (Recess held)
15       VIDEOGRAPHER: We're back on the record at
16  4:55.
17           CROSS EXAMINATION
18  BY MR. MEADOR:
19   Q   Introduce yourself to the jury, please.
20   A   My name is Charles Wayne Powell.  I live in
21  Norman, Oklahoma.  I'm a registered professional
22  engineer/materials engineer.
23   Q   All right.  I've retained you on behalf of
24  Jon Batts in a lawsuit filed against Remington
25  related to an incident that happened back in November

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 205

1  2015; is that right?
2  **A  Yes, sir.**
3  Q  You've been designated as an expert and
4  that's why you're testifying here today; is that
5  right?
6  **A  Yes.**
7  Q  Okay.  All right.  Can you identify Exhibit
8  Number 1 for us?
9  **A  Plaintiff's Exhibit Number 1 is a copy of my**
10  **curriculum vitae.**
11  Q  Okay.  I want to walk you through that real
12  briefly.  How long have you been an engineer?
13  **A  Well, I graduated from the University of**
14  **Oklahoma in 1973, and I went on active duty in the**
15  **U.S. military from '73 to '76.  I came back to one**
16  **year of grad school and then left grad school to be**
17  **an engineer with a company that ultimately became**
18  **Engineering Materials Technology, which I became**
19  **president of after a number of years.**
20  **I became registered after that period of**
21  **time, probably -- oh, my registration probably goes**
22  **back to around 1980, and I've been a registered**
23  **materials engineer performing failure analysis for**
24  **the last 40 years.**
25  Q  Well, what's involved?  You said that you are

Page 206

1  registered.  What's involved with the registration
2  process?
3  **A  A registered engineer is required to have a**
4  **sufficient amount of experience, and then you're**
5  **allowed to take two different types of tests:  One on**
6  **basic engineering subjects, and then later on one in**
7  **professional practices and principles.  Both are**
8  **one-day tests.**
9  Q  Is that done through the state?
10  **A  Yes.**
11  Q  And what states have you held that
12  certification in?
13  **A  I'm certified currently in Oklahoma and**
14  **Alabama.**
15  Q  All right.
16  **A  With --**
17  Q  You mentioned military.
18  **A  Yeah, I can be registered in other states if**
19  **I need to be.**
20  Q  All right.  You mentioned military services.
21  What did you do in the military?
22  **A  I was with the Corps of Engineers.  We were**
23  **with a combat engineer battalion, so I built things**
24  **and destroyed things with different types of**
25  **explosives.  We were one of the engineering units**

Page 207

1  **that were the support unit for Fort Benning for the**
2  **ranger school.**
3  Q  All right.  In terms of your professional
4  history, how long have you been evaluating incidents
5  involving firearms?
6  **A  As we had talked a little bit earlier -- I**
7  **can't recall if we did this through defense counsel,**
8  **but I worked on my first firearms cases in the**
9  **mid-1980's.  So I've been working on failure analysis**
10  **of firearms for approximately the last 30 years.**
11  Q  Okay.  Explain to the jury what failure
12  analysis means, please.
13  **A  Failure analysis is -- in my case as a**
14  **materials engineer, it's the evaluation of the**
15  **physical forces and material properties that allow**
16  **materials to misbehave or fail, whether that failure**
17  **is the result of damage from other components or**
18  **corrosion or cracking.**
19  **There are a variety of different types of**
20  **metal failures that I look at in different types of**
21  **components.  I'm what's called a physical**
22  **metallurgist.  I'm not the kind of metallurgical**
23  **engineer that extracts metals from ore, but I'm the**
24  **kind that evaluates forces of material properties.**
25  Q  And how -- are you exclusively working on

Page 208

1  firearms cases at this point?
2  **A  No.  Obviously I do materials failure**
3  **analysis.  I work on a wide variety of different**
4  **components, looking at how the materials perform.**
5  Q  All right.  Have you and I ever worked on a
6  case before?
7  **A  No, sir.**
8  Q  Have you ever testified for me in another
9  matter?
10  **A  No.**
11  Q  You are being compensated to be here today,
12  aren't you?
13  **A  Yes.**
14  Q  And you've been compensated for the other
15  work that you've done on the case; is that right?
16  **A  Yes, sir.**
17  Q  All right.  You don't work for lawyers for
18  free, do you?
19  **A  Not generally, no, sir.**
20  Q  All right.  Will you agree with me today that
21  any opinions that you offer will be based on your
22  education, training and experience as an engineer?
23  **A  Yes, as well as my physical evaluation and**
24  **testing in this case.**
25  Q  All right.  Do you belong to any professional

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 209

1  groups or associations at this point?
2    A  Yes.
3    Q  Which ones?
4    A  Well, I'm a member of the National Society of
5  Professional Engineers.  I'm a member of the American
6  Society for Testing Materials.  Let's see.  Let's go
7  down my list here.  Those are the two that I
8  primarily work in.
9      I'm a member of the National Rifle
10  Association, the Glock Shooting Sports Federation,
11  the American Society of Corrosion Engineers, the
12  Historical Metallurgical Society, the Society of
13  Automotive Engineers and the Fifty Caliber Shooters
14  Association.
15    Q  All right.  We've heard references today
16  about nondestructive testing.  Will you explain to
17  the jury what nondestructive testing consists of?
18    A  Nondestructive testing is the use of
19  different techniques for the evaluation of materials
20  without damaging them.  Primary methods include
21  visual testing, magnetic particle testing, penetrant
22  testing, radiography, ultrasonic testing,
23  eddy-current testing.
24    Q  All right.  What type of rifle are we here to
25  talk about today?

Page 210

1    A  We are here to talk about what's called a
2  Handi-Rifle.  It's a single-shot, break-open type
3  rifle.
4    Q  Can you explain to the jury what a break-open
5  type rifle as opposed to a pump action, lever action,
6  bolt action?  How does that type of action function?
7    A  This single-shot action has a single barrel
8  and holds a single cartridge; and when a lever is
9  pushed on the top of the action, the rifle hinges
10  over around an axis and opens up so that a fired
11  cartridge case can be extracted and a new loaded
12  cartridge inserted, and then the rifle is closed by
13  rotating the barrel around its axis and closing it
14  with the receiver.
15    Q  And we're here today to talk about the
16  locking mechanism on a rifle; is that right?
17    A  Yes.  Once you've closed it up, those two
18  pieces have to be held locked together while the
19  cartridge fires.
20    Q  All right.  The -- we're going to talk about
21  a couple of rifles this afternoon.  The rifle that
22  belonged to my client, Jon Batts, has been referred
23  to as the subject rifle.  So when I talk about the
24  subject rifle, do you understand that we're talking
25  about Sergeant Batts' rifle?

