## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **JON BATTS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 6:17-cv-00346** |
| **v.** | § | **[JURY DEMANDED]** |
| | § | |
| **REMINGTON ARMS COMPANY, LLC,** | § | |
| | § | |
| *Defendant.* | § | |

### DEFENDANT REMINGTON ARMS COMPANY, LLC'S OPPOSED MOTION TO DISMISS AND FOR SANCTIONS AGAINST PLAINTIFF JON BATTS

*Important principles may, and must, be inflexible.*   -   Abraham Lincoln

Pursuant to this Court's inherent supervisory power and pursuant to Fed. R. Civ. P. 37(c), Defendant, Remington Arms Company, LLC ("Remington"), moves to dismiss Plaintiff Jon Batts' lawsuit with prejudice and for sanctions against Batts on grounds that he attempted to hide and destroy material evidence, falsely testified, falsely denied requests to admit, falsely answered interrogatories, and failed to amend any of his prior false testimony and false answers to discovery.

## I.
## OVERVIEW

1.      On November 18, 2015, Plaintiff Jon Batts was firing his .300 Blackout caliber H&R Handi-Rifle manufactured by Remington.  After he pulled the trigger to fire his third shot from the rifle, the bullet lodged in the barrel, the single-shot, break-action rifle opened, and the just-fired (spent) cartridge case (shell) was propelled out of the rifle's chamber rearward through Batts' glasses and into his eye.[1]  Batts recorded the incident with a GoPro video camera mounted

---

[1] The underlying incident and the operation of the rifle are described in Remington's motion to exclude the opinions of Plaintiff's disclosed expert, Charles Powell.  (Doc. 26).

on a tripod next to him at the shooting bench (the "Incident Video").[2]  Batts filed his lawsuit against Remington on November 3, 2017, in Texas state court, and Remington timely removed.  (Doc. 01).

## II.
## THE PARTIES' POSITIONS

2.     The parties and their experts have differed about what caused the incident.[3]  The issue and this lawsuit revolve around the ammunition and timing and testing.  (*See* Doc. 26, Remington's Motion to Exclude the Opinions of Batts' liability expert.)  Remington and its expert Derek Watkins concluded after extensive testing that *improperly reloaded (non-factory) ammunition* was the cause.  An *improperly formed* ammunition cartridge prevented the rifle from locking up, *and improper and insufficient propellant* caused the bullet to lodge in the barrel (a squib round) which *then* caused the unlocked rifle to open.  (*See* Doc. 26 and Doc. 26-2 and 26-3 (Watkins' reports).  From the start, Remington wanted to determine the source of the ammunition and suspected Batts himself had reloaded the incident cartridge.

3.     Batts, and his retained expert Charles Powell, blamed the rifle, claiming that the force of a fired, *properly loaded* cartridge caused the rifle to open which *then* caused the bullet to lodge in the barrel.  (Doc. 26, p. 4-5).  Batts denied he reloaded the ammunition, claiming he purchased it from an unknown seller at an unknown gun show.  In fact, Batts denied that he has ever reloaded any rifle ammunition.  While Powell agreed the ammunition had been reloaded (by someone), he persisted in contending, without any confirmatory testing, that the ammunition was properly loaded and factory-compliant.  (Doc. 26, p. 4).

---

[2] While not germane to the current motion, the Incident Video can be made available to the Court.

[3] Recently, Batts "de-designated" his expert rather than respond to Remington's motion to exclude that expert's opinions.  (Doc. 28).

### III.
### BATTS' INITIAL DISCOVERY RESPONSES

4.      On August 27, 2018, Batts answered interrogatories and responded to requests for production.  (Exhibits 1 and 2).  In sworn answers to Interrogatories 4 and 18, Batts stated that he did not know who sold him the ammunition, and he denied ever reloading any .300 Blackout caliber ammunition or any other rifle ammunition.  Responding to the requests for production, Batts also claimed he does not have the spent (fired) incident cartridge case or any other spent cartridge case fired that day and reiterated that he has never reloaded any .300 Blackout caliber or other rifle ammunition.

5.      As part of his August 2018 production, Batts produced two video recordings to Remington.  (Exhibit 03).  One was entitled "Batts GoPro M1A video" which showed Batts firing another (M1A) rifle a few minutes before the incident.  The second video was entitled "Batts GoPro Handi-Rifle video," the Incident Video showing Batts' second and third shots from the Handi-Rifle, the third being the incident shot.