Page 211

1    A  Yes.
2    Q  And I understand that you purchased a like
3  rifle for evaluation purposes; is that right?
4    A  Yes.
5    Q  You've referred to that in your report as an
6  exemplar rifle; is that true?
7    A  Correct.
8    Q  All right.  The defendant in this case is
9  Remington.  The rifle that we're here to talk about
10  is marked as H&R for Harrington & Richardson; is that
11  right?
12    A  Yes.
13    Q  For the purposes of this case, your opinions
14  regarding Remington or H&R, those are
15  interchangeable; is that right?
16    A  Yes.  I think Remington is the primary owner
17  of that particular manufacturing brand.
18    Q  All right.  Now, you've generated two
19  reports; is that right?
20    A  Yes.
21    Q  And those were marked earlier as Defendant's
22  Exhibits 2 and 4; is that true?
23    A  Yes.
24    Q  Are Exhibits 2 and 4 true and correct copies
25  of the reports that you generated?

Page 212

1    A  They are.
2    Q  And do those reports reflect your opinions
3  formed with respect to Mr. Batts' case against
4  Remington?
5    A  They do.
6    Q  You've talked at length earlier today about
7  aspects of those so I want to just kind of hit some
8  of the high points.  Based on your investigation into
9  this incident, explain to the jury what you
10  understand to have happened in November of 2015 when
11  Sergeant Batts was injured.
12    A  When Sergeant Batts was injured, his rifle
13  did not stay locked together, such that when the
14  barrel and the receiver separated or rotated around
15  the hinge and opened up, the barrel still had
16  pressure in it, and the pressure threw the fired
17  cartridge case back into his head and caused his
18  severe head injury.
19    Q  Was the expulsion or ejection of the
20  cartridge from the back of Sergeant Batts' rifle,
21  that was not the means that it's supposed to exit the
22  weapon; is that true?
23    A  No.  The weapon is designed such that you
24  undo the latch after the cartridge has been fired and
25  you open the action when there is no pressure inside

EXHIBIT 3

Page 213

1 the barrel and you physically take the cartridge out
2 of the chamber.
3    Q   Okay.
4    A   The cartridge case out of the chamber.
5    Q   Because the folks on the jury may be familiar
6 with rifles, like an AR-15 or others, that the
7 function of the rifle involves a shot ejecting its
8 own shell.  This is not one of those types of rifles;
9 true?
10   A   No.  Those firearms have a mechanism that
11 utilize generally the pressure of the cartridge
12 firing to activate a mechanism to automatically
13 extract the cartridge case and load a new cartridge
14 into the chamber.
15   Q   All right.  So the rifle that Sergeant Batts
16 was firing on the day of our incident, that
17 Handi-Rifle, that was designed not to expel a
18 cartridge until it was manually opened by the
19 shooter?
20   A   Correct.  And it doesn't expel one even then.
21 It just simply extracts it slowly out by about an
22 eighth of an inch and you have to grab it -- go in
23 with your fingers and grab it and pull it out.
24   Q   Okay.  Can you explain briefly for the jury
25 the nature of the locking mechanism on that

Page 214

1 Handi-Rifle as it existed in the rifle that Mr. Batts
2 was firing?
3    A   Sure.  In general, there is a lug on the
4 bottom of the barrel; and as the action closes, as
5 the barrel closes into the receiver, that lug down
6 here on the bottom of the barrel rotates underneath a
7 locking latch that swings forward under spring
8 pressure and goes -- and captures the barrel lug on
9 the top of the lug.
10      REPORTER:  Top of the lug?
11      THE WITNESS:  Lug, L-U-G.  Correct.
12   Q   (By Mr. Meador)  All right.  Have you
13 reviewed Remington documents in this lawsuit that
14 relate to the specifications for the locking
15 mechanism on a Handi-Rifle?
16   A   I have.
17   Q   Is there a diagram included in one of your
18 reports of that locking mechanism?
19   A   Yes.
20   Q   Can you turn to that, please?
21   A   This is Drawing Number 10 in my report that
22 was written in January of 2019.
23   Q   Okay.  Can you turn that around and the
24 videographer is going to zoom in on that so that we
25 can see that.  Now, page 25 of your report, Drawing

Page 215

1 Number 10, is that a Remington document?
2    A   Yes.
3    Q   And does that document show proper and
4 improper engagement of those locking parts that you
5 told us about earlier?
6    A   Yes, it does.
7    Q   All right.  What are the three categories
8 that Remington uses to describe those -- is that
9 called an engagement surface?
10   A   Yes.  It's showing the amount of engagement
11 that the locking latch covers into the barrel lug.
12   Q   Okay.
13   A   So here we have the latch moving
14 significantly onto the barrel lug, and that's good.
15 It's got good engagement.
16   Q   That's the middle -- that's the middle
17 diagram?
18   A   Yes.
19   Q   Is that right?
20   A   The one on the left is "go," meaning it's
21 just right at the minimum but it's still acceptable.
22 And if this indicator notch doesn't engage onto the
23 barrel lug far enough -- in fact, this one is not
24 engaged at all.  That's a no-go.  That's a failure
25 for the barrel latching mechanism.

Page 216

1    Q   And based on your review of the Remington
2 documents, if a Handi-Rifle is inspected and
3 determined to have a no-go engagement, what do the
4 Remington documents indicate?
5    A   It has to be remanufactured so that it is
6 correctly engaging.
7    Q   All right.  Based on the Remington documents
8 that you reviewed, does Remington release no-go rifles
9 into the stream of commerce?
10   A   They are not supposed to, no.
11   Q   Okay.
12   A   But there are apparently -- from some of the
13 product documents, some have been released.
14   Q   Okay.  In the -- in your -- and you can put
15 that down.  Thank you, Mr. Powell.  I appreciate it.
16      In your examination of the exemplar rifle
17 that we talked about earlier, did you examine the
18 engagement surface between the barrel lug and the
19 locking catch?
20   A   Yes.
21   Q   Did you -- now, is there some means to
22 visualize that with the rifle as they are sold?
23   A   There is a means, but it's -- the view window
24 that shows the engagement is hidden underneath a
25 steel plug.  So you have to be able to remove the

EXHIBIT 3

Page 217

1  plug in order to see that engagement.  Otherwise,
2  it's totally invisible to the consumer.
3      Q   Okay.  In the course of your examination and
4  evaluation of that exemplar rifle, did you remove
5  that plug?
6      A   I did and actually used a machine to enlarge
7  the size of the window so we could see clearly the
8  amount of engagement.
9      Q   So with the enlarged window that you just
10 described, you can actually visually observe the
11 contact between those two surfaces; is that right?
12     A   Correct.
13     Q   Now, did you do any sort of removal of that
14 plug or enlargement of the hole on the subject rifle?
15     A   No, sir.
16     Q   Were you able to evaluate by any means what
17 the engagement surface looked like on Sergeant Batts'
18 rifle?
19     A   In two methods, yes.  Initially it was
20 CAT-scanned.  In other words, it was placed into a
21 machine just like you would CAT-scan a person for a
22 medical issue, and a large radiographic source takes
23 computer views through the part as it rotates on the
24 turntable, and then a three-dimensional image can be
25 reconstructed.  And so that particular subject rifle