### IV.
### BATTS DEPOSITION

6.      Batts testified under oath on January 7, 2019.  (Exhibit 4 is a copy of the deposition transcript.)  His false testimony included the following:

    (1)    <u>He never experienced a squib load (the bullet does not leave the barrel) (*Id.*, p. 19):</u>

    Q.  Are you familiar with the term squib load?
    A.  Yes, sir.

    Q.  What does that mean to you?
    A.  When there is an underpressure in the projectile and it fails to cause the projectile to exit the barrel.

    **Q.  Have you ever experienced a squib load?**
    **A.  No.  No, sir.**

(2) <u>He did not video record the first shot fired from the H&R Handi-Rifle (*Id.*, p. 57):</u>

 Q. Okay.  I have watched the video and it appears that you fired one round, removed the spent case, put the -- what I'm going to call the incident round into the rifle and then you pulled the trigger and that's when the accident happened?

 A. Yes, sir.

 **Q. So did you fire a round out of this rifle <u>before</u> you started video recording shooting this rifle?**

 **A. Yes, sir.**

 Q. So the incident round was the third round that you fired from this rifle?

 A. That is correct.

(3) <u>The first two shots he fired from the H&R Handi-Rifle fired normally (*Id.*, p. 79):</u>

 **Q. The first two rounds you fired that day fired what you perceived to be normally?**

 **A. Yes, sir.**

(4) <u>He discharged the first shot at a 75 yard target and, after the first shot, walked to the target to locate where the bullet impacted (*Id.*, p. 80):</u>

 Q. Okay.  Did you notice the first two rounds --well, first of all, let me back up.  What sort of target were you shooting at?

 A. It was full a -- shooting at a full silhouette.

 Q. And through the scope did you see the round hit the silhouette?

 A. I fired one round.  **I fired the first round at a distance of 75 yards and waited for the range to go cold.  Went, inspected the target.  I saw the round [had] . . . impact[ed the berm] . . . behind the target but there was no mark on the paper.**[4]  So at that point I moved the target to seven yards so that I wouldn't waste ammunition all day and fired the second and third rounds at seven yards.

(5) <u>The recoil from the first and second shots were equal (*Id.*, p. 101):</u>

 Q. Okay.  Was the recoil from the first round you fired that's not on the video and the second round you fired which is on the video, is the recoil to your recollection the same as -- for each round?

---

[4] The video of Batts' deposition reveals the court reporter apparently misheard Batts' testimony and transcribed, "the round of impact had burned behind the target."  Remington can provide the Court with the video of Batts' deposition testimony.

A. Yes, sir.

(6)   He did not use lubricant on the H&R Handi-Rifle the day of the incident (*Id.*, p. 94):

Q. Okay. Had you used any of that lubricant on the H&R rifle that day?
A. No, sir.

(7)   He had never reloaded any rifle ammunition, including .300 Blackout (*Id.*, p. 14):

**Q. Okay. Have you ever reloaded any rifle ammunition?**
**A. No. I have not.**

**Q. Have you ever reloaded any 300 Blackout?**
**A. No, sir.**

Each of these statements is demonstrably false.

7.     Batts testified he purchased the subject ammunition, 20 rounds of .300 Blackout, at a gun show. (*Id.*, p. 30-37). He claimed he did not recall the name of the gun show, the name of the seller, anything about the seller's identifying characteristics, anything about the packaging, or even whether the ammunition sold to him was in a container. (*Id.*, p. 30, 32, 74, 122-23). He said he paid cash and had no receipt. (*Id.*, p. 32). Batts testified he took those 20 rounds to the range in a plastic ammunition box and fired three rounds. (*Id.*, p. 54-56, 63-66). Yet, he produced only nine live rounds and none of the three fired cartridge cases. (*Id.*, p. 59-63). Batts said someone packed up his gear after the incident, and he found just nine loose rounds in his gun case the next day. (*Id.*, p. 45-47, 51-52). The Incident Video shows a man placing all of the loose live rounds on the shooting bench into Batts' plastic ammunition box and then placing that box into a bag Batts had with him that day. Batts never produced the plastic ammunition box, the other eight live rounds, or any of the spent cartridge cases, claiming they went "missing." (*Id.*, p. 53, 65-66).