Page 218

1  was CAT-scanned so that you could see the engagement
2  between the barrel latch and the barrel -- pardon me.
3  The latch and the barrel lug.
4      Q   All right.  On the subject rifle, what did
5  you determine?  Can you explain to the jury what you
6  identified with respect to the extent of the
7  engagement between the barrel lug and the locking
8  catch?
9      A   The engagement of the subject rifle would be
10 what is termed in this document a "no-go" situation.
11 The engagement was only about half of that that was
12 shown by the exemplar rifle.
13     Q   All right.  Do you know the numbers in terms
14 of the size or the measurements that were taken of
15 the exemplar rifle with respect to that engagement
16 surface?
17     A   The engagement length of the exemplar rifle
18 was measured to be 145/thousandths of an inch.
19     Q   And what was it on the subject rifle?
20     A   The subject rifle was 60/thousandths of an
21 inch.
22     Q   Less than half?
23     A   A little less than half, yes, correct.
24     Q   Do you have images as part of your initial
25 report that's been marked as Exhibit Number 2 that

Page 219

1  shows those engagement surfaces on the exemplar rifle
2  and the subject rifle?
3      A   Yes.
4      Q   Starting with the exemplar rifle, can you
5  hold that up for the videographer to look at.
6      A   We have the -- first we'll show the
7  radiograph of the exemplar rifle showing its
8  engagement in the radiograph.
9      Q   All right.  Based on your examination of that
10 radiograph result, did the exemplar rifle have the
11 proper or appropriate engagement between the barrel
12 lug and the locking catch?
13     A   Yes, it did.
14     Q   All right.  Do you have another
15 representation of the exemplar rifle there in Exhibit
16 Number 2?
17     A   Here is a view through the viewing window,
18 where again you can see that large engagement between
19 the latch and the barrel lug.
20     Q   Now, if you'll point with your finger or that
21 pen and point out to the jury which part is the
22 barrel lug and which part is the latch.
23     A   The barrel lug is the lower portion here, and
24 the latch is this large component here.
25     Q   Okay.

Page 220

1      A   So the engagement distance is shown by that
2  red arrow.
3      Q   All right.  Is the barrel latch, is that --
4  or the release latch, locking latch, is that a cast
5  part or a forged part?
6      A   I believe it's cast.  Either that or it's
7  metal-injection molded.
8      Q   Okay.  Now, there is -- this right here, what
9  is that?
10     A   That is a locating notch on the lug to allow
11 the termination, when this is assembled, as to
12 whether there is a "go" or "no-go" situation on the
13 amount of engagement.
14     Q   All right.  So the photograph that you're
15 holding up, that demonstrates a "go" or good
16 engagement surface?
17     A   Correct.
18     Q   Is that right?
19     A   Correct.  If it's -- if the latch is moved,
20 it only latches to where -- the edge of this locating
21 notch is beyond that corner of the lug, then that's a
22 no-go situation.
23     Q   Okay.  Can you show us the imaging of the
24 subject rifle?  Sergeant Batts' rifle, please.
25

Page 221

1    A   This is an image taken from the CAT scan from
2  Sergeant Batts' rifle, and you can see that the
3  indicating notch here is beyond the corner of the
4  barrel lug and therefore that's in a no-go situation.
5    Q   All right.  So on Sergeant Batts' rifle, the
6  engagement surface between the latch and the barrel
7  lug is below the Remington specifications?  Is that
8  your understanding?
9    A   Yes.
10   Q   All right.  Thank you.  You can put that
11 down.
12       And do you have an opinion as to whether the
13 lack of appropriate engagement with that locking
14 mechanism was the cause of the incident involving
15 Mr. Batts in November of 2015?
16   A   Yes.  After my testing of the components of
17 both rifles and my education and background and
18 evaluation in failure analysis, I determined that the
19 engagement, which was defectively low on Sergeant
20 Batts' rifle, is what allowed it to open when the
21 cartridge was fired and to eject the shell that
22 caused his injury.
23   Q   All right.  Have you examined or evaluated
24 ammunition that was provided by Sergeant Batts?
25   A   Yes.  I was present when one round of the

Page 222

1  seven rounds that he provided of the low-velocity 300
2  AAC Blackout ammunition, I was there when it was
3  disassembled so we could look and measure the
4  components in that round, as well as seeing all of
5  the rounds when they were digitally radiographed in
6  the CAT-scan unit.
7    Q   All right.  Now, for the jury's edification,
8  there are many kinds of rifle ammunition; but in our
9  case, we've talked about subsonic ammunition and
10 hypersonic ammunition; is that right?
11   A   Yes.
12   Q   What -- explain to the jury what subsonic
13 ammunition is, please.
14   A   Subsonic ammunition generally uses a larger
15 bullet and the velocities are generally around a
16 thousand feet per second or less so that the round
17 does not break the sound barrier when it leaves the
18 firearm.
19   Q   And what's the purpose behind having subsonic
20 ammunition?
21   A   Generally, it was manufactured to -- if
22 desired, used with a suppressor so that the firing of
23 that rifle has a very low noise footprint.
24   Q   Are the velocities involved in -- those are
25 -- the velocities with subsonic ammunition are slower

Page 223

1  than hypersonic ammunition obviously; true?
2    A   Yes.  Hypersonic obviously beyond the speed
3  of sound.  Subsonic hopefully below the speed of
4  sound.
5    Q   All right.  Now, earlier you referred to the
6  bullet in subsonic ammunition being larger.  By that,
7  did you mean they are heavier?
8    A   Yes.  They are the same diameter, but they
9  are different -- they are generally longer and
10 heavier than a hypersonic 300 Blackout cartridge
11 bullet.
12   Q   Now, do you have an understanding of whether
13 Sergeant Batts was firing subsonic or hypersonic
14 ammunition at the time our incident happened?
15   A   When his -- when his injury occurred, the
16 bullet was actually left in the barrel of the rifle,
17 so we could evaluate that bullet and see that it was
18 a polymer-tipped, heavy bullet that was used in
19 subsonic ammunition.
20   Q   Have you seen any indication or any evidence
21 to suggest that the ammunition that Sergeant Batts
22 was firing on the day of our incident was in fact
23 hypersonic --
24   A   No.
25   Q   -- ammunition?

Page 224

1    A   No.
2    Q   All right.  Now, when a -- the mechanics of a
3  bullet firing, a firing pin strikes a primer; is that
4  right?
5    A   Yes.
6    Q   The primer ignites the powder charge in the
7  cartridge case; true?
8    A   Correct.
9    Q   And the expanding gas and pressure pushes the
10 bullet out the end of the barrel.  Is that generally
11 the way that it works?
12   A   Pushes it out the end of the cartridge
13 through the barrel and on out into the environment.
14   Q   All right.  For various firearms, we've heard
15 references to pressure and chamber pressure.  Do you
16 remember that earlier in your deposition?
17   A   Yes.
18   Q   Explain to the jury what chamber pressure is
19 and how it's generated.
20   A   Well, the chamber is that portion of the
21 barrel that's shaped like the cartridge.  That's
22 where the cartridge is placed before firing.  Chamber
23 pressure is the pressure generated just within that
24 region of the barrel.
25       In general, pressure could be measured