## V.
## THE GAME WARDEN'S REPORT

8.      After Batts' deposition, Remington's investigation revealed that Game Warden Al Langford investigated Batt's incident.  On February 8, 2019, Remington produced Langsford's report to Batts' attorney (who, as a result, cancelled Powell's deposition which had been scheduled by agreement) (Exhibit 5).  The report contradicted Batts' testimony.  Langford reported that a witness said, "Batts had used a clearing rod to push a previously lodged round from the barrel on said rifle."

## VI.
## RECOVERY OF THE DELETED VIDEO

9.      After Batts' deposition and receipt of Langford's report, Remington hired two experts, Lance Sloves and Douglas Lacey, to examine the SD card that was in Batts' GoPro video camera on the day of the incident.  (Their reports are Exhibits 6 (Sloves) and 7 (Lacey).  They found that Batts' GoPro had recorded three videos around the time of the incident.  (Exhibit 7, p. 6, 14).  The camera had named the first "GOPR5586," the second "GOPR5587," and the third "GOPR5588."  (*Id.*)  The first, GOPR5586, is the video of Batts firing his other rifle.  That video segment was produced to Remington as "Batts GoPro M1A video."  The third, GOPR5588, is the Incident Video, produced to Remington as "Batts GoPro Handi-Rifle video," showing Batt's second shot and third (incident) shots from the Handi-Rifle.  The second video, GOPR5587, had been deleted prior to the production to Remington of the GOPR5586 and GOPR5588 videos.  Sloves opined GOPR5587 was deleted on December 12, 2015 (Exhibit 6, p. 5).  This was less than a month after Batts' incident.

10.     Lacey was able to recover the deleted video, GOPR5587 (Exhibit 7, p. 3-6).  (The deleted video that Lacey recovered is Exhibit 8, shall be referred to as the "Deleted Video," and

will be delivered to and filed with the Court in a separate envelope marked accordingly.)  The Deleted Video (GOPR5587) ended 2.5 seconds before the Incident Video (GOPR5588) began. (*Id.*).  Remington produced the recovered Deleted Video to Batts' attorney on May 13, 2019, who, as a result, again cancelled Powell's scheduled deposition (Exhibit 9).

11.     The recovered Deleted Video vividly contradicts Batts' sworn testimony and prior discovery responses.  Batts did record the first shot from the Handi-Rifle.  The first round did not fire normally.  It was a squib load.  The bullet failed to exit the barrel, sticking in the end of the barrel.  Batts never went down range to inspect the target after firing the first round, because that round stuck in the end of the barrel.  Rather, Batts used pliers to break off part of the bullet from the muzzle of the barrel and then used a metal rod to push the remainder of the stuck bullet from the barrel, just as Game Warden Langford's report stated.  Batts then sprayed lubricant into the barrel before firing the next shot.

## VII.
## BATTS' RESPONSES TO REQUESTS FOR ADMISSIONS AND ADDITIONAL INTERROGATORIES

12.     As Sloves and Lacey were in the process of examining Batts' SD card, Remington served requests for admissions and additional interrogatories on Batts.  Batts responded on April 4, 2019 (Exhibits 10 and 11).  Batts stated he had the SD card in his possession through February 6, 2016 (well after video GOPR5587 had been "deleted"), when he turned it over to his attorney (Exhibit  10, No. 2).

13.     Batts responded untruthfully to Remington's Rule 36 requests to admit certain facts regarding his video recordings and the attempted deletion of video GOPR5587 (*See* Exhibit 11). Remington's pertinent requests and Batts' responses are:

REQUEST FOR ADMISSION NO. 1:
You, Jon Batts, recorded the incident with a Go Pro camera.

ANSWER:
Admit.

REQUEST FOR ADMISSION NO. 2:
The Go Pro camera recorded the Incident on the SD card as file name "GOPR5588."

ANSWER:
Admit.

REQUEST FOR ADMISSION NO. 5:
The Go Pro camera recorded you, Batts, firing an M1A rifle on the SD card as file name "GOPR5586."

ANSWER:
Admit.

REQUEST FOR ADMISSION NO. 7:
After recording yourself, Jon Batts, firing an M1A rifle and prior to recording the video of the Incident (produced as video rifle "Batts GoPro Handi-Rifle Video"), you recorded yourself, Jon Batts, firing the Rifle with the same Go Pro Camera.

ANSWER:
**Deny.**

REQUEST FOR ADMISSION NO. 8:
The Go Pro camera recorded that video of your firing the Rifle (after you fired an M1A rifle and prior to the video of the Incident) on the SD Card as file name "GOPR5587."