EXHIBIT 3

Page 225

1 wherever you want to measure pressure at; but in
2 general, chamber pressure is a limiting factor in the
3 design and loading of ammunition.
4    Q  All right.  How is that measured?  Is there a
5 -- what's the unit of measurement that we would hear?
6    A  Pounds -- pounds per square inch generally.
7    Q  All right.  In the case of subsonic
8 ammunition, does it tend to generate chamber pressure
9 that is higher or lower than hypersonic ammunition?
10   A  It's going to depend on the ammunition, but
11 generally it's lower.
12   Q  All right.  Do subsonic rounds have more or
13 less powder in them than a hypersonic round?
14   A  The smaller the bullet, generally the more
15 the propellant.  So generally, subsonic ammunition
16 that has larger bullets has less propellant in it.
17   Q  All right.  Now, you testified earlier that
18 you've had an opportunity to inspect and image and do
19 various evaluations on the ammunition that was
20 provided by Sergeant Batts as being of the same type
21 and kind as was being fired on the day of our
22 incident; true?
23   A  Correct.
24   Q  Have you seen any indication that the
25 ammunition that Sergeant Batts was firing on the date

Page 226

1 of our incident caused or contributed to cause his
2 rifle to open?
3    A  No.  The reason his rifle opened was because
4 of low engagement between the barrel lug and the
5 latching, the latch.
6    Q  Now, we all went to -- well, came up here to
7 Oklahoma City in March of this year for Remington's
8 expert to remove the bullet that was lodged in
9 Sergeant Batts' rifle; is that right?
10   A  In the barrel, yes.
11   Q  Right.  You and I both watched Mr. Watkins
12 remove that; true?
13   A  Correct.
14   Q  After that, did you have an opportunity to
15 view the bullet that was removed from the bore?
16   A  I did.
17   Q  Was there anything about that bullet or your
18 examination of that bullet that suggested that it was
19 the wrong caliber for that rifle?
20   A  No.
21   Q  Was it consistent -- did you say earlier that
22 a cartridge was disassembled --
23   A  Yes.
24   Q  -- during that meeting?  All right.  Was the
25 bullet that you -- that was removed from the bore

Page 227

1 that day, was it the same as the bullet from the
2 disassembled cartridge?
3    A  Yes.
4    Q  Did you -- now, have you had an opportunity
5 to look at the cartridge case that struck Sergeant
6 Batts in the eye?
7    A  No.
8    Q  Do you know what happened to that case?
9    A  I do not.
10   Q  All right.  But you were able to examine the
11 cartridge case for both the assembled and the one
12 disassembled round that Sergeant Batts provided; is
13 that right?
14   A  Yes.
15   Q  Was -- were the diameters of lengths and
16 what-have-you of the various cartridge cases that you
17 looked at, were those consistent with the
18 measurements that you would expect to find in 300
19 Blackout round?
20   A  Yes.
21   Q  In anything that you have reviewed, inspected
22 or evaluated, have you seen any indication that the
23 ammunition that Sergeant Batts was firing on the date
24 of our incident was defective?
25   A  No.

Page 228

1    Q  And any indication from any of the imaging,
2 the disassembly, the weights and measures and things
3 that you conducted, that the ammunition that Sergeant
4 Batts was firing in any way caused his rifle to open
5 on the day of our incident?
6    A  No.  The fire -- the firearm opened because
7 of the low engagement between the latch and the
8 barrel lug, not because of the ammunition being
9 fired.
10   Q  All right.  There has been some discussion
11 today about a squib load.  Can you explain to the
12 jury what a squib load is?
13   A  A squib load is a name for a cartridge that's
14 low pressure, basically.  Often squib loads may have
15 very little propellant or no propellant in them at
16 all, just the primer; and when that fires, the bullet
17 leaves the cartridge and just moves a short distance
18 down the barrel.
19   Q  And it stays in the barrel?
20   A  Stays in the barrel generally, although one
21 squib load was fired by Sergeant Batts.  The bullet
22 almost came out the barrel.
23   Q  All right.  You've actually seen the video of
24 that squib load; right?
25   A  Yes.

Page 229

1    Q   And did you also watch that portion of the
2  video that showed Sergeant Batts removing that
3  projectile from the end of the bullet?
4    A   Yes.
5    Q   Or from the end of the bore, rather.
6    A   Yes, from the end of the bore.
7    Q   How did he do that?
8    A   He used a metal rod to push from the breech
9  end of the barrel, up through the barrel, to impact
10 into the bottom of the bullet and tap it out of --
11 out of the bore.
12   Q   So in layman's terms, he put a metal rod in
13 the back end of the barrel and pushed it out the
14 front end of the barrel; is that right?
15   A   Correct.
16   Q   All right. Was there anything about that
17 process of removing that bullet from the barrel of
18 Sergeant Batts' rifle as depicted in that video that
19 I think we've seen referred to today as Recover 7,
20 was there anything about the removal of that bullet
21 that you believe would have weakened or in any way
22 adversely affected the locking mechanism on his
23 rifle?
24   A   No.
25   Q   Now, before he knocked it out with a rod, he

Page 230

1  -- I believe the video shows he took a multi-tool
2  like a pair of pliers. Do you recall that?
3    A   Uh-huh, tried to grab it, but he couldn't
4  grab it with sufficient force to get it to remove.
5  In fact, I think he actually pulled part of the
6  jacket off of the bullet.
7    Q   Was there anything about his effort to remove
8  the bullet using those pliers that would have had any
9  effect on the other end of the barrel where this
10 locking mechanism is located?
11   A   No, sir.
12   Q   After -- well, what did he do -- what did
13 Sergeant Batts do as depicted on the video after he
14 used the rod to remove the bullet from the bore?
15   A   He -- he cleaned the bore, using a bore
16 snake; and then before the next shell would be fired,
17 he added some CLP oil to the chamber and barrel.
18   Q   Okay. What's a bore snake?
19   A   A bore snake is a long tube of material that
20 people utilize to pull through a barrel of a rifle in
21 order to remove deposits within.
22   Q   Is that rigid or is it soft?
23   A   It's soft. It's flexible.
24   Q   Is it a cloth that has some sort of a
25 cleaning brush embedded in it?

Page 231

1    A   Some do, yes. Some have cleaning brushes and
2  other kinds of abrasive components along the length
3  of it.
4    Q   Is that used in lieu of a cleaning rod with a
5  patch on it, the way a lot of us old-school clean
6  rifles?
7    A   Yes.
8    Q   Is there anything about Sergeant Batts' use
9  of that bore snake as depicted in that video that
10 would have in any way affected the locking mechanism
11 on his rifle?
12   A   No, sir.
13   Q   Now, you mentioned that he placed some CLP in
14 the chamber of the rifle before firing it; is that
15 right?
16   A   Yes.
17   Q   Explain to the jury what CLP is.
18   A   CLP is cleaning, lubricating and protecting
19 fluid. It's a type of oil utilized in firearm
20 maintenance.
21   Q   All right. And it's my understanding that
22 after observing that on the video, Recover 7, that
23 you had some questions about what that CLP might have
24 done to his rifle; is that right?
25   A   Correct.