ANSWER:
**Deny.**

REQUEST FOR ADMISSION NO. 9:
You have not produced to Defendant the video of your firing the Rifle after you fired an M1A rifle and prior to the video of the Incident.

ANSWER:
**Plaintiff admits that only 2 videos from the date of the incident have been produced. Plaintiff has made reasonable inquiry and the known or readily obtainable information is insufficient to enable Plaintiff to admit or deny the Request with respect to a third video.**

REQUEST FOR ADMISSIONS NO. 10:
As you recorded yourself, Jon Batts, firing the Rifle after firing an M1A rifle and
prior to recording the video containing the Incident (produced as video file "Batts
GoPro Handi-Rifle video") you experienced a Squib Load – the bullet did not exit
the barrel when you discharged the Rifle.

ANSWER:
**Plaintiff has made reasonable inquiry and the readily known or obtainable
information is insufficient to enable Plaintiff to admit or deny the Request.**

REQUEST FOR ADMISSION NO. 16:
Your testimony under oath at your deposition (Page 19) that you never experienced
a squib load is false testimony.

ANSWER:
**Deny.**

REQUEST FOR ADMISSION NO. 19:
The SD card made available to Defendant on February 12, 2019, at the offices of
Plaintiff's counsel was the actual SD card in the recording device (believed to be a
Go Pro camera) when the recording device recorded the Incident.

ANSWER:
Admit.

(*Id.*; emphasis added).

14.      The denials to requests 7, 8, and 16 are false.  The recovered "Deleted Video" leaves

no question about that.  The responses to requests 9 and 10 are equally disingenuous.  After

"reasonable inquiry," Batts claimed he was unable to admit or deny he had not produced a third

video or that he experienced a squib load with the first round fired from the subject rifle.

**VIII.
CHARLES POWELL**

15.      Powell finally appeared for his deposition on June 19, 2019.  He was seemingly

untroubled by either the recovered Deleted Video or Batts' false testimony.  Although he agreed

that Batts' first shot did not fire normally – it was a squib load – and despite the stark evidence of

an improperly loaded round of ammunition, the recovery of the Deleted Video did not change

Powell's opinions (Doc. 26-4, p. 123-24; Exhibit 12, p. 2-5).  He stuck with his untested opinion that the firing of a properly loaded, factory-compliant round of ammunition caused the rifle to open.  He did tell his "client that his testimony is different than what the evidence was in this case."  (Doc. 26-4, p. 124).  Yet, Powell made no inquiry, was not curious about, and had no knowledge about why the now recovered Deleted Video was not on the SD card when it was provided to him soon after he was retained in February 2016.  (*Id.*, p. 130-31, 133).

## IX.
## THE *DAUBERT* MOTION, REMINGTON'S EXPERT DISCLOSURES & THE AFTERMATH

16.     On July 19, 2019, Remington filed a motion under *Daubert* and its progeny to exclude Powell's opinions, based on his disregard for the scientific method and the laws of physics and his failure to conduct any testing to prove or disprove his causation opinion (Doc. 26).

17.     Meanwhile, on July 15, 2019, Remington disclosed its experts and their reports (Exhibit 13).  Mechanical engineer Derek Watkins had proven through testing that it was not physically possible for a properly loaded, factory-compliant round to have caused the incident (Doc. 26-2, 26-3).  In his report, Watkins refers to Batts' March 19, 2016 post on his Facebook page that contains a photo revealing an array of Batts' reloading equipment and rifle ammunition, including .300 Blackout ammunition (Doc. 26-2, p. 19-20).  Batts titled his post, "This rifle stuff is just slightly more difficult than pistol (sarcasm)" (Exhibit 14, p. 29-30).  Remington produced Batts' Facebook pages to Batts' attorney on July 16, 2019 (Exhibit 15).

18.     On July 17, 2019, Army Captain Bradley Craycraft, who had sold Batts the Handi-Rifle at issue, provided a declaration to Remington's attorneys (Exhibit 16).  Craycraft, who served in the Army with Batts from 2013 to 2016, stated Batts had reloaded rifle ammunition and was reloading .300 Blackout ammunition as of the time of Batts' incident, directly refuting Batts'

testimony and discovery answers that he had never reloaded .300 Blackout or any other rifle

ammunition.  Specifically, Craycraft states in the following paragraphs of his declaration:

8.      While we were stationed together, Jon Batts and I spoke often about shooting and reloading.

9.      While we were stationed together, Jon Batts told me that he re-loaded handgun rounds - 9 mm, .45 caliber, .40 Smith & Wesson, and .357 - and rounds for rifles - including .300 Blackout, .308 Winchester and .556 NATO.