Page 232

1    Q   Did you -- what did you do to investigate
2  that, if anything?
3    A   I conducted test-firings of an exemplar rifle
4  in firing it both with and without oil in the bore.
5    Q   Okay. Let's go back to the squib for just a
6  minute. Does a squib round in a rifle like a 300
7  Blackout, does that develop more pressure or less
8  pressure or the same amount of pressure in the
9  chamber as a normal, fully loaded round?
10   A   Much less.
11   Q   Can you give us some idea percentage-wise how
12 much less?
13   A   No. You would have to measure it. It
14 depends on how the squib load -- a standard chamber
15 pressure for a regularly loaded 300 Blackout
16 cartridge, around 30,000 psi, depending on the kind
17 of cartridge, but a squib load will have pressures at
18 like 5 to 10,000 psi, if that much.
19   Q   Okay. I have seen references in some of the
20 documents to S-A-A-M-I. What does that stand for?
21   A   Sporting Arms and Ammunition Manufacturers
22 Institute.
23   Q   And what is SAAMI?
24   A   It is an industry group that helps promulgate
25 standards for firearms manufacture and use.

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 233

1    Q   Do those SAAMI standards include chamber
2  pressures?
3    A   Yes.  They help set manu -- chamber pressures
4  so manufacturers know how to design rifle strengths
5  to withstand those pressures.
6    Q   Do they set maximum chamber pressures for
7  particular calibers, for example?
8    A   Yes.
9    Q   Do you know what the maximum SAAMI chamber
10 pressure is for a 300 Blackout?
11   A   I think it's around 58,000 psi.
12   Q   All right.
13   A   I would have to look up the exact number.
14   Q   All right.  So if a -- what did you tell me
15 the chamber pressure you would expect on a subsonic
16 300 Blackout would be?
17   A   When I conducted the tests without oil in the
18 barrel, they were around 30,000 psi.
19   Q   All right.  So the maximum for a 300 Blackout
20 is 58,000; is that true?
21   A   Approximately.  Correct.
22   Q   And what you observed from firing a standard
23 factory subsonic 300 Blackout round out of this same
24 type of rifle, you got a chamber pressure of what?
25   A   About half that.  About 30,000 psi.

Page 234

1    Q   All right.  So you would expect a squib load
2  to, by extension, have a chamber pressure of less
3  than approximately half --
4    A   Oh.
5    Q   -- of this SAAMI maximum; is that right?
6    A   Much less.  Just enough to move the bullet
7  down the bore.
8    Q   All right.  From your observation of the
9  video, your inspection and work with both the subject
10 rifle and the exemplar rifle, do you have an opinion
11 as to whether the squib load that we see in the video
12 named "Recover 7" damaged the rifle or caused any
13 problems with the locking mechanism?
14   A   I do.
15   Q   And what is that opinion?
16   A   In my opinion, there was no damage created to
17 the rifle by the use or firing of a squib load in the
18 rifle from Round 1 by Mr. Batts.
19   Q   Okay.  Then jumping back to the CLP, the oil
20 that we talked about earlier, you did some testing
21 with the exemplar rifle involving oil; is that right?
22   A   Correct.
23   Q   Can you describe real briefly for the jury
24 what your procedure or process was that you tested
25 that?

Page 235

1    A   In general, the rifle was placed into a test
2  stand, and it was fired both with and without oil.
3  The oil was placed into the chamber and barrel just
4  like Sergeant Batts did, through a squeeze bottle,
5  and then the rifle was fired.  And utilizing a
6  pressure sensitive disk at the end of the cartridge,
7  we could measure the thrust load created by those
8  shells, as well as using a strain gage to measure the
9  pressure inside the chamber.
10   Q   Okay.  What is a strain gage.  Explain to the
11 jury what that is.
12   A   A strain gage is a small metal foil gage that
13 is glued to a piece of material; and when that
14 material microscopically stretches as a result of
15 force, the strain gage emits an electrical signal
16 that's detected and measured.
17   Q   It generates some sort of a numerical
18 reading?
19   A   It generates a chart and a numerical reading,
20 correct.
21   Q   Okay.  And then explain to the jury about
22 those pressure-sensitive disks that you told us about
23 a minute ago.
24   A   Fuji manufactures a type of film called
25 Prescale that, upon impact, changes color.  It

Page 236

1  changes color and its color densities relate to the
2  amount of stress for that range of film.  So in this
3  case I used a high-range film; and when the shell was
4  fired, it mashes or pushes back against the receiver,
5  the breech of the rifle, and squeezes that film and
6  creates a pattern of color that's related to the
7  amount of load that that cartridge generated.
8    Q   Okay.  Is that described as thrust?
9    A   Yes, thrust load.
10   Q   All right.  So if I'm understanding you
11 correctly, the pressure gage measures the outward
12 pressure as the cartridge fires, and there is some
13 minute expansion of the receiver; is that right?
14   A   Yes.
15   Q   And the pressure-sensitive disks that you
16 talked about measures the pressure of the cartridge
17 pushing back against the flat part of the rifle's
18 receiver in recoil; is that right?
19   A   Yes.
20   Q   Do you have anything in Exhibit Number 4, do
21 you have photographs in there that show the setup
22 when you did that testing?
23   A   Yes.  Two photographs.  Here is one that's a
24 little closer and a little easier to see.
25   Q   All right.  Using that setup, did you fire

EXHIBIT 3

Page 237

1  the exemplar rifle?
2      A  Yes.
3      Q  And tell us about the series of shots that
4  you fired.  I understand that some used oil and some
5  did not use oil.  Would you explain the process that
6  you went through?
7      A  Yes.  Initially four shots were fired with no
8  oil in the clean barrel, and then three series were
9  fired.  First oil was placed in the barrel, and then
10 three different cartridges were fired without
11 cleaning the barrel.
12     Q  All right.  Did you note that there were
13 differences in thrust and chamber pressure for the
14 rounds that were fired using oil and not using oil?
15     A  In general, when the cartridge had oil
16 present, the chamber pressures went up slightly, as
17 well the thrust -- pardon me.  As well as the thrust
18 loads.  And when there was no oil or after the first
19 firing of the oil, the pressures went lower.
20     Q  All right.  Now, in -- I understand that you
21 have seen the video of Sergeant Batts that actually
22 shows our incident; is that right?
23     A  Yes.
24     Q  In that video, did Sergeant -- before the
25 injury-producing shot, did he fire another round out

Page 238

1  of that rifle?
2      A  Yes.  After the squib load, he cleaned the
3  rifle and he put some oil down in it and a cartridge
4  was placed in the chamber.  He closed the rifle and
5  fired that round.  He then opened it back up and took
6  that cartridge case out, adjusted his scope because
7  of the strike of the bullet, which is what he was
8  doing at the range that day is adjusting his -- the
9  rifle's scope so that it would accurately show where
10 he was shooting the rifle.
11         And then he loaded another cartridge; and
12 when he fired that next cartridge, the rifle breech
13 and barrel separated and allowed the fired cartridge
14 case to come flying back into his face.
15     Q  So if I understand you correctly, the first
16 shot that he fired after putting the oil into the
17 barrel went off normally; is that true?
18     A  Yes.
19     Q  All right.  As a result of your test-firing
20 that you just told us about, did you reach an opinion
21 about whether Sergeant Batts placing oil in the
22 chamber or barrel, as depicted in the video Recover
23 7, did the use of that oil contribute at all to our
24 incident?
25     A  The oil did not allow sufficient higher