13.     When he transferred [a] Remington 700 rifle to me, Jon Batts gave me a bag full of empty brass from Winchester.

14.     Jon Batts had the .308 brass, because he had been reloading .308 ammo.

15.     I spoke with Jon Batts about reloading .300 Blackout ammunition, because he said he had been reloading .300 Blackout ammunition.

16.     Jon Batts told me that I could save money reloading sub-sonic .300 Blackout ammunition.

17.     Jon Batts told me that a .556 cartridge case could be cut down and fitted with a .30 caliber projectile to make a .300 Blackout round.

18.     Jon Batts told me he picked up spent .556 brass at the range and used them to reload .300 Blackout.

26.     As of the time of Jon Batts' November 2015 accident, based upon what he had told me I understood Jon Batts had been re-loading 300 Blackout.

19.     On July 22, 2019, Remington produced Craycraft's Declaration and Watkins' July

19, 2019 supplemental report, which referred to Craycraft's Declaration (Exhibits 17, 18, 19).

Watkins stated in his supplemental report:

In my report (July 15, 2019) I presented evidence in support of my opinion that, "Mr. Batts' contribution to the condition of the evidence and the cause of the incident may be more significant than was originally indicated." Captain Craycraft makes a minimum of 6 declarations that directly refute Mr. Batts' sworn testimony that he did not load rifle ammunition.  Captain Craycraft's declaration also states Mr. Batts had been reloading 300 Blackout ammunition as of the time of the incident.

*   *   *

      The physical condition of the subject unfired subsonic cartridges (constructed with repurposed military 5.56mm NATO shells), coupled with Mr. Batts' Facebook post about reloading rifle ammunition, coupled with Captain Craycraft's declaration that Mr. Batts reloaded 300 Blackout using repurposed 5.56mm NATO shells, coupled with Captain Craycraft's declaration that Mr. Batts reloaded 308 Win ammunition, coupled with the live fire testing results of 300 Blackout ammunition improperly loaded with 308 Win propellant all indicates that <u>it is most probable that Mr. Batts improperly formed the incident shell from a recovered discharged military 5.56 NATO shell and then loaded it with an improper amount of an inappropriate propellant to form the defective incident 300 Blackout cartridge</u>.

(Exhibit 19, p. 1, 4; emphasis added).

      20.    The recovered Deleted Video was, apparently, not enough for Batts to rectify his repeated false testimony.  Despite having already received Game Warden Langford's report six months earlier and the recovered Deleted Video in mid-May, it was only after Batts' attorney received Remington's experts' reports, Batts' own Facebook pages, and Captain Craycraft's Declaration that Batts rolled over on Remington's motion to exclude Powell's opinions.  On August 8, 2019, Batts' attorney "de-designated" Powell as an expert and so advised the Court in a "response" to Remington's motion, stating that "no ruling on the exclusion of Mr. Powell's opinion testimony is needed"[5] (Doc. 28).  Minutes later, Batts' counsel moved to withdraw as Batts' attorney (Doc. 29).

---

[5] Powell's slapdash superficiality must not pass unnoticed.  As Remington shows in its motion to exclude his opinions (Doc. 26), Powell had no rational or reliable basis for his proffered opinion that a factory-compliant round caused what he assumed to be a defective rifle to open when that round was fired.  Had he considered basic physics and conducted any validating testing, Powell would have come to same conclusion as Watkins.  Yet, after being involved in the case since February 2016, even after he was provided with the recovered Deleted Video showing Batts had repeatedly testified falsely and showing there was something clearly wrong with the first reloaded round, Powell was not curious and did not inquire further of Batts or his attorney.  For the reasons set forth in Remington's motion to exclude Powell's opinions (Doc. 26) and in this motion to dismiss and for sanctions, Remington is entitled to:  (1) the sanctions requested against Batts in this motion; and (2) entry of an order granting Remington's motion to exclude Powell's opinions.