Page 239

1  pressures, chamber pressures or thrust loads, and had
2  no effect in causing the kind of injury and
3  unlatching that the subject rifle did on the day of
4  Sergeant Batts' injury.
5      Q  What was the highest chamber pressure that
6  you measured during your recent test-firing that
7  resulted from the use of oil in the barrel?
8      A  The highest test pressure was approximately
9  35,000 psi.
10     Q  Again, with a maximum SAAMI allowance being
11 58,000; is that right?
12     A  Yes.
13     Q  Have you seen any indication from your
14 imaging, examination, evaluation of the subject rifle
15 to indicate that prior to our injury-producing shot,
16 it had ever been fired with an overpressured shell?
17     A  No.
18     Q  And by -- can you explain to the jury what
19 kinds of indications you would expect to see in a
20 rifle that had been fired with a round that generated
21 excessive pressure?
22     A  You expect to see component damage to the
23 rifle.  The rifle's trigger guard and its assembly
24 are plastic.  You expect to see damage to the
25 plastic.  You expect to see gas ejected.  You expect

Page 240

1  to see deformation of the different components.
2      Q  Okay.  When you say deformation, tell me what
3  you mean by that?
4      A  Bending and stretching and sometimes
5  fracturing.
6      Q  If the Batts rifle had been subjected to an
7  excess pressure load that would have involved that
8  type of stretching, is that something that would have
9  shown up on the imaging that was done on the rifle?
10     A  It could be.  It certainly would have shown
11 up during the component inspection.
12     Q  Now, there were x-rays done of the subject
13 rifle; is that right?
14     A  Both x-rays and CAT scans, correct.
15     Q  Okay.  Tell the jury about the CAT scans.
16     A  Again, I think we talked about it, but a CAT
17 scan is basically the ability to use a very tightly
18 focused x-ray and have it penetrate through the part
19 as it's spinning.  And that shadow of the part, if
20 you will, is detected on an electronic detector, and
21 all the different data points that are created as
22 that objects spin are loaded into a computer program
23 and it creates a three-dimensional radiographic image
24 of that part that you can manipulate, rotate and
25 measure after the inspection is completed.

EXHIBIT 3

Page 241

1    Q   And that was done -- are there a lot of
2  places in the United States that do that type of CT
3  on metal?
4    **A   There are beginning to be more and more, but**
5  **there is only four or five really good places to have**
6  **that done in the United States.**
7    Q   And did we all:  Remington's lawyers, their
8  expert, you and I, did we all go and do that in
9  November of '17?
10   **A   Yes, up in Rogers, Minnesota.**
11   Q   All right.  And the ammunition was also
12 imaged; is that right?
13   **A   Yes.**
14   Q   In that same fashion?
15   **A   Correct.**
16   Q   So with respect to that imaging, was there
17 any irregularity with the ammunition that you saw
18 that would lead you to conclude that it was defective
19 in any way?
20   **A   No.  It all looked exactly as I suspected it**
21 **would look.**
22   Q   What about the subject rifle?  Did you
23 observe anything from that imaging with respect to
24 the locking mechanism that forms any part of the
25 basis for your opinions?

Page 242

1    **A   You -- you examined the CAT scans for the**
2  **locking engagement.  You saw that it was low, lower**
3  **than required by Remington.  You also looked around**
4  **to see if any component showed damage from**
5  **high-pressure use, and there was none.**
6    Q   You were asked earlier in your deposition
7  about some of your bills that you sent to my law
8  firm.  Do you remember that?
9    **A   I do.**
10   Q   And you were questioned about a bill from
11 January of this year about a meeting for some
12 testing.  Do you remember that?
13   **A   I do.**
14   Q   Do you recall that in January of this year,
15 we were scheduled to come up to Norman, you and I, a
16 Remington lawyer and Remington's expert Derek
17 Watkins, to perform the bullet removal that we talked
18 about earlier?
19   **A   Yes.**
20   Q   And by that, I mean the removal of the bullet
21 from the bore of the subject rifle.  Do you remember
22 that?
23   **A   Correct, like we talked about earlier.**
24   Q   And you and Mr. Watkins I think were going to
25 meet in the morning to look at a rifle on another

Page 243

1  case, and we were going to do our rifle in the
2  afternoon.  Do you remember that?
3    **A   Yes.**
4    Q   Did that meeting go forward on January 31st?
5    **A   No.**
6    Q   Why not?
7    **A   It was my understanding that Mr. Watkins was**
8  **not feeling well, and therefore we postponed that**
9  **exam until later on in the year.**
10   Q   Do you remember hearing that he got the flu
11 at the SHOT Show?
12   **A   That's what someone told me, yes.**
13   Q   Okay.  So that testing that was referred to
14 in your January 2019 bill -- well, the removal of the
15 bullet, was that my idea?  Something I asked you to
16 do, or was that something Remington asked for?
17   **A   That was something Remington asked to do.**
18   Q   So that billing entry for testing and our
19 phone calls about that testing, that was related to
20 Remington's request for access to the rifle so that
21 their expert could remove the bullet; true?
22   **A   Correct.**
23   Q   That was not any other testing or evaluation
24 of the rifle that I had asked you to do, was it?
25   **A   No.**

Page 244

1    Q   Now, you were asked earlier a number of times
2  about other potential tests that might be done and
3  specifically asked about whether you, using the
4  exemplar rifle or some other rifle, whether you had
5  done testing with a Handi-Rifle and 300 Blackout that
6  was set up to have an engagement surface that was the
7  same as what you've observed in Sergeant Batts'
8  rifle.  Do you remember that line of questioning?
9    **A   In general, yes.**
10   Q   Okay.
11   VIDEOGRAPHER:  10 minutes.
12   Q   (By Mr. Meador)  Why -- what problems would
13 you perceive in trying to set up that test with a
14 rifle that had a barrel engagement of 61/thousandths
15 of an inch?
16   **A   We talked some of that during my deposition.**
17 **I don't need to do any further testing to support my**
18 **opinions in this case.  I feel like I've got adequate**
19 **testing and evaluation and examination in order to**
20 **form the opinions that I have.**
21 **       The problems in trying to replicate a**
22 **particular instance is trying to get all of the**
23 **components to be formed and having the same positions**
24 **that were present at the time of the particular**
25 **accident and injury.**

EXHIBIT 3

Charles Wayne Powell - June 19, 2019

Page 245

1    So you've got to have the same kind of
2  particles between that.  You've got to have the same
3  engagement length.  You've got to have a lot of
4  different things that are the same in order to say
5  you've accurately replicated a particular incident.
6    Also, when you're going to be creating
7  something that's going to open a chamber under
8  pressure, you're looking at something that's very
9  dangerous.  Particles flying around.  And in this
10  case, obviously a cartridge case coming out.  So it's
11  a very difficult and dangerous test to do and not
12  necessary in my opinion.
13  Q  Earlier you were asked about the brass
14  markings on the breech face of the subject rifle.  Do
15  you remember that?
16  A  Yes.
17  Q  And the breech face is the part behind the
18  barrel that the firing pin comes out of; is that
19  right?
20  A  Yes.
21  Q  All right.  So Mr. Danekas was talking with
22  you about some vertical brass marking on there.  Do
23  you remember that?
24  A  Yes.
25  Q  Do you have any theories on why there would