**X.**
**THE APPLICABLE LAW – DISMISSAL AND SANCTIONS**

21.     When a plaintiff willfully gives false testimony about a material fact of his case, the court acts within its discretion to dismiss the case with prejudice.  *Brown v. Oil States Skagit Smatco*, 664 F.3d 71 (5th Cir. 2011); *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 694 (8th Cir. 2001); *see also Hull v. Municipality of San Juan*, 356 F.3d 98, 100 (1st Cir. 2004) (dismissal sanction appropriate where plaintiff failed to reveal material information "in response to questions fairly seeking this information" until the defense uncovered this information on its own).  The Fifth Circuit has held dismissal with prejudice is warranted where:  (1) there is "a clear record of delay *or* contumacious conduct by the plaintiff;" and (2) "lesser sanctions would not serve the best interests of justice."  *Brown,* 664 F.3d at 77; *citing Sturgeon v. Airborne Freight Corp.,* 778 F.2d 1154, 1159 (5th Cir.1985).   Contumacious conduct includes false testimony and fabricating evidence.  *See Brown*, 664 F.3d at 77-78 (finding false testimony to be contumacious conduct).  When determining whether justice is best served by dismissing an action, courts consider the deterring effect.  *Johnese v. Jani-King, Inc.*, No. CIV.A. 3:06CV0533-D, 2008 WL 631237, at *2 (N.D. Tex. Mar. 3, 2008) (sanctions serve not only as a remedy for harm caused in the case at issue but "also as a deterrent to future litigants who might consider engaging in similar conduct."); *citing Jimenez v. Madison Area Tech. Coll.,* 321 F.3d 652, 657 (7th Cir. 2003) (upholding district court's sanctions of dismissal and monetary payment against plaintiff and her attorney).

22.     In *Brown*, the Fifth Circuit upheld the district court's dismissal sanction, because the plaintiff testified falsely during his deposition.  664 F.3d at 80.  The Fifth Circuit highlighted with approval the district court's rationale:

> [D]ismissal of the entire complaint with prejudice was the only appropriate sanction commensurate with Brown's serious misconduct.  The district court also explained that this severe sanction was necessary under deterrence and

institutional integrity rationales. Under the deterrence rationale, the court explained that "not everyone like Brown will be caught," so "when [perjury] is discovered, the penalty needs to be severe enough to deter such conduct." Regarding the protection of the judicial process against abuse, the court stated that "[t]he proper administration of justice depends on people testifying truthfully under oath."

*Id*. at 78-79. "[A] terminating sanction is justified in only the most egregious cases, such as where a party has engaged in perjury, tampering with evidence, or intentionally destroying evidence by burning, shredding, or wiping out computer hard drives." *Quantlab Technolgies Ltd. v. Godlevsky*, No. 4:09-CV-4039, 2014 WL 651944, at *9 (S.D. Tex. Feb. 19, 2014) (quoting *Pension Comm. Of Univ. of Montreal Pension Plan v. Banc. Of Am. Sec.*, 685 F. Supp. 2d 456, 469-70 (S.D.N.Y. 2010)).

22.     This is one of those "most egregious cases."

## XI.
## BATTS' ACTIONS WARRANT A DISMISSAL WITH PREJUDICE AND IMPOSITION OF MONETARY SANCTIONS

23.     His entire Facebook reveals Batts to be experienced with firearms and ammunition (Exhibit 14). Batts knew improperly reloaded ammunition could be dangerous (Exhibit 4, p. 17-19, 37-38, 71-76). Remington's owner's manual for Batts' rifle, which Batts had read, warns about those very dangers (*Id.*, p. 71-76). And what warning can be more robust about any rounds of ammunition than when one of those actual rounds is fired and its bullet sticks in the barrel?

24.     Batts most assuredly knew that the failure of the first hand reloaded round he fired from the rifle would be damning evidence in the legal action against Remington he was already contemplating. The very day after his incident, he posted on his Facebook page, "Ok here is the update, I am not going into details until I have the weapon inspected for mfg defects…" (Exhibit 14, p. 53). Under his November 20, 2015 post, Batts wrote, "For legal reasons I'm not going to give make or model but it's not a semi auto or machine gun." (*Id.*). So, with legal action already

on his mind, the day after the incident Batts took to Facebook and started to spin his story, telling the world that he was using "factory ammo."  (*Id.*, p. 53-54).

25.     Batts knew this to be untrue and that he had spoken too soon.  He realized he could not sell that piece of his story.  Batts' ammunition had different cartridges marked for another caliber.  They had been resized.  Even Batts agrees that the different cartridge cases tell him the ammunition was reloaded ammunition[6] (Exhibit 4, p. 124-25).