Page 246

1  have been vertical markings on there?
2  A  Well, obviously the barrel rotates that
3  upward; and if there is gas, with brass particles
4  coming out, you're going to see particles in a
5  longitudinal stripe up the breech place [sic] as you
6  see it, but I haven't done any further testing to
7  determine exactly why that's occurred that way, but
8  that would be my...
9  Q  Okay.  Did anything about those brass
10  remnants on the breech face in any way suggest to you
11  that there was an issue with the ammunition --
12  A  No.
13  Q  -- that Sergeant Batts was firing on the date
14  of the incident?
15  A  No.
16  Q  You were asked some questions earlier about
17  some black markings on the bullet that was removed
18  from the bore of the subject rifle.  Do you remember
19  that?
20  A  I do.
21  Q  There was a reference to it being carbon.
22  You talked about oil.  Was there anything about the
23  black markings on the bullet that was removed from
24  Sergeant Batts' rifle, from the injury-producing
25  shot, that would lead you to the conclusion that that

Page 247

1  ammunition was defective?
2  A  No.
3  Q  Did the fact that there was blackening on
4  that copper-jacketed bullet, did that suggest
5  anything to you?  Did it have any significance in
6  forming your opinions?
7  A  Well, based on my testing, it suggested to me
8  that it was fired in a bore that had residual carbon
9  in it from firing it with oil in it.
10    MR. MEADOR: I think I'm going to reserve the
11  rest of mine until the time of trial.
12    MR. DANEKAS: Okay.  I just have a few
13  follow-ups to your testimony.
14    VIDEOGRAPHER: There is six minutes.
15    MR. DANEKAS: Let's change so I don't get
16  interrupted.
17    VIDEOGRAPHER: Sounds good to me.
18    MR. DANEKAS: It's probably going to be 10.
19    VIDEOGRAPHER: Off the record at 5:42.
20    (Recess held)
21    VIDEOGRAPHER: We're back on the record at
22  5:47.
23    REDIRECT EXAMINATION
24  BY MR. DANEKAS:
25  Q  Mr. Powell, I just have a few more questions

Page 248

1  on Mr. Meador's exam.  He ended with asking you -- or
2  toward the end of your exam, he was asking you about
3  potential further testing, and one of the things I
4  think you said was that in trying to replicate the
5  incident, you could not get all of the circumstances,
6  the conditions exactly as they were at the time of
7  the actual incident.  Is that a fair statement?
8  A  It's very difficult to do, correct.
9  Q  Okay.  Is that ever possible to do, to get
10  the conditions in a test identical to the conditions
11  at the time of the incident?
12  A  Well, you have to if you're going to do a
13  replica of that particular event.
14  Q  You have to get them identical?
15  A  Otherwise it's not the same.
16  Q  Okay.  Is the -- the engagement of the
17  subject rifle, Mr. Batts' rifle that we talked about
18  at length and that you've looked at and photographed,
19  measured and so forth, in your opinion is that
20  engagement between the barrel catch and the barrel
21  lug the same as it was at the time of the incident?
22  A  We talked about that, because it's going to
23  change slightly every time you open and close the
24  rifle.  We can only show you what it measured when we
25  saw it, and the markings on the barrel lug showed

EXHIBIT 3

Page 249

1 that it never got significantly more than that.
2 Certainly it never got to where what we'll call the
3 "go" position.
4    Q   We looked at the one photograph where I think
5 you had something in the 70-some/thousandths of an
6 inch engagement between the surface. Do you remember
7 that photograph?
8    A   I do.
9    Q   Okay. So is it your position that you see no
10 benefit at all of conducting any test-firing of the
11 subject rifle?
12    A   Not at this time. I mean, my opinions are
13 based on the examination and the physical evidence.
14    Q   If we were to ask Mr. Meador for an
15 opportunity to test-fire the exemplar rifle, do you
16 have any concerns about what that would do to the
17 subject rifle?
18    A   Sure. As I told you, it's going to alter it,
19 and I would have to talk to Mr. Meador before I would
20 say I think that's a good thing to do.
21    Q   How would it alter it?
22    A   Because the engagement would probably slip
23 again and will damage those surfaces.
24    Q   Okay. Now, those surfaces, you have
25 memorialized with many photographs; is that correct?

Page 250

1    A   That's correct.
2    Q   You could -- I think we established earlier
3 that if you wanted to conduct additional testing to
4 try to replicate the incident, it could be conducted
5 safely?
6    A   I don't know. I -- I can't conduct it safely
7 as we do it now, but perhaps it can be, but I don't
8 know.
9    Q   SAAMI does not specify the muzzle velocity
10 for a 300 Blackout subsonic round, does it?
11    A   I'm sorry. Could you ask that question
12 again?
13    Q   SAAMI does not specify the muzzle velocity
14 for a 300 Blackout subsonic round; is that correct?
15    A   No. They don't specify. They specify just
16 for a 300 Blackout, period.
17    Q   Mr. Meador was asking you earlier about your
18 you compensation in the case. You are billing out at
19 $350 an hour?
20    A   $200 per hour for this case, but it's been
21 $350 since the first of the year.
22    Q   Okay. You are correct. We looked at Exhibit
23 8. Do you have Exhibit 8 there handy?
24    A   Yes.
25    Q   And we looked at your invoices that started

Page 251

1 with Bates number 79.
2    A   Yes.
3    Q   And I believe you said these invoices brought
4 you up to -- were current as of through March of this
5 year?
6    A   Yes.
7    Q   And then the time since March has been an
8 additional, you estimated, about 20 hours?
9    A   Correct.
10    Q   So your invoices -- and I'm just going to go
11 through these page by page. Your first invoice at
12 page 79 was for $1,450?
13    A   Yes.
14    Q   The next one was 562.50?
15    A   Hang on. I haven't caught up with you yet.
16    Q   Okay.
17    A   Correct.
18    Q   The next one was for a thousand?
19    A   Yes.
20    Q   The next one was $1,452.30?
21    A   Correct.
22    Q   Another one was for $800?
23    A   Yes.
24    Q   Another for $200?
25    A   Yes.

Page 252

1    Q   The next one is for $350?
2    A   Correct.
3    Q   The next one is for $350?
4    A   Correct.
5    Q   The next one is for $5,567.84?
6    A   Correct.
7    Q   The next one is for $700?
8    A   Yes.
9    Q   The next one is for $244.48?
10    A   Correct.
11    Q   The next one is for $150?
12    A   Correct.
13    Q   And the last one is for $10,537.50?
14    A   Correct.
15    Q   Okay. Now, in fairness, some of those
16 charges were for reimbursement for supplies and
17 expenses such as your purchase of the exemplar rifle.
18    A   Correct.
19    Q   Okay. And those are all set forth as to what
20 were your services and what were charges for
21 reimbursement for expenses; is that correct?
22    A   Yes.
23    Q   And so for approximately 20 hours since then,
24 that would be another $7,000 or so; correct?
25    A   Approximately, correct.