26.     Anticipating he would be unable to convince anyone in his legal action against Remington he was using "factory ammo" and knowing he could certainly not admit he reloaded the ammunition himself, Batts would say he bought the ammunition from a seller at a gun show. He was confident no one could track down an unknown seller at an unknown gun show, especially without a receipt or product packaging to produce.  He could just say that, at the time of purchase, he did not know if he was purchasing factory or reloaded ammunition.  That was his later testimony under oath (Exhibit 4, p. 37, 66).

27.     Batts would also deny he ever reloaded any rifle ammunition, including .300 Blackout.  It is perhaps for that reason he took down his Facebook page before his deposition (Exhibit 4, p. 120).  Batts probably thought he was in the clear when he answered initial written discovery and denied ever reloading rifle ammunition.  He continued that falsehood under oath during his January 2019 deposition.  As shown by Batts' photographs and comments on his own Facebook post in March 2016 and by Captain Craycraft's declaration, Batts did reload rifle ammunition, including .300 Blackout.

---

[6] Both Powell and Watkins also knew by just the ammunition's visual appearance that the rounds were reloads.  (Doc. 26-4, p. 4, 29, 32, 48-49; Doc. 26-2 and 26-3; Exhibit 19, p. 1, 4).

28.     Thinking he could back off his impulsive, one-day-post-incident statement he was using "factory ammo" and still avoid responsibility for using his own reloaded ammunition by denying he reloaded rifle ammunition, Batts understood he needed to take care of an important loose end – the damning video, GOPR5587, that so clearly showed the very first round he fired from the rifle was a bad round; a squib round whose bullet stuck in the barrel.  Thus, Batts' falsification of evidence began on or about December 12, 2015, when, in control of the SD card from his GoPro video camera, he tried to delete that video.[7]

29.     Batts filed suit and provided false answers to interrogatories.  Batts testified falsely, repeatedly, under oath.  Each of his falsehoods was an attempt to conceal material facts regarding the origin and functioning of the hand reloaded ammunition he used at the time of the incident. He denied he recorded the first shot.  He denied he had experienced a squib round.  He said the first shot fired normally and had the same recoil as the second shot.  He denied reloading .300 Blackout ammunition or any rifle ammunition.  He even made-up a story about going down range after he fired the first shot to check that bullet's impact near the down range target when, in fact, the recovered Deleted Video shows the bullet never left the barrel.  Batts continued to conceal the facts and circumstances of that first shot throughout his deposition – and afterward.

30.     Despite being presented with Game Warden Langford's report stating there was a witness who said Batts pushed a previously lodged round out of rifle's barrel, despite knowing that experts were examining his SD card, and despite being presented with pointed requests for admissions, Batts continued to lie three months after his false deposition testimony when he answered requests for admissions.  Astonishingly, to say the least, Batts denied (and continues to deny) recording file GOPR5587 on his SD card while admitting he recorded files GOPR5586 and

---

[7] One can surmise that Batts thought his plan would pay off, if only he could find an "expert" who would not ask questions and who would support his story, and he found one.

GOPR5588 (the Incident Video).  He provided and continues to provide a false denial about his false testimony.  Equally bewildering, Batts does not deny the Deleted Video recorded him experiencing a squib load on his first shot.  Instead, he states "Plaintiff has made reasonable inquiry and the readily known or obtainable information is insufficient to enable Plaintiff to admit or deny the Request."[8]  *What* exactly does *that* mean?  It means he was continuing his efforts to hide the true facts.

31.    Batts has never attempted to correct his deposition testimony.  To this day, even after being presented with the recovered GoPro video, his own Facebook pages, and his fellow soldier's Declaration, Batts has never amended any of his false testimony or discovery responses.

32.    Batts' contumacious conduct has been a deliberate, continued scheme to destroy and conceal material evidence and to lie repeatedly about it.  Beyond his web of false statements, Batts' conduct goes even deeper into the abyss.  He attempted to destroy unfavorable material evidence by trying to delete and conceal forever the GoPro video of his first shot from the rifle.  Batts' conduct has been an attempt to conceal material facts about the most important aspect of his case -- whether the ammunition functioned properly.  Batts' conduct is of the exact sort for which the dismissal sanction is intended.