EXHIBIT 3

**Charles Wayne Powell - June 19, 2019**

Page 253

1    Q   Okay.  Now, you have produced in other
2  litigation in this case -- I have marked as Exhibit
3  10.  You previously produced for us the amounts that
4  the amounts that had been paid to you or your
5  company, SSEC, in matters involving Remington and --
6  matters involving Remington Arms; correct?
7    A   Yes.
8    Q   And Exhibit 10 shows the amounts for years
9  2012 through 2018; is that correct?
10   A   Yes.
11   Q   And those numbers are accurate?
12   A   Yes.
13   Q   Okay.  So for -- and I'm just going to round
14  to the nearest thousand.  For 2012, for services
15  alone was $34,000?
16   A   Wait.  Do you want me to approve?  Yes.  Yes.
17   Q   Yes.  I'm rounding to the nearest thousand.
18   A   That's fine.
19   Q   For 2013, it was $67,000?
20   A   Yes.
21   Q   For 2014, 13,000?
22   A   Yes.
23   Q   For 2015, 9,000?
24   A   Yes.
25   Q   For 2016, 56,000?

Page 254

1    A   Yes.
2    Q   For 2017, 25,000?
3    A   Correct.
4    Q   For 2018, 23,000?
5    A   Correct.
6    Q   Now, you also produced and provided to us
7  recently a similar document for the year 2019, and
8  we've marked it as Exhibit 11, and I believe this is
9  -- this document is about two months old because I
10  think that's when it was produced to us prior to your
11  -- in preparation for your prior deposition.
12  According to this document, in 2019 you were at
13  $36,000 for services involving Remington matters for
14  2019; correct?
15   A   Correct.
16   Q   Do you have any estimate as to how much has
17  been added to that amount in the last couple of
18  months?
19   A   None billed, but probably time spent, the
20  hours spent on this case, and perhaps a few hours,
21  less than 10, spent on two other Remington cases.
22     MR. DANEKAS: Mitch, do we anything?  Derek?
23  I think that's all I have.  Thank you.
24     THE WITNESS: You're welcome.
25     VIDEOGRAPHER: Any other cross?  Deposition

Page 255

1  concluded.  Off the record at 5:55.
2       (Deposition recessed; signature requested)

Page 256

1                    J U R A T
2       I, CHARLES WAYNE POWELL, do hereby state
3  under oath that I have read the above and foregoing
4  deposition in its entirety and that the same is a
5  full, true and correct transcription of my testimony
6  so given at said time and place.
7       _____  With Corrections.
8       _____  No Corrections.
9
10
11
12       _____
13            CHARLES WAYNE POWELL
14
15                * * * * *
16       Subscribed and sworn to before me, the
17  undersigned Notary Public in and for the State of
18  Oklahoma by said witness, CHARLES WAYNE POWELL, on
19  this _____ day of _____, 20____.
20
21
22       _____
23       NOTARY PUBLIC, STATE OF OKLAHOMA
24  My Commission Expires: _____

EXHIBIT 3

**Charles Wayne Powell - June 19, 2019**

```
                                              Page 257
 1            E R R A T A   S H E E T
 2        WITNESS:  CHARLES WAYNE POWELL
               CASE NO.:  WA:17-CV-00346-RP
 3     REPORTER:  Theresa A. White, CSR, RPR, RMR, CRR
               DATE TAKEN:  JUNE 19, 2019
 4
 5   PAGE  LINE   IS                 SHOULD BE
     ____  ____   _____    _____
 6   ____  ____   _____    _____
 7   ____  ____   _____    _____
 8   ____  ____   _____    _____
 9   ____  ____   _____    _____
10   ____  ____   _____    _____
11   ____  ____   _____    _____
12   ____  ____   _____    _____
13   ____  ____   _____    _____
14   ____  ____   _____    _____
15   ____  ____   _____    _____
16   ____  ____   _____    _____
17   ____  ____   _____    _____
18   ____  ____   _____    _____
19   ____  ____   _____    _____
20   ____  ____   _____    _____
21   ____  ____   _____    _____
22   ____  ____   _____    _____
23   ____  ____   _____    _____
24   ____  ____   _____    _____
25   (If more space is needed, duplicate this format)
```

```
                                              Page 258
 1            C E R T I F I C A T E
 2   STATE OF OKLAHOMA   )
                         }  SS:
 3   COUNTY OF OKLAHOMA  )
 4        I, Theresa A. White, CSR, RPR, RMR, CRR, do
 5   hereby certify that on June 19, 2019, beginning at
 6   10:06 a.m. at the offices of Legalese Reporting
 7   Services, 228 Robert S. Kerr Avenue, Suite 840,
 8   Oklahoma City, Oklahoma, there came before me CHARLES
 9   WAYNE POWELL who was duly sworn to testify the truth,
10   the whole truth, and nothing but the truth; and that
11   the foregoing 257 pages constitute a full, true, and
12   correct transcript of the deposition of said witness
13   on the date as indicated.
14        I do further certify that I am not counsel,
15   attorney, or relative of either party, or otherwise
16   interested in the event of this suit.
17        IN WITNESS WHEREOF, I have hereunto set my
18   hand and affixed my seal at my office in Oklahoma
19   City, Oklahoma County, Oklahoma, this 24th day of
20   June, 2019.

                    _____
                    Theresa A. White, CSR, RPR, RMR, CRR
                    CSR No. 402
                    My Commission Expires: 12/31/19


              LEGALESE REPORTING SERVICES
       405-236-8426 * www.LegaleseReporting.com
```

EXHIBIT 3

```
1                    C E R T I F I C A T E

2    STATE OF OKLAHOMA    )
                          ) SS:
3    COUNTY OF OKLAHOMA   )

4            I, Theresa A. White, CSR, RPR, RMR, CRR, do

5    hereby certify that on June 19, 2019, beginning at

6    10:06 a.m. at the offices of Legalese Reporting

7    Services, 228 Robert S. Kerr Avenue, Suite 840,

8    Oklahoma City, Oklahoma, there came before me CHARLES

9    WAYNE POWELL who was duly sworn to testify the truth,

10   the whole truth, and nothing but the truth; and that

11   the foregoing 257 pages constitute a full, true, and

12   correct transcript of the deposition of said witness

13   on the date as indicated.

14           I do further certify that I am not counsel,

15   attorney, or relative of either party, or otherwise

16   interested in the event of this suit.

17           IN WITNESS WHEREOF, I have hereunto set my

18   hand and affixed my seal at my office in Oklahoma

19   City, Oklahoma County, Oklahoma, this 24th day of

20   June, 2019.

22   _____
     Theresa A. White, CSR, RPR, RMR, CRR
23   CSR No. 402
     My Commission Expires: 12/31/19
24

25
```

EXHIBIT 3