33.    Because of Batts' conduct and false statements, Remington has incurred great expense.  Remington has incurred costs in terms of expert fees and expenses and attorneys' fees and expenses.  Remington retained two experts to examine the SD card to determine if any videos had been "deleted" and, if so, whether they could be recovered.  Remington's mechanical engineering expert was required to conduct testing to determine the cause of the incident and

---

[8] Any excuse Batts was careless or simply forgot he recorded GOPR5587, at this point, is fanciful considering the material content of the recovered Deleted Video, his fabrications and dishonesty about its content, and falsehoods in written discovery and during his deposition.

whether it was caused by improperly formed and reloaded ammunition. Remington produced two employees for depositions. None of these expenses would have been necessary if Batts had not tried to delete video GOPR5587 (or, at least, had come clean about its existence and the squib load it depicted), if he had testified truthfully, or if he had answered written discovery truthfully. This is evident by the fact that, only after being provided with Game Warden Langford's report, the recovered Deleted Video, Remington's experts' reports, Batts' own Facebook pages, *and* Captain Craycraft's Declaration, Batts' attorney "de-designated" Powell and moved to withdraw as Batts' counsel. Batts should have never brought this lawsuit.

34. Remington requests Plaintiff's lawsuit be dismissed with prejudice and Remington be awarded costs and attorneys' fees it has incurred in connection with this lawsuit.

## XII.
## RULE 37 REQUIRES THE COURT TO DISMISS BATTS' ACTION AND TO ASSESS FEES & COSTS

35. Beyond the Court's inherent power to fashion the appropriate sanctions, Fed. R. Civ. P. 37 requires an award of sanctions and permits a dismissal. The Rule reads in pertinent part (emphasis added):

(c)    FAILURE TO DISCLOSE, TO SUPPLEMENT AN EARLIER RESPONSE, OR TO ADMIT.

(1)    *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A)    may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B)    may inform the jury of the party's failure; and

(C)  may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi)[9].

(2)  *Failure to Admit.* If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court **must** so order unless:

(A)  the request was held objectionable under Rule 36(a);
(B)  the admission sought was of no substantial importance;
(C)  the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or
(D)  there was other good reason for the failure to admit.

36.     For reasons discussed above, under Rule 37 Remington is entitled to a dismissal with prejudice and an award of its costs and attorneys' fees.

## XIII.
## CONCLUSION

37.     Abraham Lincoln was spot-on.  "*Important principles may, and must, be inflexible.*"  Truthfulness in sworn testimony is one of those principles.  Batts was not and has not been truthful at any stage of these proceedings against Remington.  He has known all along that the ammunition he was using when he was injured was bad ammunition he himself had reloaded.  Remington is entitled to a dismissal with prejudice and reimbursement for the attorneys' fees, experts' fees, and costs it has incurred.[10]

WHEREFORE, for the foregoing reasons, Remington requests this court to enter an Order:

(1)     Dismissing Plaintiff's lawsuit with prejudice;

(2)     Ordering Plaintiff Jon Batts to reimburse Remington for all of its attorneys' fees incurred in this matter, including the preparation of this motion;

---

[9] This part of Rule 37 allows for sanctions including dismissal and contempt of court.

[10] Remington stands ready for a prove up of any fees and expenses this Court might award.

(3)     Ordering Plaintiff Jon Batts to reimburse Remington for all of its costs incurred in

this matter, including all payments to its experts;

(4)     Granting Remington's motion to exclude the opinions of Plaintiff's expert, Charles

Powell (Doc. 26); and

(5)     Granting any other relief the Court deems proper.

August 30, 2019.                                  Respectfully submitted,


By: */s/   Steven E. Danekas*
Steven E. Danekas, Admitted *Pro Hac Vice*
Illinois Bar No. 6180496
Email:  sdanekas@smbtrials.com

OF COUNSEL:
SWANSON MARTIN & BELL, LLP
330 North Wabash, Suite 3300
Chicago, Illinois 60611
312-923-8273
Fax 312-321-3973

and

Mitchell C. Chaney
Texas Bar No. 04107500
Email:  MChaney@mcginnislaw.com

OF COUNSEL:
MCGINNIS LOCHRIDGE
600 Congress Avenue, Suite 2100
Austin, TX   78701
512.495.6198
Fax 512.499.7998

***ATTORNEYS FOR DEFENDANT
REMINGTON ARMS COMPANY, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on this the 30th day of August 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

RAD LAW FIRM
Robert M. Meador
8001 LBJ Freeway, Suite 300
Dallas, Texas  75251
972-661-1111
972-354-5651 Fax
rmeador@radlawfirm.com
efileRM@radlawfirm.com

*ATTORNEY FOR PLAINTIFF JON BATTS*

/s/ *Mitchell C. Chaney*
Mitchell C. Chaney